Paul Conable, OSB No. 975368
  Direct:  503.802.2188
  Email:  paul.conable@tonkon.com
Steven D. Olson, OSB No. 003410
  Direct:  503.802.2159
  Email:  steven.olson@tonkon.com
Tonkon Torp LLP
1300 SW Fifth Ave., Suite 2400
Portland, OR 97201
Facsimile:  503.274.8779

    *Motion for admission pro hac vice forth-
coming*

*Attorneys for Plaintiff*

Susan Cook*
  Email:  susan.cook@hoganlovells.com
Jessica L. Ellsworth*
  Email:  jessica.ellsworth@hoganlovells.com
Alexander V. Sverdlov*
  Email:  aleks.sverdlov@hoganlovells.com
Marlan Golden*
  Email:  marlan.golden@hoganlovells.com
Jacob T. Young*
  Email: jake.young@hoganlovells.com
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-5600

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(PORTLAND DIVISION)

| | |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>        Plaintiff,<br><br>   v.<br><br>OREGON BOARD OF PHARMACY PRESIDENT RICHARD JOYCE, in his official capacity; OREGON BOARD OF PHARMACY VICE PRESIDENT AMY KIRKBRIDE, in her official capacity; and MEMBERS OF THE OREGON BOARD OF PHARMACY KATHLEEN CHINN, JENNIFER HALL, VICTORIA KROEGER, PRIYAL PATEL, ANA PINEDO, and BRYAN SMITH, in their official capacities.<br><br>        Defendants. | Civil No. 3:25-cv-01330<br><br>**VERIFIED COMPLAINT** |

Novartis Pharmaceuticals Corporation (Novartis) brings this complaint against Defendants Richard Joyce, in his official capacity as President of the Oregon Board of Pharmacy; Amy Kirkbride, in her official capacity as Vice President of the Oregon Board of Pharmacy; and Kathleen Chinn, Jennifer Hall, Victoria Kroeger, Priyal Patel, Ana Pinedo, and Bryan Smith, in their official capacities as members of the Oregon Board of Pharmacy.  Novartis seeks preliminary and permanent injunctive relief preventing enforcement of Oregon's recently enacted H.B. 2385. Novartis alleges as follows:

## PRELIMINARY STATEMENT

1.      Under the federal statute that creates and governs the 340B Drug Pricing Program, pharmaceutical manufacturers must offer to sell certain drugs at low prices to statutorily defined types of healthcare providers.  The 340B Program is governed exclusively by federal law, under a comprehensive system of federal pricing rules, compliance obligations, and enforcement mechanisms.

2.      Everything about the 340B Program is federal.  It is solely a creation of Congress, designed to address an unintended consequence of the Medicaid Drug Rebate Program, another federal drug-pricing program that Congress had also recently created.  H.R. Rep. No. 102-384(II), at *9, 12.  The 340B Program takes its name from the section of the federal Public Health Service Act containing the program's seminal language.  Congress mandated that the 340B Program be "superintended" by the federal Health Resources and Services Administration (HRSA), which is supposed to remain "in control" of the 340B Program's "drug-price prescriptions."  *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113–114 (2011).  In the 340B statute, Congress delineated the entities entitled to receive the 340B discount, the circumstances in which it must be given, and the penalties available for noncompliance.  And to give HRSA tight reins, Congress created a

"unitary administrative and enforcement scheme" meant to "centralize[ ] enforcement in the government." *Id.* at 119–120 (quotation omitted).

3.      In recent years, the 340B Program has ballooned from a niche safety-net program affecting a small minority of healthcare providers into the largest healthcare program most people have never heard of.  Almost two-thirds of U.S. hospitals now derive revenue from the program, and the total volume of 340B sales has increased to *ten times* its size in 2010.  Much of that growth has been fueled by the birth of a cottage industry of middlemen that help healthcare providers exploit the 340B Program and maximize revenue from it—in exchange for their share of the profits.

4.      Most relevant here are so-called "contract pharmacies": a type of for-profit pharmacy that contracts with a covered entity in order to expand the volume of discounts the covered entity may claim.  Contract pharmacies were not part of the 340B Program's original design.  But some covered entities claimed they could not participate in the program because they lacked an in-house pharmacy.  HRSA issued early guidance allowing covered entities to contract with one outside pharmacy, essentially to serve as its in-house pharmacy, and the 340B Program proceeded in that manner for many years.  Then in 2010, HRSA began allowing covered entities to contract with an unlimited number of pharmacies—regardless of where they are located.  This move changed the 340B Program dramatically; some covered entities now purport to have hundreds of contract pharmacies in multiple states.

5.      Contract pharmacies are based on an accounting fiction in which covered entities and their contract pharmacies purport to claim 340B discounts retroactively, long after the drug is purchased and then dispensed to patients.  Their methods of doing so employ minor variations, but follow a similar theme.  In the predominant version of the methodology, known as the

"replenishment model," pharmacies purchase drugs at the commercial price and dispense them to customers in the normal course. Later, a third-party administrator culls through claims data and purports to match up the pharmacy's dispenses with covered entities' patient list, applying an opaque set of criteria not known to manufacturers. If the third party administrator finds what it claims to be a match, the covered entity deems that unit eligible for the 340B discount—even though the drug itself was initially purchased at the commercial price. To effectuate a retroactive discount, the covered entity (or sometimes the contract pharmacy) orders a second "replenishment" unit at the low 340B price for delivery to the pharmacy. The pharmacy then intermingles the 340B-priced unit in its inventory with commercially priced units, to be dispensed to whoever next walks in the door with that prescription—whether or not that person was a patient of the covered entity. The covered entity, the contract pharmacy, and the third party administrator each have every incentive to "find" belated 340B discounts because doing so increases their profits.

6.     Contract-pharmacy arrangements therefore have nothing to do with patient access to drugs, or how much patients pay for their drugs. Patients are able to fill their prescriptions for these same drugs at the same pharmacies at the same price whether or not covered entities engage in the accounting fiction espoused by retroactive pricing models.

7.     Covered entities have no obligation to pass on 340B savings to their patients, and they generally do not. Instead, they bill insurers and government payors for the full price of the drug and pocket the difference—and most covered entities need never explain what they do with those profits. The purported "patients" often do not know they have "participated" in the program at all. In short: The only people who benefit from the contract-pharmacy arrangement are covered entities, contract pharmacies, and the third-party administrators who service them. Patients get the

same drugs at the same prices at the same locations, whether or not their pharmacy is deemed a contract pharmacy or their transaction is at some point deemed a 340B-eligible sale.

8.      Contract pharmacies have fueled the 340B Program's breakneck growth—most of which has occurred outside the boundaries Congress drew for the program.  That is because contract pharmacies create the kind of pricing opacity that allows program misuse to thrive, with predictable results:  The 340B Program has been beset by fraud, waste, and abuse, as the federal government and many private analysts have repeatedly found.

9.      With that as backdrop, both the D.C. Circuit and the Third Circuit have recognized that the federal 340B statute gives manufacturers power to place reasonable conditions on contract-pharmacy arrangements in order to rein in this abuse.  *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696 (3d Cir. 2023).  In particular, in a lawsuit brought by Novartis, the D.C. Circuit expressly held that federal law does not require manufacturers to recognize an unlimited number of contract-pharmacy arrangements in order to comply with federal law.  *Novartis*, 102 F.4th at 459.

10.     In light of that ruling, Novartis began limiting contract-pharmacy arrangements to something closer to their historical role in the 340B Program.  Novartis also took steps to increase program transparency and accountability.  Corporate beneficiaries of unlimited contract-pharmacy arrangements—contract pharmacies and other middlemen, but emphatically *not* patients—have fought back by trying to come up with creative ways to try to keep the 340B spigot overflowing.

11.     Enter H.B. 2385.  This new Oregon law purports to force manufacturers to do what the federal courts found Congress intentionally gave manufacturers the power to choose *not* to do: recognize unlimited contract-pharmacy arrangements, with the dramatic expansion of 340B

pricing that entails.  H.B. 2385 would turn federalism on its head; states cannot override Congress's policy choices—especially in a closed system like 340B.

12.    H.B. 2385 is a state drug-pricing statute.  It requires manufacturers to recognize an unlimited number of contract pharmacy arrangements—thus greatly expanding the amount of 340B discounts manufacturers must provide in Oregon, including ones the federal statute does not require.  To do this is to sweep ordinary drug sales that would otherwise occur outside the 340B Program into the program's ambit.  And this is solely an issue of price, not delivery.  The exact same drugs at issue are already being delivered to the same pharmacies, and the same sales to customers at the same price would occur regardless of H.B. 2385.  The only thing that distinguishes a "340B" drug from a non-"340B" drug under H.B. 2385 is the discount a *covered entity*—not a patient—claims on it after it is dispensed.

13.    H.B. 2385 also contains its own enforcement scheme—and it authorizes potentially drastic sanctions.  H.B. 2385 thus replaces Congress's "unitary" design with a fractal set of overlapping and potentially contradictory adjudications.  That directly contravenes the Supreme Court's holding that enforcement of the 340B statute rests with the federal government alone. *Astra*, 563 U.S. at 119–120.  Both the significant expansion of penalties and the decentralized nature of the enforcement scheme improperly override the plain language of the 340B statute, congressional intent, and binding Supreme Court authority.

14.    H.B. 2385 would roll back manufacturers' efforts—upheld by two federal courts of appeals—to bolster transparency in 340B pricing, too.  Among other things, H.B. 2385 prohibits manufacturers from requiring a 340B entity to "submit a claim or utilization review data as a condition" for recognizing 340B pricing.  The resulting harms are wide-ranging and devastating:  Federal 340B enforcement mechanisms would become nugatory—dealing still further damage to

Congress's centralized design. And the fraud, waste, and abuse that have plagued the 340B Program for years will be permitted to continue accelerating.

15.    H.B. 2385 repeatedly conflicts with Congress's design. The Oregon law attempts to refashion the 340B Program by dictating who can participate, on what terms they can participate, and the consequences of noncompliance. Carried to its logical conclusion, that effort would transform the federal 340B Program into 56 separate drug-pricing programs—one for each state, inhabited territory, and the District of Columbia. That is not the law Congress passed, and the Supremacy Clause of the U.S. Constitution does not permit that result.

16.    None of this is how Congress intended the 340B Program to work. For starters, the 340B Program is a paradigmatically federal field, and Congress intended exclusive federal governance.

17.    The overwhelmingly federal nature of this subject is apparent from the face of H.B. 2385. It is impossible to explain what H.B. 2385 does without explaining the federal 340B Program first; H.B. 2385 defines "covered entity" and "340B drug" exclusively by reference to the federal statute, leaving the reader to consult federal law to make sense of its state-law mandates. Yet states are not free to tinker with federal requirements as they see fit.

18.    H.B. 2385 also violates the dormant Commerce Clause. The state law reaches beyond Oregon's borders by capping the prices that out-of-state manufacturers can charge their out-of-state wholesalers. It discriminates against non-Oregon economic interests by forcing the out-of-state pharmaceutical industry to subsidize in-state hospitals and pharmacies. And it burdens interstate commerce by subjecting manufacturers to a patchwork of fractalized state regulation— all without providing any legitimate local benefit.

19.    Absent immediate judicial intervention enjoining H.B. 2385, Novartis will suffer irreparable harm.  Once the law takes effect on **September 26, 2025,** Novartis will risk violating Oregon law—and incurring serious penalties—merely by maintaining a 340B policy with reasonable guardrails that have already been declared lawful by federal courts applying the federal 340B statute.  If H.B. 2385 is not enjoined, that irreparable harm will include an ongoing loss of Novartis's constitutional rights and unrecoverable administrative costs as Novartis scrambles to navigate a motley, continuously shifting regulatory landscape.  Novartis therefore requests a preliminary injunction enjoining enforcement of H.B. 2385 pending a decision on the merits of its claims.

20.    For all these reasons, Novartis seeks a declaration that H.B. 2385 is unconstitutional and a preliminary and permanent injunction barring Defendants from enforcing it against Novartis.

## PARTIES

21.    Plaintiff Novartis Pharmaceuticals Corporation is a corporation organized in Delaware with its principal place of business at 59 Route 10, East Hanover, New Jersey 07936.  Novartis's mission is to reimagine medicine to improve and extend people's lives.

22.    Defendant Richard Joyce is the President of the Oregon Board of Pharmacy.  Defendant Amy Kirkbride is the Vice President of the Oregon Board of Pharmacy.  Defendants Kathleen Chinn, Jennifer Hall, Victoria Kroeger, Priyal Patel, Ana Pinedo, and Bryan Smith are members of the Oregon Board of Pharmacy.  Collectively, Defendants are responsible for administering and enforcing the provisions of H.B. 2385.  Defendants maintain an office at 800 NE Oregon St., Suite 150, Portland, Oregon 97232.  Defendants are each sued in their official capacities only.

## JURISDICTION AND VENUE

23.    This Court has jurisdiction under 28 U.S.C. § 1331, because this civil action arises under the laws of the United States, and under 28 U.S.C. §§ 2201–02, because this is an actual,

justiciable controversy as to which Novartis requires a declaration of its rights by this Court and injunctive relief to prohibit Defendants from violating the U.S. Constitution.

24.     This Court also has inherent equitable power to enjoin the actions of state officials that violate the U.S. Constitution and federal law.  *Ex parte Young*, 209 U.S. 123, 159–160 (1908); *Mecinas v. Hobbs*, 30 F.4th 890, 903 (9th Cir. 2022).

25.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1) and (2) because Defendants reside in this district and because a substantial part of the events giving rise to Novartis's claims occurred in this district.  The challenged state law also purports to govern contract-pharmacy arrangements in this district.

## FACTUAL BACKGROUND

## I.     Statutory and Regulatory Background

### The 340B Program

26.     When Congress created the Medicaid Drug Rebate Program, it inadvertently disincentivized drug manufacturers from voluntarily offering reduced prices to the Department of Veterans Affairs and to charitable hospitals.  H.R. Rep. No. 102-384(II), *9–10 (1992); Milt Freudenheim, *Big Costs Imposed on Drug Makers*, N.Y. Times (Nov. 6, 1990) at D2, https://tinyurl.com/368umt5y.  Congress enacted the 340B Program in 1992 to undo that disincentive.  H.R. Rep. No. 102-384(II), *12 (1992); Pub. L. No. 102-585, § 602(a), 106 Stat. 4943, 4967 (1992).

27.     The 340B Program therefore serves a specific, deliberately balanced federal purpose.  Its core function is to regulate drug prices in a narrow category of purchases.  Pharmaceutical manufacturers must offer covered outpatient drugs to providers called "covered entities" at a deeply reduced price, known as the "ceiling price."  42 U.S.C. §§ 256b(a)(1), (a)(4), (b)(1).

28.     Federal law defines a covered entity in precise terms.  The statute lists fifteen types of healthcare providers that can be covered entities.  42 U.S.C. § 256b(a)(4).  When Congress created the program, only about 1,000 covered entities could receive the heavily reduced 340B ceiling prices.[1]  The statute's enumeration of covered entities continues to reflect the program's narrow purpose: to support care for specific types of under-resourced patients.  *Id.*; *see also, e.g.*, 42 U.S.C. § 256b(a)(4) (listing AIDS drug purchasing assistance programs, hemophilia diagnostic treatment centers, black-lung clinics, and Native Hawaiian Health Centers, among others).

29.     Federal law also prescribes a statutory formula for calculating 340B ceiling prices. 42 U.S.C. § 256b(a)(2); 42 C.F.R. § 10.10(a).  Ceiling prices can drop as low as a penny per drug. 340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary Penalties Regulation, 82 Fed. Reg. 1,210, 1,215 (Jan. 5, 2017).  Covered entities, however, have no obligation to pass those savings on to patients,[2] and they mostly do not.[3]

30.     Manufacturers need not offer 340B prices to anyone other than a covered entity. 42 U.S.C. § 256b(a)(1).  The statutory definition of a covered entity is expressly limited to providers that fit one of the types listed in the statute and also "meet[ ]" enumerated compliance "requirements."  *Id.* §§ 256b(a)(4)–(5).

31.     Three compliance requirements are especially relevant here.  First, covered entities may not "duplicate" discounts by requesting 340B prices on drugs that will be billed to Medicaid and subject to a rebate claim paid by the manufacturer.  *See* 42 U.S.C. § 256b(a)(5)(A).  Second,

---

[1]  Ryan P. Knox et al., *Outcomes of the 340B Drug Pricing Program*, 4(11):e233716 JAMA Health F., at 4 (Nov. 2023), https://tinyurl.com/mwrfzwym.

[2]  Rena M. Conti & Peter B. Bach, *Cost Consequences of the 340B Drug Discount Program*, 309 JAMA 1995, 1995 (2013), https://tinyurl.com/yc2t8b35.

[3]  Rory Martin & Kepler Illich, IQVIA, *Are Discounts in the 340B Drug Discount Program Being Shared with Patients at Contract Pharmacies?* 11–12 (2022), https://tinyurl.com/4bfbz7yz.

covered entities cannot "divert" 340B product by dispensing it to people who are not patients of a covered entity. *See id.* § 256b(a)(5)(B). These limitations reflect Congress's awareness of the dangerous arbitrage incentives created by the 340B Program: Covered entities can sell discounted drugs for much more to patients and payors, including Medicare and Medicaid. These anti-duplication and anti-diversion provisions are intended to ensure that 340B pricing remains contained to appropriate entities and hews to its purpose. Third, covered entities must permit manufacturers to audit records that "directly pertain to the entity's compliance" with the anti-duplication and anti-diversion prohibitions. *Id.* § 256b(a)(5)(C). This audit requirement is intended to give teeth to the first two compliance requirements and to ensure that covered entities request 340B prices only for eligible transactions.

**Federal Enforcement Mechanisms**

32.     The federal 340B statute provides for two program-enforcement mechanisms. The federal government can levy civil monetary penalties on manufacturers that knowingly and intentionally charge covered entities more than the ceiling price for drugs dispensed to 340B patients. 42 U.S.C. § 256b(d)(1)(B)(vi)(III). Manufacturers face liability of up to $7,034 "for *each instance* of overcharging a covered entity that may have occurred." *Id.* (emphasis added); *see also* Annual Civil Monetary Penalties Inflation Adjustment, 89 Fed. Reg. 64,815, 64,819 (Aug. 8, 2024) (adjusting the statutory amount for inflation). Each "order" that ultimately "results in a covered entity paying more than the ceiling price" counts as an "instance of overcharging." 42 C.F.R. § 10.11(b).

33.     Federal law also provides for an administrative-dispute resolution (ADR) process, in which 340B Program compliance can be enforced against both covered entities and manufacturers. 42 U.S.C. § 256b(d)(3). HHS has promulgated detailed regulations that structure the ADR process. 340B Drug Pricing Program, 89 Fed. Reg. 28,643 (Apr. 19, 2024); 42 C.F.R. § 10.20 *et*

*seq.* Under those regulations, a covered entity may bring an ADR claim against a manufacturer alleging that the "manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. § 10.21(a)(1). HHS's procedural regulations include a three-year statute of limitations, *id.* § 10.21(b)(1), joinder rules, *id.* § 10.21(c), timelines for responses, § 10.21(e), covered entities' ability to request discovery from manufacturers, *id.* § 10.22, and a mechanism for appealing adverse decisions to the HRSA Administrator, *id.* § 10.24. A final decision by the HRSA Administrator constitutes final agency action reviewable in federal court under the Administrative Procedure Act. *See id.* § 10.24(e); 5 U.S.C. § 704.

34. Manufacturers' ability to bring an ADR proceeding depends on their ability to get timely information about covered entities' transactions. Federal law prevents a manufacturer from initiating ADR proceedings against a covered entity unless it has first audited that entity. 42 U.S.C. § 256b(d)(3)(B)(iv). And by regulation, HRSA requires manufacturers to first show "reasonable cause" to initiate an audit by adducing "sufficient facts and evidence in support" of a claim that a covered entity has misused the 340B Program. Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed. Reg. 65,406, 65,410 (Dec. 12, 1996) (Audit Guidelines). A manufacturer therefore cannot begin an audit—or, by extension, ADR proceedings—unless it first has enough data to substantiate concerns about a covered entity's transactions.

**Contract-Pharmacy Arrangements**

35. At the 340B Program's inception, covered entities dispensed 340B-priced drugs only from their in-house pharmacies. That is unsurprising. The 340B statute's "language suggests that [Congress] had in mind one-to-one transactions between a covered entity and a drug maker." *Sanofi*, 58 F.4th at 704.

36.     But covered entities without an in-house pharmacy quickly sought the ability to contract with an outside pharmacy to claim the discounts.  In 1996, HRSA finalized guidance that permitted each covered entity to contract with one outside pharmacy, so long as the pharmacy agreed to abide federal compliance standards.  Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,550 (Aug. 23, 1996).

37.     At first, covered entities and their contract pharmacies mostly used a physical-inventory model.  That is, a covered entity or its contract pharmacy physically segregated units purchased at 340B prices from units purchased at commercial prices.  Each entity then determined whether a prescription was 340B-eligible before dispensing a drug.[4]  If the prescription was 340B-eligible, the covered entity dispensed a 340B-priced unit.  Otherwise, it dispensed a commercially priced unit.

38.     Over time, contract pharmacies handling 340B-priced drugs shifted toward retroactive methods of claiming 340B pricing, including the replenishment model.  These retroactive pricing models are now the dominant methods of offering 340B pricing in Oregon.

39.     The replenishment model works like this:

    a.     The pharmacy purchases, at commercial prices, a pre-set amount of a drug. The pharmacy places the drug in common inventory—that is, the pharmacy maintains no distinction between "340B" drugs and other drugs on the pharmacy shelf.

---

[4] *See* HHS OIG, *Contract Pharmacy Arrangements in the 340B Program*, OEI-05-13-00431 at 5 (Feb. 4, 2014) (Contract Pharmacy Report), https://tinyurl.com/2nmdrcey.

b.    Over time, the pharmacy dispenses drugs from common inventory when-ever a customer arrives at the pharmacy counter with a prescription. The pharmacy does so without regard to whether the person is a patient of the covered entity or whether the prescription is 340B-eligible.

c.    A third-party administrator gathers claims data from both covered entities and contract pharmacies to analyze prior dispenses to assess which of them it thinks *could* have been 340B-eligible. That call is made through an opaque algorithm that drug manufacturers never see. And the third-party administrator is incentivized to "find" 340B eligibility as often as possible because it (like contract pharmacies) gets paid based on the number of "matches" it reports.

d.    When the third-party administrator purports to identify enough 340B-eligi-ble transactions, the covered entity orders "replenishment" units of the drug at the 340B price, nominally to make up for not receiving the discount on the original purchase.

e.    The pharmacy places the replenishment drug purchased at the 340B price in its common inventory, to be dispensed to the next customer who walks in the door (whether a patient of the covered entity or not, and whether eli-gible to receive a 340B drug or not). And the cycle begins all over again.

40.    In short, this "replenishment" model—like all retroactive pricing models—is based on an accounting trick. The upshot is that 340B drugs are dispensed without regard to 340B eli-gibility. A unit may receive 340B pricing based on the identification of a previously dispensed drug—often one dispensed long ago—as ostensibly 340B-eligible. But a pharmacy that receives

340B-priced drugs does not treat that inventory as belonging to the 340B Program, and it routinely acquires the same drugs at commercial prices irrespective of the 340B Program. As a logical outgrowth of retroactive pricing models, drugs purchased at 340B prices are not necessarily dispensed to patients of covered entities, nor does a covered entity necessarily maintain title to them. Patients, for their part, almost always pay whatever price their insurance ordinarily requires, without regard to whether their prescription was the trigger for 340B eligibility.

41.    Retroactive pricing models and their inevitable furtherance of fraud and abuse have not always been a part of the 340B Program—far from it. Covered entities originally could dispense only from their in-house pharmacies. After that, HRSA adhered to its one-contract-pharmacy limit for many years. And even that concession was "designed to facilitate program participation for those eligible covered entities that do not have access to appropriate 'inhouse' pharmacy services." 61 Fed. Reg. at 43,555. Over time, however, covered entities began pressuring HRSA to relax that longstanding restriction so as to claim the discounts on a larger number of drug sales. *See* Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,273 (March. 5, 2010).

42.    In 2010, HRSA opened the floodgates. It allowed covered entities to "pursue more complex arrangements that include multiple pharmacies," essentially placing no limit on the number of contract pharmacies that could participate in the 340B Program. *Id.* at 10,277. HRSA's decision spawned the contemporary 340B Program: an ever-growing sprawl of contract pharmacies selling drugs to anyone with a prescription, and then—with the help of third-party

administrators—retroactively deeming some of those sales 340B sales based on opaque criteria, all nominally on behalf of covered entities that may be many miles away.[5]

43.    Contract pharmacies and third-party administrators have a strong incentive to report transactions as being supposedly 340B-eligible.  Each middleman gets a cut of the 340B funds, which shapes how the program plays out in practice:  As the U.S. Court of Appeals for the D.C. Circuit has correctly noted, "[t]he covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate.  Each of these actors thus has a financial incentive to catalog as many prescriptions as possible as eligible for the discount."  *Novartis*, 102 F.4th at 457–458.

44.    Those incentives have made big business out of purporting to identify 340B-eligible transactions.  A handful of massive for-profit pharmacy chains and pharmacy benefit managers now dominates the contract-pharmacy industry.[6]  Third parties siphon a shocking share of these funds that Congress had intended to help non-profit hospitals located in underserved communities:  About 16 percent of *all* 340B "revenue" currently goes to these for-profit third parties.[7]  That share is so large that some covered entities reported a "net loss" on 340B transactions "as a result of their high external operational costs."  *Id.* at 25.  Meanwhile, Walgreens and CVS warn investors that changes to contract-pharmacy arrangements would materially hurt their bottom lines.[8]

---

[5]  *See* Sayeh Nikpay et al., *Trends in 340B Drug Pricing Contract Growth Among Retail Pharmacies from 2009 to 2022*, 4(8):e232139 JAMA Health F., at 1–2 (Aug. 4, 2023), https://ti-nyurl.com/558msvnk.

[6]  Adam Fein, *EXCLUSIVE: For 2023, Five For-Profit Retailers and PBMs Dominate an Evolving 340BContract Pharmacy Market*, Drug Channels (July 11, 2023), https://tinyurl.com/5n6hfmtd.

[7]  Minnesota Dep't of Health, *340B Covered Entity Report* 9 (Nov. 25, 2024) https://www.health.state.mn.us/data/340b/docs/2024report.pdf.

[8]  CVS Health, *2024 Annual Report* 23 (Feb. 12, 2025) ("A reduction in Covered Entities' participation in contract pharmacy arrangements . . . could materially and adversely affect the

45.    For-profit third parties' work occurs largely in secret.  Under retroactive pricing models, covered entities typically do not tell manufacturers which specific transactions they have identified as 340B-eligible or why—either before or after demanding that manufacturers effectuate 340B pricing for a past purchase.  In other words, the covered entities and their cohorts are demanding that manufacturers offer significant discounts—sometimes as low as a penny per pill—without providing even the most basic documentation showing the sale's eligibility for this discount.  No legitimate business would or could operate in this manner.

46.    As a result, "[t]ransparency in the 340B Program is being compromised . . . by a lack of publicly available data, including" data showing "which claims are 340B-eligible."  Martin & Illich, *supra* n.3, at 12.  Even "patients are often unaware that they have participated in the 340B Program at all."[9]

**Runaway Growth and Compliance Problems**

47.    The predictable result of all this clandestine profit-seeking has been accelerating growth of the 340B Program—driven largely by misuse.

48.    When HRSA unleashed unlimited contract-pharmacy arrangements in 2010, total 340B spending was about $6.6 billion.[10]  That volume multiplied *tenfold* by 2023: $66.3 billion.[11]

---

Company."), https://tinyurl.com/2s396dp2; Walgreens Boots Alliance, *2024 Annual Report* 35 (Oct. 15, 2024) (similar), https://tinyurl.com/32nssxjm.

[9]  Neal Masia, Alliance for Integrity & Reform, *340B Drug Pricing Program: Analysis Reveals $40 Billion in Profits in 2019* 2, https://tinyurl.com/7cc3dw2t.

[10]  Rebecca Sachs & Joshua Varcie, Congressional Budget Off., *Spending in the 340B Drug Pricing Program, 2010 to 2021* 2 (June 17, 2024) (CBO Report), https://tinyurl.com/ykt2d4v9.

[11]  Adam Fein, *The 340B Program Reached $66 Billion in 2023—Up 23% vs. 2022*, Drug Channels (Oct. 22, 2024), https://tinyurl.com/mryxdh34.

In just the last five years of available data, 340B volume grew by *over 129 percent*.[12]  The 340B

Program is now the second-largest federal drug-pricing program, behind only Medicare Part D

(and not by much).[13]  Thus, it is larger than Medicaid and Medicare Part B—even though access

to those programs is supposed to be the incentive for manufacturers to participate in the 340B

Program.  *See* 42 U.S.C. §§ 1396r-8(a)(1), (5)(A).

49.    Contract-pharmacy arrangements exploded alongside 340B Program growth.  According to the federal Government Accountability Office (GAO), only about 1,300 such relationships existed in 2010.  GAO, *340B Discount Program: Oversight of the Intersection with the Medicaid Drug Rebate Program Needs Improvement*, GAO-20-212 at 2 (Jan. 2020) (GAO 2020 Report), https://www.gao.gov/assets/gao-20-212.pdf.  The same number is now about 35,000.[14]

50.    This contract-pharmacy eruption presents serious federal compliance concerns, as federal agencies have repeatedly recognized.  For example, GAO has tied the increase in contract-pharmacy arrangements to increased "potential for duplicate discounts."  *See* GAO 2020 Report, *supra* ¶ 51, at 2; *see also id.* at 32–33 (noting that dispenses at contract pharmacies often do not produce data that allows stakeholders "to detect potential duplicate discounts").  HHS OIG, too, found that the proliferation of contract pharmacies "create[s] complications in preventing" both unlawful "diversion" and "duplicate discounts."  Contract Pharmacy Report, *supra* n.4, at 1–2.

51.    To see why, consider that "contract pharmacies are more likely" than in-house covered-entity pharmacies "to serve both patients of covered entities and others in the community."

---

[12] Rory Martin & Harish Karne, IQVIA, *The 340B Drug Discount Program Grew to $124B in 2023* (May 31, 2024), https://tinyurl.com/3b8zcu5a.

[13]  Ashley Flint et al., *340B Purchase Data Highlights Continued Program Growth*, Avalere Health (Oct. 24, 2024), https://tinyurl.com/yzwt66mf.

[14]  Milena Sullivan et al., *Contract Pharmacy Trends May Help Inform 340B Reform Debate*, Avalere Health (June 10, 2024), https://tinyurl.com/3umyyrvc.

GAO, *Drug Pricing: Manufacturer Discounts in the 340B Program Offer Benefits, but Federal Oversight Needs Improvement*, GAO-11-836 at 28 (Sept. 2011), https://www.gao.gov/assets/d11836.pdf. When that fact is combined with the opacity of retroactive pricing models, it results in ample opportunities to claim 340B pricing inappropriately. The D.C. Circuit has noted a helpful example: "[S]uppose a physician practices at a covered entity and somewhere else. The physician writes a prescription for a patient of his private practice. Yet the contract pharmacy, connecting the physician to the covered entity, classifies the prescription as eligible for the discount." *Novartis*, 102 F.4th at 458.

52.    Under those circumstances, 340B noncompliance has become routine. In just one seven-year span, HHS audits found over 1,500 instances of 340B Program noncompliance, including 429 instances of duplication. GAO, *HHS Uses Multiple Mechanisms to Help Ensure Compliance with 340B Requirements*, GAO-21-107 at 14 (Dec. 2020), https://www.gao.gov/assets/gao-21-107.pdf. Given the low volume of government audits,[15] those findings suggest huge rates of noncompliance. The available evidence confirms as much: In 2021, "[m]ore than 60 percent of audited covered entities had at least one adverse finding."[16] In short, 340B "discount errors" have become "likely" and "duplicate discounts" are now "quite common."[17]

---

[15]  HHS audits only about 200 covered entities per year. Decl. of Krista M. Pedley, *Sanofi-Aventis U.S., LLC v. HHS*, No. 3:21-CV-634 (D.N.J. July 6, 2021), ECF No. 93-2 ¶ 6. HHS also does not audit for duplication in Medicaid managed care, which accounts for the majority of Medicaid utilization. GAO, *Drug Discount Program: Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement*, GAO-18-480 at 25 (June 2018).

[16]  Lindsay Bealor Greenleaf, *Analysis of FY 2021 HRSA 340B Covered Entity Audits*, ADVI (Feb. 23, 2023), https://tinyurl.com/yc2aktnh.

[17]  House Energy & Com. Comm.*, Review of the 340B Drug Pricing Program* 36 (Jan. 10, 2018) (340B House Report), https://tinyurl.com/58rpjkfv.

53.    Unlawful duplication, in particular, has become staggering.  Some analysts estimate that three to five percent of *all* Medicaid rebates now duplicate 340B pricing.[18]  In 2020 alone, that rate amounted to between *$1.3 billion and $2.1 billion* in illegal duplicates.  *Id.*  The amount of duplication is likely much higher today because 340B purchases nearly doubled between 2020 and 2023, rising from $38 billion to $66 billion.  *See* Fein, *supra* n.11.

54.    The Congressional Budget Office recently found that "[t]wenty percent of the growth in 340B spending from 2010 to 2021 can be attributed to spending on drugs dispensed at contract pharmacies."  CBO Report, *supra* n.10, at 8.  More contract pharmacies, or fewer restrictions on contract pharmacies, means more opportunities for self-interested middlemen to "influence which prescriptions are classified as 340B."[19]  That is, after all, why many covered entities partner with for-profit third parties in the first place—they "show[ ] hospitals how to . . . boost[ ] the number of prescriptions that can qualify for discounts."  *See, e.g.*, Ellen Gabler, *How a Company Makes Millions off a Hospital Program Meant to Help the Poor*, N.Y. Times (Jan. 16, 2025), https://tinyurl.com/yv7akn6t.

55.    Hospitals have been particularly adept at milking 340B pricing spreads; one recent study found that "[h]ospitals eligible for 340B discounts obtained reimbursement-price markups that were 6.59 times . . . as high as those obtained by physician practices."[20]  More contract-pharmacy arrangements therefore means more money in the pockets of hospitals, third-party pharmacies, and third-party administrators.  It has no benefit to patients.  Worse, some evidence shows

---

[18] Ashwin Mundra, *The 340B Noncompliance Data Gap Leaves Drug Manufacturers in the Dark*, Drug Channels (Mar. 18, 2022), https://tinyurl.com/2ewmceba.

[19] *See* Aaron Vandervelde et al., Berkely Rsch. Grp., *For-Profit Pharmacy Participation in the 340B Program* 8 (Oct. 2020), https://tinyurl.com/mrxxr4rn.

[20] James C. Robinson et al., *Hospital Prices for Physician-Administered Drugs for Patients with Private Insurance*, 390 New Engl. J. of Med. 338, 344 (2024), https://tinyurl.com/33zvwnex.

"that the ability of people suffering severe economic hardship to afford needed drugs and medical care, relative to the general population, is *negatively correlated* with growth in the 340B Program."[21]

56.    After a detailed investigation into how the 340B Program works on the ground, a Senate committee recently concluded that the covered entities it studied "do not pass 340B discounts directly to their patients," and that in recent years manufacturers "have seen significant increases in 340B sales to contract pharmacies compared to direct sales to hospitals and grantees." The investigation necessarily focused on select covered entities, federal grantees, and drug manufacturers, but its "findings reveal insights into how 340B revenue flows among the largest 340B participants, and how they use this revenue on behalf of patients."[22]  Those insights culminated in the finding that "transparency and oversight concerns . . . prevent 340B discounts from translating to better access or lower costs for patients."  Senate HELP Committee Report, *supra* n.22, at 38.

57.    For all those reasons, contract-pharmacy arrangements have nothing whatsoever to do with giving patients access to drugs, or even to discounted prices on drugs.  They exist solely to benefit hospitals, pharmacies, and third party administrators at drug manufacturers' expense.

## II.    Novartis's Contract-Pharmacy Policies and Related Litigation

58.    Novartis has long been concerned about the seemingly endless growth of contract-pharmacy arrangements and the resulting abuses of the 340B Program.  It has therefore adopted policies placing reasonable limitations on contract-pharmacy arrangements to mitigate their harms

---

[21]  Bruce Levinson, *Measuring the Effectiveness of the 340B Program* 3–9 (Nov. 1, 2018) (emphasis added), https://tinyurl.com/3fnsr4nv.

[22]  Senate Health, Education, Labor & Pensions Comm., *Congress Must Act to Needed Reforms to the 340B Drug Pricing Reform* 5, 9, 32 (Apr. 2025) (Senate HELP Committee Report), https://tinyurl.com/bdd24yd4.

and to restore contract pharmacies to the place they have historically occupied in the 340B Program.

**Novartis's Prior Policies and Federal Litigation**

59.    Novartis implemented its first contract-pharmacy policy in late 2020 after notifying HRSA of its intention to do so.  Under that policy, Novartis honored contract-pharmacy arrangements only if the third-party pharmacy was within 40 miles of the covered entity.  But Novartis exempted all federal grantees and permitted other covered entities to request exemptions if justified by a specific need.

60.    Novartis explained to covered entities that its policy was a commonsense way to increase the 340B Program's transparency and integrity.  Novartis therefore requested—but did not require—that covered entities give Novartis basic claims data using an electronic platform.

61.    Covered entities complained to HRSA.  Letter from HRSA to Novartis at 1 (May 17, 2021) (2021 HRSA Letter), https://tinyurl.com/d34r9ajp.  In response, HRSA took the position that Novartis's policy violated the federal 340B statute.  *Id.*  HRSA claimed that "[n]othing in the 340B statute grants a manufacturer the right to place conditions" on offers to provide drugs at 340B prices.  *Id.*  So HRSA threatened Novartis with civil monetary penalties and ordered Novartis to "plan to restart selling, without restriction, 340B covered outpatient drugs at the 340B price to covered entities with contract pharmacy arrangements."  *Id.* at 2.

62.    Novartis challenged HRSA's 2021 letter as inconsistent with the federal 340B statute.  *Novartis Pharms. Corp. v. Espinosa*, No. 1:21-CV-1479 (D.D.C. filed May 31, 2021).  The U.S. District Court for the District of Columbia set aside HRSA's letter.  *Id.*, 2021 WL 5161783 (D.D.C. Nov. 5, 2021).  It rejected HRSA's position that the federal 340B statute "prohibit[s] . . .

manufacturers from imposing *any* conditions on their offers of 340B-priced drugs to covered en-

tities." *Id.* at *9.

63. Novartis updated its contract-pharmacy policy in 2023. Under that policy, Novartis

would ship 340B-priced drugs directly to covered entities with an in-house pharmacy. Covered

entities without an in-house pharmacy could select one contract pharmacy where Novartis would

provide 340B pricing. Novartis also elected to continue recognizing contract-pharmacy arrange-

ments between covered entities and pharmacies wholly owned and controlled by those covered

entities. Novartis again requested that covered entities provide claims data electronically.

64. About a year later, the U.S. Court of Appeals for the D.C. Circuit affirmed the

district court's decision setting aside HRSA's 2021 letter. *Novartis*, 102 F.4th 452. The D.C.

Circuit observed that a contract-pharmacy arrangement creates "a financial incentive to catalog as

many prescriptions as possible as [340B-]eligible." *Id.* at 457–58. That is because it allows "[t]he

covered entity, the pharmacy, and the third-party administrator [to] divvy up the spread between

the discounted price and the higher insurance reimbursement rate." *Id.* at 457.

65. The D.C. Circuit "reject[ed] HRSA's position that section 340B prohibits drug

manufacturers from imposing any conditions" on the use of contract pharmacies. *Novartis*, 102

F.4th at 459. HRSA was correct that the statute does not expressly tell manufacturers they may

impose such conditions. But the D.C. Circuit concluded that "this silence preserves—rather than

abrogates" manufacturers' discretion to do so. *Id.* at 460. Among other problems, HRSA's con-

trary reading would have "categorically requir[ed] manufacturers to deal with an unlimited number

of contract pharmacies"—an obligation not found in the federal statute. *See id.* at 462.

66. Despite referring to statutory "silence," the D.C. Circuit did not suggest that the

federal 340B statute leaves manufacturers' ability to condition 340B pricing *unregulated*. Rather,

the federal 340B statute requires manufacturers to "offer each covered entity covered outpatient drugs for purchase" at or below the "ceiling price."  42 U.S.C. § 256b(a)(1).  That requirement prevents manufacturers from imposing conditions so onerous that they amount to a failure to make a "bona fide offer"—for example, if the conditions "effectively increase the contract 'price,' thus perhaps nudging it above the statutory ceiling." *Novartis*, 102 F.4th at 462.  But within the range of bona fide offers, the federal 340B statute affirmatively and intentionally grants "private parties" the right to "act freely" in agreeing to contractual terms. *See id.* at 460.

67.    The D.C. Circuit expressly held Novartis's updated contract-pharmacy policy lawful.  It reasoned that limiting covered entities to in-house pharmacies or to "a single contract pharmacy . . . neither precludes Novartis from making a bona fide 'offer' nor increases its contract 'price.' " *Novartis*, 102 F.4th at 463–464.  That condition on 340B sales is "consistent with historic practices under the section 340B Program." *Id.* at 464.  It is thus within the range permitted by the federal 340B statute. *See also Sanofi*, 58 F.4th at 703–706.

**Novartis's Current Policy**

68.    Novartis further updated its contract-pharmacy policy on January 1, 2025.  Ex. 1 (2025 Policy).  This policy differs from Novartis's 2023 policy in essentially three ways.

69.    First, contract pharmacies working for covered entities subject to the policy must provide basic claims data to receive 340B-priced drugs.  These data are needed to "mitigate instances of duplicative discounts" that violate federal law, and sharing them will "increase transparency" and "help maintain the integrity and sustainability" of the 340B Program.  Ex. 1 (2025 Policy) at 1.  Novartis's decision to require these data was also influenced by the fact that covered entities mostly refused to provide such data voluntarily under Novartis's prior policies.

70. Second, Novartis clarified that a designated contract pharmacy must be one that dispenses drugs to patients. That is, covered entities cannot designate a "central fill" pharmacy—a pharmacy that distributes product to many retail pharmacy locations—in an attempt to circumvent Novartis's one-contract-pharmacy condition on 340B pricing.

71. Third, contract pharmacies wholly owned and controlled by a covered entity are no longer exempted from the policy. Novartis will not recognize arrangements between covered entities and these pharmacies unless a covered entity lacks an in-house pharmacy and designates an outside pharmacy as its single permitted contract-pharmacy location.

## III. Oregon Enacts Its Own "340B" Legislation

72. The Oregon Legislature recently passed H.B. 2385, a law that explicitly creates new state-level "340B" obligations. Oregon Legislative Information, H.B. 2385 (last visited July 25, 2025), https://tinyurl.com/y65zn2h8. This state law does not even attempt to conceal its federal subject matter. H.B. 2385 defines its key terms solely by reference to federal law. *See* H.B. 2385 §§ 1(1)(a), (c) (incorporating by reference 42 U.S.C. § 256b).

**Pricing Regulations**

73. H.B. 2385 purports to regulate pricing by forbidding manufacturers to "deny, restrict, prohibit, or otherwise interfere directly or indirectly with the acquisition of a 340B drug, delivery of a 340B drug to or dispensation of a 340B drug by" a contract pharmacy. H.B. 2385 § 1(2)(a). The statute separately defines a "340B drug" as any drug purchased at "a reduced price" by "a covered entity"—a federally defined term, as the statute acknowledges. *Id.* § 1(1)(c) (citing 42 U.S.C. § 256b). The term "[c]overed entity," H.B. 2385 announces, has the same meaning given in the federal 230B statute. *Id.* § 1(1)(a) (citing 42 U.S.C. § 256b(a)(4)).

74.    There are no "340B drugs" and "non-340B drugs."  There are only "covered out-patient drugs," which—when sold to covered entities under the terms of the federal 340B statute—are subject to discounted pricing under the federal 340B law.   The same drug that is sold to a covered entity at 340B prices is also routinely dispensed to myriad pharmacies—including the very same pharmacies covered entities purport to designate as contract pharmacies—at commercial prices.  Remember that under retroactive pricing models, contract-pharmacy arrangements are based on an accounting fiction.  Pharmacies dispense drugs *they already have in their possession* and do not even try to distinguish between 340B- and non-340B-priced inventory until long after a drug has been dispensed.  A third-party administrator culls through data post hoc and tries to match up dispenses to pharmacy customers with hospital patient information to identify a match.  Approaches vary on what happens when a match is purportedly found.  Typically, the covered entity (or sometimes the contract pharmacy or third party administrator) purchases a "replenish-ment" unit at the low 340B price, and the contract pharmacy then intermingles the 340B-priced drugs in its inventory with commercially priced units, to be dispensed to whoever walks in the door next with a prescription.  But these details are less important than the retroactivity itself—these machinations are solely about effectuating after-the-fact 340B pricing.

75.    Under the replenishment model, it isn't even clear which drug the covered entity would argue is the "340B drug"—the one that was purchased at commercial prices and dispensed by the pharmacy to a patient of a hospital, or the "replenishment drug" that ultimately is purchased at the 340B discount and dispensed to a non-patient of a hospital.  Covered entities do not seem to care.  The point is simply for covered entities, pharmacies, and third party administrators to claim the 340B discount on as many transactions as possible.

76.     This provision of H.B. 2385 therefore purports to require manufacturers to give the 340B discount (through their distributors) on more transactions than federal law requires and will also almost certainly require discounts that federal law expressly prohibits, such as discounts that duplicate drug rebates under Medicaid.

**Restrictions on Data Collection**

77.     H.B. 2385 also purports to make it unlawful for a manufacturer to "[r]equire, either directly or indirectly, a covered entity to submit a claim or utilization review data as a condition" of receiving 340B pricing.  H.B. 2385 § 1(2)(b).  In other words, Novartis may not "require that all non-grantee covered entities upload their claims data" to an electronic platform.  Ex. 1 (2025 Policy) at 1.

78.     H.B. 2385 exempts data required to be submitted by the U.S. Department of Health and Human Services.  H.B. 2385 § 1(2)(b).  But this narrow carve-out does not include data that federal law authorizes, or even encourages, manufacturers to obtain.

**Enforcement Mechanisms**

79.     Manufacturers who violate H.B. 2385's sweeping provisions are subject to severe penalties.  The statute grants the State Board of Pharmacy authority to impose civil monetary penalties up to $5,000 per day on a manufacturer "for each violation."  *Id.* H.B. 2385 § 2(1).

80.     Assuming a "violation" occurs each time a manufacturer does not honor a request for 340B pricing on drugs dispensed by a contract pharmacy, the penalties could stack up quickly.  H.B. 2385's objective is thus to coerce manufacturers into operating the federal 340B Program on Oregon's terms.

## H.B. 2385 VIOLATES THE SUPREMACY CLAUSE

81.    "The Supremacy Clause provides a clear rule that federal law 'shall be the supreme law of the land . . . anything in the . . . laws of any State to the contrary notwithstanding.' " *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting U.S. Const. art. VI, cl. 2).

82.    "Congress placed the Secretary [of HHS] (acting through her designate, HRSA) in control of § 340B's drug-price prescriptions." *Astra*, 563 U.S. at 114.  If other entities were to gain power over these requirements, "[t]hat control could not be maintained." *Id.*  But that is precisely what H.B. 2385 has attempted to do: wrest control over drug pricing from federal hands and tell Oregon regulators to start calling the shots.

83.    The Supremacy Clause forbids that result.  H.B. 2385 is misguided from the start because the 340B Program is a pervasive regulatory scheme that states may not supplement or alter.  In addition, H.B. 2385 impermissibly throws up several independent obstacles to accomplishing the purposes of the 340B statute and other federal statutes.

**H.B. 2385 is Preempted Under Field Preemption Principles.**

84.    H.B. 2385 is preempted under field preemption principles.  Congressional "intent to displace state law" can be inferred from a regulatory scheme "so pervasive . . . that Congress left no room for the States to supplement it" or from a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399 (quotation omitted).  The "essential" inquiry "is "whether the density and detail of federal regulation merits the inference" that state regulation "will necessarily interfere with the federal regulatory scheme." *National Fed'n of the Blind v. United Airlines, Inc.*, 813 F.3d 718, 734 (9th Cir. 2016).

85.    The first step in a field-preemption analysis is to " 'delineat[e] the pertinent regulatory field' Congress intended to occupy by enacting" the 340B statute.  *Knox v. Brnovich*, 907 F.3d 1167, 1177 (9th Cir. 2018) (quoting *National Fed'n of the Blind*, 813 F.3d at 734).  The federal 340B statute occupies the field of the parameters of the 340B Program.  Indeed, the "field" H.B. 2385 regulates *is* federal law—the contours of the legal obligation for manufacturers to provide discounted pricing under the federal 340B statute.

86.    H.B. 2385 has no force or meaning outside of the federal 340B Program.  If Congress repealed the federal 340B statute, H.B. 2385 would cease to have any effect.  *See* H.B. 2385 § 1(c) (citing 42 U.S.C. § 256b).  H.B. 2385, in other words, "is inherently federal in character" because it regulates relationships that "originate[ ] from, [are] governed by, and terminate[ ] according to federal law."  *Nathan Kimmel, Inc. v. DowElanco*, 275 F.3d 1199, 1205 (9th Cir. 2002) (quoting *Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001)).  In that sense, it is not a generally applicable state law—it is grafted onto a federal program.  *Cf. Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 387 (2015) (broadly applicable state laws are less likely to be preempted).

87.    Field preemption here turns on whether Congress intended to regulate the program it created "to the exclusion of state law."  *Montalvo v. Spirit Airlines*, 508 F.3d 464, 470 (9th Cir. 2007).  The 340B statute's "structure and purpose" shows that to be precisely what Congress intended.  *Id.* (quoting *Cipollone v. Liggett Group, Inc.*, 505 U.S. 504, 516 (1992)).

88.    Congress created the 340B Program using its Spending Clause power.  *See Talevski ex rel. Talevski v. Health & Hosp. Corp. of Marion Cnty.*, 6 F.4th 713, 723–724 (7th Cir. 2021). The discounts the Program imposes on manufacturers are a condition of eligibility for federal funding under Medicaid and Medicare Part B.  42 U.S.C. § 1396r-8(a)(1), (5)(A).  Thus, its

requirements fit into the broader set of drug-pricing obligations the federal government packages together for manufacturers. And that is equally true of the things the federal 340B Program does *not* require. Put another way, making 340B requirements more onerous dilutes the incentive Congress created to underpin Medicaid and Medicare.

89.  The federal 340B statute sets up a pervasive and carefully integrated pricing scheme that was "designed to work as a 'harmonious whole,' " with other federal drug-pricing programs. *Valle Del Sol Inc. v. Whiting*, 732 F.3d 1006, 1024–26 (quoting *Arizona*, 567 U.S. at 401) (holding that a federal statute which was "part of a larger federal scheme" was "comprehensive and field preemptive"); *see Astra*, 563 U.S. at 120. Congress determined the ceiling price that manufacturers may charge to covered entities and decided which entities are entitled to receive that benefit. *See* 42 U.S.C. §§ 256b(a)(1), (a)(4), (b)(1). Contract pharmacies are not among them. *See id.* § 256b(a)(4). Congress balanced the pricing obligations it imposed on manufacturers with corresponding requirements on covered entities. Covered entities may not exploit the program by diverting 340B-priced drugs to persons who are not "patients of the covered entity." *Id.* § 256b(a)(5)(B). And Congress directed that manufacturers should not have to provide 340B pricing that duplicates discounts it has separately required under the Medicaid Drug Rebate Program, *id.* § 256b(a)(5)(A)(i), or the Inflation Reduction Act of 2022 (IRA), *id.* § 1320f-2(d)(1).

90.  To protect both covered entities and manufacturers, Congress also created particular enforcement mechanisms under federal power and oversight. HRSA may directly enforce the federal statute by imposing civil monetary penalties. 42 U.S.C. § 256b(d)(1)(B)(vi); 42 C.F.R. § 1003.100 *et seq.* HRSA also oversees factfinding and dispute-resolution processes initiated by regulated parties. *See id.* §§ 256b(a)(5)(C)–(D) (providing for auditing of covered entities and sanctions for noncompliance); 256b(d)(3) (establishing an ADR process).

91.    These enforcement mechanisms are exclusive. Congress intended to "centralize enforcement in the government." *Astra*, 563 U.S. at 119. It gave HHS "authority to oversee compliance" to ensure that the 340B Program is administered on a "uniform, nationwide basis," and it declined to permit "auxiliary enforcement" outside of the program. *Id.* at 117, 120.

92.    The federal 340B statute reflects the intent to retain federal control over even the marginal details of how 340B pricing is provided. Congress instructed HRSA to "establish[ ] a single, universal, and standardized identification system by which each covered entity site can be identified by manufacturers, distributors, covered entities, and the Secretary for purposes of facilitating the ordering, purchasing, and delivery of covered outpatient drugs under this section." 42 U.S.C. § 256b(d)(2)(B)(iv). The federal statute regulates every part of the transaction chain, from drug availability to pricing to delivery to enforcement and dispute resolution. The "whole tenor" of the federal 340B statute was "to create and enforce one unified system" for regulating how 340B pricing is provided. *Montalvo*, 508 F.3d at 471; *see Astra*, 563 U.S. at 117, 119–120.

93.    H.B. 2385 "necessarily interfere[s]" with that "federal regulatory scheme." *National Fed'n of the Blind*, 813 F.3d at 734 (explaining that the second step of the analysis is to "survey the scope of the federal regulation" within the pertinent field). By prohibiting manufacturers from "deny[ing], restrict[ing], [or] prohibit[ing]" a contract pharmacy from acquiring "a 340B drug," H.B. 2385 effectively *requires* manufacturers to provide the 340B discount to entities that are excluded from the federal 340B program list of covered entities. *See* H.B. 2385 § 1(2)(a); *see also* 42 U.S.C. § 256b(a)(4). The Oregon law greatly expands Congress's careful determinations about *when* and *to whom* the 340B discount is owed.

94.    In sum, Congress intended the federal 340B statute to be the sole source of the 340B Program's obligations, benefits, and operations. H.B. 2385 intrudes on that field, and it

undermines the bargain underpinning Congress's Spending Clause legislation by purporting to take away power Congress expressly gave manufacturers—the power to impose reasonable limits on covered entities' use of contract pharmacies.

**H.B. 2385 Is Preempted Under Conflict Preemption Principles.**

95.    H.B. 2385 also is preempted under conflict preemption principles.  H.B. 2385 "interferes with the methods by which . . . federal statute[s] [were] designed to reach [their] goal[s]." *International Paper Co. v. Ouellette*, 479 U.S. 481, 494 (1987).

96.    H.B. 2385 is a quintessential drug-pricing statute—it purports to control the prices at which drugs must be sold to contract pharmacies.  That H.B. 2385 refers to "delivery" and "acquisition" of 340B drugs does not change this fact.  *See* H.B. 2385 § 1(2)(a).  The only attribute that distinguishes a "340B" drug from a non-"340B" drug is its price.  *Pharmaceutical Rsch. & Mfrs. of Am. (PhRMA) v. Morrisey*, 760 F. Supp. 3d 439, 455 (S.D. W. Va. 2024) (addressing a similar West Virginia statute and finding it likely preempted by federal law).

97.    Regardless of the operations of the 340B Program or of H.B. 2385, Novartis continuously delivers (through its wholesalers) *the very same drugs at issue to the very same pharmacies impacted by Novartis's policy*.  By mandating Novartis to deliver "340B drugs" to contract pharmacies, H.B. 2385 regulates *only* the price at which those units may be sold.  Put differently, Oregon regulators could assess whether a violation of H.B. 2385 has occurred only by comparing the price Novartis charged for a drug with the federal 340B ceiling price.

98.    H.B. 2385 conflicts with federal law because it requires manufacturers to provide 340B pricing where the federal statute does not.  The federal 340B statute does not require manufacturers to provide 340B prices to unlimited contract pharmacies.  *E.g.*, *Novartis*, 102 F.4th at 461; *Sanofi*, 58 F.4th at 703; *Novartis*, 2021 WL 5161783, at *7; *AstraZeneca Pharms. LP v.*

*Becerra*, No. 21-CV-27, 543 F. Supp. 3d 47, 61 (D. Del. 2021).  But Oregon has effectively tried to add contract pharmacies to the federal 340B statute as a sixteenth type of covered entity that must be offered 340B prices.  *See* H.B. 2385 § 1(2)(a).

99.    H.B. 2385's expansion of 340B pricing is preempted because it imposes on manu-facturers "far more onerous conditions than those required by federal law."  *United States v. Su-preme Ct. of N.M.*, 839 F.3d 888, 928 (10th Cir. 2016); *see also Geier v. American Honda Motor Co.*, 529 U.S. 861, 881 (2000) (state tort law could not impose a duty not created by federal regu-lation).

100.    Similarly, allowing Oregon to determine whether particular drugs should be subject to 340B pricing "would interfere with the method by which the federal statute was designed to reach it goals"—by changing the costs and benefits of participation in the 340B Program.  *Public Util. Dist. No. 1 v. IDACORP Inc.*, 379 F.3d 641, 650 (9th Cir. 2004) (finding a state law preempted where a court was asked "to set a fair price" for electricity priced by a federal agency).

101.    H.B. 2385 further warps the federal 340B scheme by creating state-specific en-forcement pathways that conflict with the ones Congress put in place.  H.B. 2385 would allow the Oregon Board of Pharmacy to enforce a failure to provide 340B pricing by imposing stiff fines.  H.B. 2385 § 2(1).  But any enforcement proceeding to impose such fines will implicate the ques-tion whether each particular prescription is indeed a 340B drug—meaning whether the hospital qualifies as a covered entity, whether the pharmacy customer is a "patient" of the covered entity, and whether the diversion prohibition has been triggered.  Without addressing these issues, there would be no way of knowing whether a particular transaction involved a "340B drug."  *See id.* §§ 1(1)(c); (2)(a)–(b).

102.    None of that is consistent with federal law, which reflects a delicate balancing of competing interests.  Congress created penalties for non-compliance, but elected not make them so draconian that it would disincentivize participation in Medicaid and Medicare Part B.  Congress explained exactly how the requirement to offer covered entities drugs at 340B prices should be enforced:  (1) HHS may impose "sanctions in the form of civil monetary penalties" in specified amounts according to processes defined by regulation.[23]  Or (2) covered entities may bring ADR claims alleging overcharges for 340B-eligible drugs.  42 U.S.C. § 256b(d)(3)(A).  The ADR procedures, too, are exhaustively defined by regulation.  340B Drug Pricing Program, 89 Fed. Reg. 28,643 (Apr. 19, 2024); 42 C.F.R. § 10.20 *et seq.*  The availability of this enforcement mechanism is a concrete concern; multiple covered entities have already filed ADR challenges to Novartis's contract-pharmacy policies, which H.B. 2385 also purports to govern.[24]

103.    When Congress expressly provides for methods of enforcing a statute, courts presume those methods are exclusive.  *See, e.g.*, *Middlesex Cnty. Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981).  And states do not have the power to enforce federal law unless Congress clearly provides otherwise.  *See, e.g.*, *Hawaii v. Standard Oil Co.*, 405 U.S. 251, 263–264 (1972).  The federal 340B statute contains no suggestion that Congress intended to do so here—let alone a clear statement.  *See generally* 42 U.S.C. § 256b.

---

[23]  42 U.S.C. § 256b(d)(1)(B)(vi); 42 C.F.R. § 1003.100 *et seq.*; 340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary Penalties Regulation, 82 Fed. Reg. 1,210, 1,220 (Jan. 5, 2017).

[24]  Novartis AG, *U.S. SEC Form 20-F 2024* F-45 (Jan. 30, 2025), https://tinyurl.com/5n7r3s45. HRSA has now adopted manufacturers' understanding of federal law, *see* HRSA, *340B ADR Decision Summaries* (last updated May 15, 2025), https://tinyurl.com/2b9e24ec, and concluded there was no overcharge violation.

104.    The Supreme Court has confirmed as much.  When a county that operated 340B covered entities sued manufacturers to enforce its interpretation of 340B pricing requirements outside of the statutory federal enforcement mechanisms, the Court held such suits were "incompatible with the statutory scheme." *Astra*, 563 U.S. at 113.  It expressly adopted the Solicitor General's position regarding the federal 340B statute:  "Congress centralized enforcement in the government," and allowing other entities to diffuse that power "would be inconsistent with that intent." Brief for the United States as Amicus Curiae Supporting Petitioners at 32, *Astra USA, Inc. v. Santa Clara County*, 550 U.S. 110 (2011) (No. 09-1273), https://tinyurl.com/3h8numnj; *see also Astra*, 563 U.S. at 119.  Subverting that intent, moreover, "could spawn a multitude of dispersed and uncoordinated lawsuits," posing a "substantial" "risk of conflicting adjudications." *Astra*, 563 U.S. at 120.

105.    The risk of conflicting adjudications here is profound.  Because H.B. 2385 borrows most of its content from federal law, it cannot be enforced without answering a number of federal questions that HHS might—and in many cases likely would—answer differently.

106.    First, H.B. 2385 only applies when a particular drug is "a 340B drug."  *See* H.B. 2385 § 1(2)(a).  The state statute defines a 340B drug to mean a "drug that has been subject to an offer of a reduced price by a manufacturer" under the federal 340B statute.  *Id.* § 1(c).  A manufacturer has no obligation to provide 340B pricing where federal prohibitions on duplication or diversion are violated.  *See* 42 U.S.C. §§ 256b(a)(1), (a)(4)–(5).  Suppose a manufacturer cuts off a contract pharmacy's access to 340B-priced product because it has evidence that any of these criteria are not met.  If Oregon regulators brought proceedings to enforce H.B. 2385 in that situation, they would need to show that specific transactions involved "a 340B drug"—that is, that the manufacturer had a federal obligation to offer 340B pricing because there was no duplicate

discount, no diversion, and no fraud. Federal ADR proceedings exist to resolve those claims between manufacturers and *covered entities*, but that pathway is not available against the state. Thus, this Oregon enforcement proceeding would require a *prescription-by-prescription* analysis of the basis of a covered entity's request for 340B pricing.

107. What would happen if the Oregon Board of Pharmacy imposed liability for a transaction, but HRSA later determined in adjudicating an ADR claim that a manufacturer actually had *no* obligation to offer 340B pricing for the same transaction under federal law? A manufacturer would suffer sanctions for conduct that federal law expressly permitted. "It is difficult to envision a more perfect collision of purposes" than for a state to forbid something that federal law expressly "authorizes." *Maine Forest Prods. Council v. Cormier*, 51 F.4th 1, 10 (1st Cir. 2022). All the more so when the basis of that state rule is ostensibly *federal* law.

108. Another example: Who counts as a patient of the covered entity? The term "patient" is not expressly defined by the federal 340B statute. HRSA's guidance on the subject is prolix and qualitative. It requires consideration of whether a person "receives a health care service or range of services from the covered entity which is consistent with the service or range of services for which grant funding or Federally-qualified health center look-alike status has been provided to the entity" and whether the "only health care service received by the individual from the covered entity is the dispensing of a drug or drugs for subsequent self administration or administration in the home setting." Notice Regarding Section 602 of the Veterans Health Care Act of 1992 Patient and Entity Eligibility, 61 Fed. Reg. 55,156, 55,157–58 (Oct. 24, 1996). This issue, too, would determine whether any given prescription for which Novartis purportedly denied 340B pricing was improper under Oregon law. *See* 42 U.S.C. § 256b(a)(5)(B).

109.    Because penalties at least appear to be assessed on a per-prescription basis, H.B. 2385 will require Oregon regulators to make these determinations of purely federal questions in order to determine whether a manufacturer has violated the state statute, which is itself imper-missible.  The potential for different decisionmakers—and notably state versus federal ones—to reach different conclusions is plain.  H.B. 2385's enforcement provisions are thus "poised to upset" 340B's " 'careful regulatory scheme established by federal law,' " "not least by potentially leading to conflicting adjudications." *Morrisey*, 760 F. Supp. 3d at 459 (quoting *Geier*, 529 U.S. at 870); *see also id.* at 459–460 ("The fact that executing those provisions also runs the risk of producing conflicting adjudications further demonstrates what should be apparent—the Enforcement Provi-sions cut against the Supreme Court's holding in *Astra.*").

110.    These are only a few examples of the thorny federal issues that H.B. 2385 foists upon state decisionmakers.  H.B. 2385 is so interwoven with federal questions that it is impossible even to explain what it requires without referring to federal law.

111.    Fracturing that interpretive power and doling it out to any jurisdiction that wishes to seize it is the antithesis of "Congress'[s] unitary administrative and enforcement scheme." *As-tra*, 563 U.S. at 120.  If every state enacted a law similar to H.B. 2385, that would lead to a ca-cophony of conflicting determinations on these fundamentally federal questions.

112.    H.B. 2385 also forbids manufacturers to "[r]equire" covered entities "to submit a claim or utilization review data."  H.B. 2385 § 1(2)(b).  That provision appears to foreclose the part of Novartis's contract pharmacy policy requiring "covered entities [to] upload their claims data" arising from permitted contract-pharmacy arrangements using an electronic platform.  Ex. 1 (2025 Policy) at 1.  Novartis's policy requires this data because it is needed to "increase

transparency, mitigate instances of duplicative discounts, and otherwise help maintain the integrity and sustainability of [the 340B] program." *Id.*

113.    It is important to remember that when covered entities and their contract pharmacies request 340B pricing, they are asking for a deeply discounted price—as low as a penny per unit—whose availability is carefully circumscribed by law.  Requiring such entities to provide claims data enables manufacturers to at least try to determine whether covered entities are entitled to receive that price in the first place.  It is standard industry practice—and basic common sense —that a party seeking a steep discount should provide some basic documentation demonstrating eligibility for the discount before receiving it.  Novartis's claims-data policy works in much the same way.  Under H.B. 2385, the parties seeking these millions of dollars in discounts would not need to provide *any* documentation supporting their entitlement to it.  It is unreasonable and counter to any legitimate business practice to ask that a buyer of a product receive a steep discount without providing even the most basic documentation showing this request is properly made.

114.    Novartis's policy is made all the more reasonable, and indeed necessary, by the documented lack of 340B Program integrity under the status quo.  Unlawful duplication of discounts has become routine.  Mundra, *supra* n.18.  Lack of access to even basic information—a hallmark of retroactive pricing models—is a key contributor to those compliance failures.  *See, e.g.*, 340B House Report, *supra* n.17, at 36–37.  Contract-pharmacy arrangements exacerbate the situation, as the federal government has found multiple times. *E.g.*, GAO 2020 Report, *supra* ¶ 51, at 32–33; Contract Pharmacy Report, *supra* n.4, at 1–2.

115.    H.B. 2385 impedes measures endorsed under federal law for manufacturers to ensure that they give the 340B discount only when legally required to do so.  As a result, compliance problems that the federal government has identified as unlawful and attributed in part to

unrestrained contract-pharmacy arrangements will persist because of H.B. 2385. Federal regulation requires manufacturers' enforcement efforts to begin with information gathering. If a manufacturer suspects a covered entity has violated statutory prohibitions and wishes to audit the entity, it must first amass "sufficient facts and evidence in support" of that concern. Audit Guidelines, 61 Fed. Reg. at 65,410. Only once it shows "reasonable cause" in this manner can a manufacturer initiate an audit. *Id.* And the manufacturer must complete an audit before it can access ADR proceedings. 42 U.S.C. § 256b(a)(5)(C); 42 C.F.R. § 10.21(a)(2). Each part of the private federal enforcement scheme thus hinges on the first step: data collection.

116.    But manufacturers usually do not receive enough data under retroactive pricing models to clear that first hurdle. So a manufacturer lands in a catch-22: To get evidence that a covered entity violated the federal 340B statute, it must begin an audit, but it cannot begin an audit unless it has that evidence. That is among the problems Novartis's contract-pharmacy policy addresses. By requiring covered entities and their contract pharmacies to provide claims data as a condition of receiving 340B pricing, Novartis can use the federal enforcement scheme as Congress intended.

117.    H.B. 2385 hinders federal efforts to remedy such noncompliance by prohibiting Novartis from requiring such claims data. That is a classic example of state law "stand[ing] as an obstacle to the accomplishment . . . of the full purposes and objectives of Congress." *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) (quotation omitted).

118.    It is irrelevant that H.B. 2385 purports not to exempt covered entities from sharing claims data they *must* provide under federal law. H.B. 2385 § 1(2)(b). Courts have expressly recognized that federal law permits manufacturers to collect claims data. *Novartis*, 102 F.4th at 463; *Sanofi*, 58 F.4th at 701, 706.

119.    Nor is it an answer to say that covered entities may provide claims data voluntarily, as Novartis has requested for several years.  Unsurprisingly, most covered entities have refused to do so.  Indeed, allowing covered entities—who "may be engaging in the kind of fraud that the 340B Program's alternative dispute resolution system is meant to prevent"—to decide whether to provide the very data that would support initiating an audit leaves manufacturers without much recourse.  *Morrisey*, 760 F. Supp. 3d at 453.  But the "340B Program certainly did not establish a system where the fox guards the hen house."  *Id.*

120.    If H.B. 2385 succeeds in keeping manufacturers in the dark regarding contract pharmacies' reasons for claiming 340B pricing, these enforcement mechanisms will remain largely illusory.  For that reason, H.B. 2385 "create[s] an obstacle to twin federal purposes—providing [340B prices] to covered entities only *and* prohibiting fraud through duplicate discounts."  *Morrisey*, 760 F. Supp. 3d at 452.  That is the essence of what the Supremacy Clause forbids.

## H.B. 2385 VIOLATES THE DORMANT COMMERCE CLAUSE

121.    H.B. 2385 also violates the dormant Commerce Clause.  The Commerce Clause grants Congress the power to regulate commerce among the several states.  U.S. Cont. art. I, § 8, cl. 3.  That power carries with it a "negative" or "dormant" restriction:  Even when Congress has not exercised its commerce power, states may not "interfere with or impose burdens on interstate commerce."  *Arkansas Elec. Coop. Corp. v. Arkansas Pub. Serv. Comm'n*, 461 U.S. 375, 389 (1983) (citation omitted).  Statutes that purport to do so may not be enforced.

122.    There are three main flavors of dormant Commerce Clause violations.  State law is unconstitutional if it: (1) discriminates against interstate commerce in favor of in-state commerce; (2) regulates extraterritorial transactions;  or  (3) imposes  excessive  burdens  on  interstate

commerce. *Flynt v. Bonta*, 131 F.4th 918, 923–925 (9th Cir. 2025); *National Pork Producers Council v. Ross*, 598 U.S. 356, 369, 376 n.1, 377–378 (2023). H.B. 2385 does all three.

**H.B. 2385 Operates Extraterritorially.**

123.    Novartis is not located in Oregon. So, distribution of 340B-eligible drugs from Novartis to individual pharmacies in Oregon necessarily takes place through a complex series of interstate transactions. Novartis typically enters into nationwide contracts to sell its medicines to wholesalers and distributors at commercial prices. The wholesalers and distributors then sell to national chain pharmacies before the products are ultimately distributed to and dispensed by an in-state contract pharmacy out of its common inventory.

124.    Under retroactive pricing models, the 340B discount later gets billed back to Novartis through a new transaction chain. For example, once a contract pharmacy's third-party administrator has purported to identify a certain number of 340B-eligible transactions, it may submit a "replenishment" claim to the wholesaler, and the wholesaler would then arrange for the covered entity to be billed at the 340B price for the relevant number of units (whether or not it ships new product to the contract pharmacy). The wholesaler requests a refund from the manufacturer, and the manufacturer fulfills its purported 340B pricing obligation by paying the refund.

125.    H.B. 2385 regulates manufacturers, not wholesalers, and broadly states that manufacturers may not even "*indirectly*" "deny, restrict, [or] prohibit" a contract pharmacy from receiving 340B-priced product "*or otherwise interfere*" with its ability to do so. H.B. 2385 § 1(2)(a) (emphases added). But manufacturers give the discount to wholesalers, and both of these entities are typically located outside of the state. H.B. 2385 therefore sets the terms of a wholly out-of-state transaction between non-Oregon entities. The transaction that H.B. 2385 "most directly regulates" is the "wholly out-of-state" one between manufacturers such as Novartis and wholesalers.

*Flynt*, 131 F.4th at 929–930; *see Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1323 (9th Cir. 2015) (invalidating a law requiring the payment of royalties on out-of-state sales because it regulated "commerce that takes place wholly outside of the State's borders").

126.    The dormant Commerce Clause prohibits this kind of extraterritorial regulation. States may not directly regulate the price of transactions "beyond the boundaries of the State." *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989).  For this reason, the Fourth Circuit invalidated a Maryland law that prohibited drug manufacturers or wholesale distributors from imposing "an unconscionable increase in the price of a prescription drug." *Association for Accessible Medicines v. Frosh*, 887 F.3d 664, 666 (4th Cir. 2018).  As the Fourth Circuit recognized, the Maryland Act effectively sought to enforce Maryland law outside the state because it targeted the "price the manufacturer or wholesaler charge[d] *in the initial sale of the drug*," rather than the "the price the . . . consumer ultimately pays. *Id.* at 671.

127.    The Eighth Circuit recently reaffirmed the same principle.  Minnesota passed a drug-pricing law that applied only to manufacturers. *Association for Accessible Meds. v. Ellison*, 140 F.4th 957, 959 (8th Cir. 2025).  The Eighth Circuit held that the unique nature of pharmaceutical distribution rendered the state law in violation of the dormant Commerce Clause.  The law targeted out-of-state sales by a manufacturer to a wholesaler where the drugs are sold "at prices above those proscribed by the [state law] and those drugs later ended up in [the state]." *Id.* at 960. This is the "specific impermissible extraterritorial effect of controlling prices" that the Supreme Court has repeatedly held unlawful, so the Eight Circuit affirmed an injunction of the Minnesota law. *Id.* at 961–962.

128.    H.B. 2385 works exactly the same way.  If a drug ends up at an Oregon pharmacy and becomes the subject of a claim for retroactive 340B pricing, the manufacturer is forced to pay

its wholesaler a chargeback to effectuate that demand. The state law therefore impermissibly "insists that out-of-state manufacturers sell their drugs to wholesalers for a certain price." *Association for Accessible Meds.*, 140 F.4th at 961.

129. In sum, H.B. 2385 mandates that manufacturers provide the 340B price beyond what is required under the federal 340B statute, and their only mechanism for complying is to pay chargebacks to wholesalers in purely out-of-state transactions. This is no mere upstream pricing effect—by its terms, H.B. 2385 goes straight to the source.

**H.B. 2385 Discriminates Against Interstate Commerce.**

130. H.B. 2385 also violates the dormant Commerce Clause by offering a significant economic boost to in-state pharmacies at the expense of Novartis and other drug manufacturers like it. States may not engage in this kind of "economic protectionism" by enacting regulations to benefit in-state economic interests at the expense of out-of-state competitors. *Pork Producers*, 598 U.S. at 357. State laws that discriminate against "nonresident economic actors" are invalid unless they are narrowly tailored to a legitimate local purpose. *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 518 (2019); *see also Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (discriminatory laws are "virtually *per se* invalid").

131. By forcing out-of-state manufacturers to give steep discounts to in-state hospitals and pharmacies, going far beyond what federal law requires, H.B. 2385 hamstrings interstate commerce. The "fundamental objective" of the dormant Commerce Clause is to preserve a competitive national market "undisturbed by preferential advantages" to in-state interests. *General Motors Corp. v. Tracy*, 519 U.S. 278, 299 (1997). Out-of-state manufacturers like Novartis operate within the same chain of distribution as in-state contract pharmacies and covered entities, selling the same products to a "single market" of patients and competing vertically for a share of the profits. *Id.* at

300; *see also Energy Mich., Inc. v. Michigan Pub. Serv. Comm'n*, 126 F.4th 476, 493 (6th Cir. 2025) (explaining that in-state and out-of-state interests are comparable under the dormant Commerce Clause when they compete within one market).  H.B. 2385 seeks to disrupt that balance, forcing out-of-state manufacturers to subsidize in-state entities that Congress did not see fit to make beneficiaries of the federal 340B program.

132.    H.B. 2385's goal is to generate greater revenue for in-state pharmacies and covered entities by forcing out-of-state manufacturers to give them steep discounts beyond what is required of them under the federal 340B program.  This point was made clear by the two lawmakers who sponsored the bill.  Both submitted floor letters urging the legislature to "hold drug companies accountable" to "Oregonians" and explaining the bill's purpose to "restore[] funding" to Oregon "hospitals and health centers . . . at no cost to Oregon's taxpayers."  Letter from Senator Deb Patterson to the Oregon Senate (submitted May 28, 2025), https://tinyurl.com/529vzm36; Letter from Representative Rob Nosse to Oregon House of Representatives (submitted April 14, 2025), https://tinyurl.com/2ude8xmf.  The dormant Commerce Clause prohibits exactly this kind of economic protectionism.

133.    Nor is there a legitimate justification for Oregon to discriminate against out-of-state manufacturers.  Novartis's policy complies with the federal 340B statute and allows covered entities to dispense their discounted drugs through a contract pharmacy, just not an unlimited number of them.  *See* Ex. 1 (2025 Policy).  And it even exempts federal grantees from this limitation entirely.  *Id.*  Federal law unequivocally permits Novartis to impose such reasonable business conditions on 340B pricing.  *Novartis*, 102 F.4th at 463–464; *Sanofi Aventis*, 58 F.4th at 703–706.

134.    Moreover, the benefits from unlimited contract pharmacy arrangements do not run to patients or the public.  *Supra* ¶¶ 42, 48, 57–58 (explaining that almost all patients pay the same

prices irrespective of whether their prescriptions are later used to claim 340B pricing). Novartis, through its wholesalers, *already delivers* the very same drug products to the very same pharmacies, which routinely dispense them without regard to whether a patient is 340B-eligible. H.B. 2385 governs only the price of the sale to the covered entity and contract pharmacies. Further, as more and more contract entities enter the arena, the revenue generated from the 340B discount falls increasingly in the hands of these for-profit pharmacies and third-party administrators. *See, e.g.*, Minnesota Dep't of Health, *supra* n.7, at 9. Other, more targeted means, such as direct grants to hospitals and pharmacies, would better support these entities without discriminating against inter-state commerce.

**H.B. 2385 Impermissibly Burdens Interstate Commerce.**

135.    H.B. 2385 likewise fails under the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). The bill forcibly shifts the bargaining power along the distribution chain by requiring out-of-state drug manufacturers to subsidize in-state industries. Even if the purpose of H.B. 2385 were not to discriminate against out-of-state manufacturers like Novartis, the substantial burden it imposes on interstate commerce is excessive compared to the purported local benefits. *See id.* at 142; *Flynt*, 131 F.4th at 925 (recognizing post- *Pork Producers* that even non-discriminatory state laws may run afoul of *Pike*).

136.    By meddling with a formerly national drug-pricing program, H.B. 2385 ratchets up administrative burdens on manufacturers and wholesalers, who must now make state-specific exceptions to formerly national contract pharmacy policies if they wish to remain in compliance. The burden from this "inconsistent regulation" of "inherently national" activities falls entirely on non-Oregon entities. *Flynt*, 131 F.4th at 932 (explaining when state laws create a substantial burden). And the Court must also consider the burden that would arise if "many or every, State

adopted similar legislation." *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992) (quoting *Healy*, 491 U.S. at 336).

137.    That is no longer a hypothetical problem for the 340B Program.  H.B. 2385 and other state laws like it collectively unleash havoc on nationwide drug distribution.  Novartis typically sells its products by entering into nationwide contracts with wholesalers and distributors, who in turn contract with pharmacies down the distribution chain.  State-specific pricing laws like H.B. 2385 interfere with interstate distribution and impose conflicting requirements on drug manufacturers and their wholesalers and distributors.

138.    Manufacturers, wholesalers, and distributors must wade through this deepening mire that increasingly threatens to transform nationwide drug distribution into a litany of state-specific distribution systems.  As Oregon and other states continue to enact conflicting 340B laws, Novartis will be unable to implement the federal 340B program on a uniform, nationwide basis.  State-specific 340B requirements raise the administrative cost of providing drugs, as Novartis must prepare contract pharmacy policies that satisfy overlapping and inconsistent laws.

139.    The burden on interstate drug distribution continues to increase as more and more states enact their own versions of 340B laws.  Already, Arkansas, Colorado, Kansas, Louisiana, Maine, Maryland, Minnesota, Mississippi, Missouri, Nebraska, New Mexico, North Dakota, Oklahoma, Rhode Island, South Dakota, Tennessee, Utah, Vermont, and West Virginia have enacted similar laws.  One does not need to be an expert in drug distribution to see the problem. *See Frosh*, 887 F.3d at 673 (holding that a drug-pricing statute disproportionately burdened interstate commerce when it had "the potential to subject prescription drug manufacturers to conflicting state requirements").  This is exactly the compounding burden on interstate commerce that the dormant Commerce Clause prohibits.

### H.B. 2385 WILL CAUSE NOVARTIS IMMINENT, IRREPARABLE HARM

140.    Novartis will be irreparably harmed if H.B. 2385 is enforced.

141.    H.B. 2385 puts Novartis in a lose-lose situation.  On one hand, complying with the law will require Novartis to expend significant resources to satisfy requirements imposed by an unconstitutional law.  *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).  There is no way for Novartis to recover these compliance costs, and as more and more states enact similar 340B laws, the administrative burden to comply with each law will only increase.

142.    Being subject to an unconstitutional law is itself a significant irreparable harm. *American Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009) (holding that being forced to agree to "conditions which are likely unconstitutional because they are preempted" constituted irreparable injury).  That is especially so here, where H.B. 2385 undermines Novartis's ability to rely on rights conferred by federal law to structure its conduct.  *See Novartis*, 102 F.4th at 463–464; *Sanofi*, 58 F.4th at 703–706.

143.    Beyond that, H.B. 2385 will cause Novartis to lose millions of dollars as it provides discounted prices that the federal statute does not require it to offer.  In many instances, these discounts will also violate the federal statute's prohibitions on duplication or diversion.  But Novartis will often be unable to detect these violations or to pursue federal remedies such as the audit or ADR processes because H.B. 2385 makes it unlawful to require the "claim or utilization review data" needed to do so.  H.B. 2385 § 1(2)(b).

144.    The state of Oregon cannot be held directly liable for these damages because it has sovereign immunity.  Money damages that cannot later be recovered for reasons such as sovereign immunity constitute irreparable injury.  *See Idaho v. Coeur D'Alene Tribe*, 794 F.3d 1039, 1046

(9th Cir. 2015) (noting a sovereign-immunity exception to the general rule that purely economic harms are not irreparable).

145.    Failing to comply with H.B. 2385, on the other hand, exposes Novartis to costly enforcement actions and severe penalties.  Novartis could be subject to fines of up to $5,000 per day "for each violation"—which could be deemed to mean each drug dispensed at a contract pharmacy for which a covered entity demands the 340B price.  *See* H.B. 2385 § 2(1).  Regardless of the ultimate penalty imposed, any enforcement action will require Novartis to expend significant resources defending itself or its employees.  None of those sanctions or costs could ever be recovered.

146.    Either way, Novartis must divert substantial resources from research and development of new drug therapies.  Those opportunity costs can never be regained.

147.    Injunctive relief will preserve the status quo and cause no harm to Defendants.  *See, e.g.*, *April in Paris v. Becerra*, 494 F. Supp. 3d 756, 770 (E.D. Ca. 2020) (noting that an injunction would "preserve the *status quo ante*" and cause "no new harms" to the State); *id.* at 771 ("[T]he reach of [the State's] interest ends where the preemptive effect of federal law begins.").  States generally have, at most, a *de minimis* interest in enforcing laws and policies deemed unconstitutional for any reason.  *See, e.g.*, *Association for Accessible Meds. v. Bonta*, 562 F. Supp. 3d 973, 988 (E.D. Ca. 2021) (noting that if "a statutory provision is unconstitutional on its face, an injunction prohibiting its enforcement is 'proper' " (citation omitted)).

148.    Injunctive relief will also serve the public interest by maintaining the integrity of a carefully planned federal program.  *See United States v. California*, 921 F.3d 865, 893 (9th Cir. 2019) (recognizing that "preventing a violation of the Supremacy Clause serves the public interest"); *see also United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("Frustration of

federal statutes and prerogatives are not in the public interest."). Likewise, "it would not be equitable or in the public's interest" for the state "to violate the requirements of federal law." *Valle del Sol*, 732 F.3d at 1029.

149. The public will also benefit from an injunction ensuring Novartis can direct its resources where they are most needed: researching and developing new drug therapies for patients.

## COUNT I
### (Federal Field Preemption | U.S. Const. art. VI, cl. 2)

150. Novartis realleges, reasserts, and incorporates by reference each of the foregoing allegations as though set forth fully herein.

151. Federal law is "the supreme Law of the Land; . . . any Thing in the . . . Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

152. Congress has determined that the federal 340B Drug Pricing Program must be regulated by its exclusive governance. As Spending Clause legislation that is intertwined with other federal drug-pricing programs, the obligations imposed by the federal 340B statute—and just as importantly, those *not* imposed by the federal 340B statute—are a critical part of Congress's overall involvement in the nationwide pharmaceutical market. States are not free to reconfigure that level of involvement, regardless of whether they perceive Congress's limits as "silence."

153. Consistent with the 340B Program's exclusively federal domain, the federal 340B statute contains a pervasive framework of federal regulation including an exhaustive definition of the types of entities that are eligible for discounted prices, limitations on when those entities can receive discounted pricing, limitations on what those entities can do with discounted drugs, and a comprehensive remedial scheme that provides for federal enforcement and private ADR claims under the oversight of a federal agency.

154.    The federal interest in regulating 340B-priced drugs is also so dominant that Congress's statutory scheme precludes state regulation covering the same subject.  As the Supreme Court has already recognized, state attempts to interfere in this realm are "incompatible with the [340B] statutory regime." *Astra*, 563 U.S. at 113.

155.    H.B. 2385 targets the field of the federal 340B drug discount program.  *See* H.B. 2385 §§ 1(1)(a), (c); 1(2)(a)–(b).  Each of its provisions therefore implicates a legislative field that Congress has reserved for its exclusive governance.

156.    H.B. 2385 therefore violates the Supremacy Clause of the U.S. Constitution.

## COUNT II
### (Federal Conflict Preemption | U.S. Const. art. VI, cl. 2)

157.    Novartis realleges, reasserts, and incorporates by reference each of the foregoing allegations as though set forth fully herein.

158.    H.B. 2385 repeatedly frustrates the purposes of multiple federal statutes and interferes with the methods by which those federal statutes attempt to achieve their goals.

159.    H.B. 2385 directly regulates drug pricing by requiring Novartis to provide a discounted price on drugs delivered to unlimited contract pharmacies.

160.    In this way, H.B. 2385 requires Novartis to offer deeply discounted pricing in situations where the federal 340B statute does not, and therefore expands the size of the federal 340B Drug Pricing Program, imposing requirements more onerous than those of federal law.

161.    H.B. 2385 purports to overwrite several tradeoffs Congress made in passing the federal 340B statute.  H.B. 2385 interferes with federal objectives and methods by: preventing Novartis from exercising its federal statutory discretion to set reasonable conditions on 340B pricing; forcing Novartis to provide 340B pricing for more products; fracturing the federal statute's centralized enforcement scheme; creating a risk of conflicting adjudications of federal law;

undermining the effectiveness of federal enforcement mechanisms by denying Novartis data it needs to use them effectively; and perpetuating rampant noncompliance with the federal prohibitions on duplication and diversion.

162.    H.B. 2385 therefore violates the Supremacy Clause of the U.S. Constitution.

## COUNT III
### (Dormant Commerce Clause | U.S. Const. art. I, § 8, cl. 3)

163.    Novartis realleges, reasserts, and incorporates by reference each of the foregoing allegations as though set forth fully herein.

164.    Under the Commerce Clause, Congress has the power to regulate commerce among the several states.  U.S. Const. art. I, § 8, cl. 3.  The corresponding "dormant" Commerce Clause prevents states from imposing regulations that discriminate against interstate commerce, unduly burden it, or regulate commerce occurring entirely out of state.

165.    H.B. 2385 violates the dormant Commerce Clause by regulating wholly out-of-state transactions between drug manufacturers like Novartis and out-of-state wholesalers.

166.    H.B. 2385 also intentionally discriminates against interstate commerce by benefitting in-state healthcare providers and pharmacies at the expense of out-of-state manufacturers. This blatant economic protectionism violates the dormant Commerce Clause.

167.    There is no legitimate local purpose for discriminating against out-of-state manufacturers like Novartis, and even if there were, there are other, less burdensome means available to Oregon to advance that purpose.

168.    H.B. 2385 additionally fails the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  This Oregon law and others like it impose a substantial harm on interstate commerce by imposing burdensome and conflicting requirements on drug manufacturers

that impede the national distribution of pharmaceutical drugs.  The burden on interstate commerce is clearly excessive in relation to the purported local benefit and will only continue to increase as more states enact their own state 340B programs.

169.    H.B. 2385 therefore violates the Commerce Clause of the U.S. Constitution.

## PRAYER FOR RELIEF

For the foregoing reasons, Novartis prays for the following relief:

A.    A declaration under 28 U.S.C. § 2201 that H.B. 2385 is preempted by federal law and is thus null, void, and unenforceable;

B.    A declaration under 28 U.S.C. § 2201 that H.B. 2385 violates the dormant Commerce Clause and is thus null, void, and unenforceable;

C.    Preliminary and permanent injunctive relief vacating H.B. 2385 and enjoining Defendants from implementing or enforcing H.B. 2385 against Novartis or any of its affiliates, officers, agents, representatives, or contractors;

D.    Preliminary and permanent injunctive relief enjoining Defendants from seeking civil penalties, equitable relief, or any other remedy arising from an alleged violation of H.B. 2385 by Novartis or any of its affiliates, officers, agents, representatives, or contractors;

E.    An order awarding Novartis its costs, expenses, and attorney's fees incurred in these proceedings; and

F.    Such other and further relief as the Court deems proper.

DATED:  July 29, 2025

Respectfully submitted,

*/s/ Paul Conable*
Paul Conable, OSB No. 975368
Steven D. Olson, OSB No. 003410
TONKON TORP LLP
1300 S.W. Fifth Avenue, Suite 2400
Portland, OR 97201
Telephone: (503) 802-2188
paul.conable@tonkon.com


Susan Cook*
Jessica L. Ellsworth*
Alexander V. Sverdlov*
Marlan Golden*
Jacob T. Young*
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-5600
Facsimile: (202) 637-5910
susan.cook@hoganlovells.com

*Attorneys for Plaintiff Novartis Pharmaceuticals Corporation*

*\*Motion for admission pro hac vice forthcoming*

**VERIFICATION**

I, the undersigned, having read the allegations of the foregoing Verified Complaint, hereby declare under penalty of perjury and pursuant to 28 U.S.C. § 1746 that the factual allegations asserted in the Verified Complaint are true and correct.

Executed this 29th day of July 2025.

Shannon McCrudden