Paul Conable, OSB No. 975368
  Direct:  503.802.2188
  Email:  paul.conable@tonkon.com
Steven D. Olson, OSB No. 003410
  Direct:  503.802.2159
  Email:  steven.olson@tonkon.com
Tonkon Torp LLP
1300 SW Fifth Ave., Suite 2400
Portland, OR 97201
Facsimile:  503.274.8779

    *Motion for admission pro hac vice
    forthcoming

    Attorneys for Plaintiff

Susan Cook*
  Email:  susan.cook@hoganlovells.com
Jessica L. Ellsworth*
  Email:  jessica.ellsworth@hoganlovells.com
Alexander V. Sverdlov*
  Email:  aleks.sverdlov@hoganlovells.com
Marlan Golden*
  Email:  marlan.golden@hoganlovells.com
Jacob T. Young*
  Email:  jake.young@hoganlovells.com
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-5600

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## (PORTLAND DIVISION)

| | |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION, <br><br> Plaintiff, <br><br> v. <br><br> OREGON BOARD OF PHARMACY PRESIDENT RICHARD JOYCE, in his official capacity; OREGON BOARD OF PHARMACY VICE PRESIDENT AMY KIRKBRIDE, in her official capacity; and MEMBERS OF THE OREGON BOARD OF PHARMACY KATHLEEN CHINN, JENNIFER HALL, VICTORIA KROEGER, PRIYAL PATEL, ANA PINEDO, and BRYAN SMITH, in their official capacities. <br><br> Defendants. | Civil No. 3:25-cv-1330-IM <br><br> **PLAINTIFF NOVARTIS PHARMACEUTICALS CORPORATION'S MOTION FOR A PRELIMINARY INJUNCTION** <br><br> **REQUEST FOR ORAL ARGUMENT** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................II

MOTION........................................................................................................................... 1

INTRODUCTION ............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................ 3

ARGUMENT ................................................................................................................... 12

I.      NOVARTIS IS LIKELY TO PREVAIL ON THE MERITS. ........................................ 12

        A.      H.B. 2385 Is Preempted By Federal Law ............................................................ 12

                1.      Federal Law Occupies the Field H.B. 2385 Seeks to Regulate. ............... 13

                2.      H.B. 2385 Is Preempted Under Conflict Preemption Principles. ............. 17

                        a.      Expanding the Transactions Triggering 340B Pricing................. 17

                        b.      Conflicting Enforcement Procedures and Remedies ................... 20

                        c.      Frustration of Claims Data Collection ......................................... 23

        B.      H.B. 2385 Violates the Dormant Commerce Clause. .......................................... 24

                1.      H.B. 2385 Is Unlawfully Extraterritorial. ................................................. 25

                2.      H.B. 2385 Discriminates Against Out-of-State Commerce...................... 27

                3.      H.B. 2385 Excessively Burdens Interstate Commerce. ............................ 29

II.     NOVARTIS WILL SUFFER IRREPARABLE HARM ABSENT RELIEF. ................. 31

III.    THE EQUITIES AND THE PUBLIC INTEREST FAVOR AN INJUNCTION. ........... 32

CONCLUSION................................................................................................................. 34

# TABLE OF AUTHORITIES

Page(s)

CASES:

*American Trucking Ass'ns, Inc. v. City of Los Angeles*,
   559 F.3d 1046 (9th Cir. 2009) ........................................................................................31, 33

*April in Paris v. Becerra*,
   494 F. Supp. 3d 756 (E.D. Cal. 2020) ....................................................................................32

*Arizona v. United States*,
   567 U.S. 387 (2012) .......................................................................12–13, 14, 17, 19, 20

*Association for Accessible Meds. v. Bonta*,
   562 F. Supp. 3d 973 (E.D. Cal. 2021) ....................................................................................33

*Association for Accessible Meds. v. Ellison*,
   140 F.4th 957 (8th Cir. 2025) ...........................................................................................26–27

*Association for Accessible Meds. v. Frosh*,
   887 F.3d 664 (4th Cir. 2018) ..........................................................................................26, 31

*Association of Am. Railroads v. Randolph*,
   No. 2:23-CV-1154, 2024 WL 664359 (E.D. Cal. Feb. 16, 2024) ..........................................29

*Astra USA, Inc. v. Santa Clara County*,
   563 U.S. 110 (2011) ..............................................................................2, 14, 15, 20, 21, 22

*AstraZeneca Pharms. LP v. Becerra*,
   543 F. Supp. 3d 47 (D. Del. 2021) ........................................................................................17

*Brown-Forman Distillers Corp. v. New York State Liquor Auth.*,
   476 U.S. 573 (1986) ....................................................................................................25, 28

*Buckman Co. v. Plaintiffs' Legal Comm.*,
   531 U.S. 341 (2001) ....................................................................................................16, 21

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ..........................................................................................12, 33

*California Pharmacists Ass'n v. Maxwell-Jolly*,
   563 F.3d 847 (9th Cir. 2009) ................................................................................................33

*City of Burbank v. Lockheed Air Terminal Inc.*,
   411 U.S. 624 (1973) ..............................................................................................................16

*Cohen v. Apple Inc.*,
  497 F. Supp. 3d 769 (N.D. Cal. 2020) ............................................................ 19, 22
  46 F.4th 1012 (9th Cir. 2022) ....................................................................... 19

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
  596 U.S. 212 (2022) ...................................................................................... 15

*Daniels Sharpsmart, Inc. v. Smith*,
  889 F.3d 608 (9th Cir. 2018) ........................................................................ 30

*Department of Revenue of Ky. v. Davis*,
  553 U.S. 328 (2008) ...................................................................................... 28

*Edgar v. MITE Corp.*,
  457 U.S. 624 (1982) ...................................................................................... 25

*Environmental Prot. Info. Ctr. v. Carlson*,
  968 F.3d 985 (9th Cir. 2020) ........................................................................ 12

*Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*,
  458 U.S. 141 (1982) ...................................................................................... 24

*Geier v. American Honda Motor Co.*,
  529 U.S. 861 (2000) ...................................................................................... 18

*GEO Grp., Inc. v. Inslee*,
  720 F. Supp. 3d 1029 (W.D. Wash. 2024) .................................................... 32

*GMC v. Tracy*,
  519 U.S. 278 (1997) ...................................................................................... 28

*Guy v. Baltimore*,
  100 U.S. 434 (1880) ...................................................................................... 28

*Healy v. Beer Inst.*,
  491 U.S. 324 (1989) ............................................................................ 25, 26, 30

*Idaho v. Coeur D'Alene Tribe*,
  794 F.3d 1039 (9th Cir. 2015) ...................................................................... 31

*International Paper Co. v. Ouellette*,
  479 U.S. 481 (1987) ...................................................................................... 17

*Maine Forest Prods. Council v. Cormier*,
  51 F.4th 1 (1st Cir. 2022) .............................................................................. 22

*McCulloch v. Maryland*,
  17 U.S. 316 (1819) ....................................................................................... 13

*Middlesex Cnty. Sewerage Auth. v. National Sea Clammers Ass'n*,
    453 U.S. 1 (1981) ...................................................................................................20

*Montalvo v. Spirit Airlines*,
    508 F.3d 464 (9th Cir. 2007) ...................................................................14, 15–16

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)................................................................................................31

*National Collegiate Athletic Ass'n v. Miller*,
    10 F.3d 633 (9th Cir. 1993) ..................................................................................25

*National Fed'n of the Blind v. United Airlines, Inc.*,
    813 F.3d 718 (9th Cir. 2016) ................................................................................13

*National Pork Producers Council v. Ross*,
    598 U.S. 356 (2023)..............................................................................3, 25, 27, 28

*Nexus Pharms., Inc. v. Central Admixture Pharm. Servs.*,
    48 F.4th 1040 (9th Cir. 2022) ..............................................................................21

*Nken v. Holder*,
    556 U.S. 418 (2009)...............................................................................................12

*Novartis Pharms. Corp. v. Espinosa*,
    No. 1:21-CV-1479, 2021 WL 5161783 (D.D.C. Nov. 5, 2021) .......................10, 17

*Novartis Pharms. Corp. v. Johnson*,
    102 F.4th 452 (D.C. Cir. 2024)......................................2, 6, 7–8, 10, 17, 24, 29, 31

*Oregon Waste Sys., Inc. v. Department of Env't. Quality*,
    511 U.S. 93 (1994)..........................................................................................24–25, 29

*Pharmaceutical Rsch. & Mfrs. of Am. v. Morrisey*,
    760 F. Supp. 3d 439 (S.D. W. Va. 2024).................................................18, 22, 24

*Pike v. Bruce Church, Inc.*,
    397 U.S. 137 (1970)...............................................................................................29

*Rice v. Santa Fe Elevator Corp.*,
    331 U.S. 218 (1947)...............................................................................................13

*Sam Francis Found. v. Christies, Inc.*,
    784 F.3d 1320 (9th Cir. 2015) (en banc) .............................................................27

*Sanofi Aventis U.S. LLC v. HHS*,
    58 F.4th 696 (3d Cir. 2023) .........................................2, 6, 10, 17, 24, 29, 31

*Small v. Avanti Health Sys., LLC*,
    661 F.3d 1180 (9th Cir. 2011) ..................................................................33

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas*,
    588 U.S. 504 (2019) .........................................................................27–28

*Union Pac. R.R. Co. v. California Pub. Utilities Comm'n*,
    346 F.3d 851 (9th Cir. 2003) ..................................................................30

*United States v. Alabama*,
    691 F.3d 1269 (11th Cir. 2012) ..............................................................33

*Valle Del Sol Inc. v. Whiting*,
    732 F.3d 1006 (9th Cir. 2013) ...............................................14–15, 20, 33

*Winter v. Natural Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ...................................................................................12

*Wisconsin Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*,
    475 U.S. 282 (1986) ...............................................................................23

*Wyoming v. Oklahoma*,
    502 U.S. 437 (1992) ...............................................................................30

**CONSTITUTIONAL PROVISIONS:**

U.S. Const. art. I, § 8, cl. 3 ...........................................................................24

U.S. Const. art. VI, cl. 2 ...............................................................................13

**STATUTES:**

42 U.S.C. § 1320f-2(d)(1) .............................................................................16

42 U.S.C. § 1396r-8
    (a)(1) .........................................................................................................3
    (a)(5)(A) ....................................................................................................3

42 U.S.C. § 256b
    (a) .............................................................................................................3
    (a)(1) .................................................................................4, 14, 16, 21
    (a)(4) .......................................................................................4, 16, 21
    (a)(5) ............................................................................................4, 21
    (a)(5)(A)(i) ...................................................................................5, 16
    (a)(5)(B) .......................................................................................5, 16
    (a)(5)(C) .................................................................................5, 14, 23
    (a)(5)(D) ...........................................................................................14
    (a)(7) ................................................................................................14

(a)(8) ...........................................................................................................14
(a)(9) ...........................................................................................................14

(b)(1) .......................................................................................................4, 16
(d)(1) ...........................................................................................................14
(d)(1)(B)(vi) ..........................................................................................5, 20, 22
(d)(1)(B)(vi)(III) .........................................................................................22
(d)(2) ...........................................................................................................14
(d)(2)(B)(v) .................................................................................................21
(d)(3) .......................................................................................................5, 14
(d)(3)(A) ................................................................................................5, 20

## Regulations:

42 C.F.R. § 10.20 *et seq.* ............................................................................20

42 C.F.R. § 10.21
(a) .........................................................................................................6, 21
(a)(2) ...................................................................................................21, 23

42 C.F.R. § 1003.100 *et seq.* ................................................................20, 22

340B Drug Pricing Program; Administrative Dispute Resolution Regulation,
89 Fed. Reg. 28,643 (Apr. 19, 2024) ...................................................6

340B Drug Pricing Program Ceiling Price and Manufacturer Civil Monetary Penalties
Regulation, 82 Fed. Reg. 1,210 (Jan. 5, 2017).................................20

340B Program Notice:  Application Process for the 340B Rebate Model Pilot Pro-
gram, 90 Fed. Reg. 36,163 (Aug. 1, 2025) .......................................24

Annual Civil Monetary Penalties Inflation Adjustment,
89 Fed. Reg. 64,815 (Aug. 8, 2024)...................................................20

Manufacturer Audit Guidelines and Dispute Resolution Process,
61 Fed. Reg. 65,406 (Dec. 12, 1996) .................................................23

Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services,
75 Fed. Reg. 10,272, (Mar. 5, 2010)....................................................7

Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract-
Pharmacy Services, 61 Fed. Reg. 43,549 (Aug. 23, 1996) ..................6

## Legislative Materials:

Government Accountability Off. (GAO), Drug Discount Program, Federal Oversight
of Compliance at 340B Contract Pharmacies Needs Improvement, GAO-18-480
(June 2018).........................................................................................9

House Energy & Com. Comm., *Review of the 340B Drug Pricing Program* (Jan. 10, 2018) ..............................................................................................................................9

Senate Health, Education, Labor & Pensions Comm., *Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Reform* (Apr. 2025),...............................9

Oregon H.B. 2385
§ 1(1)(c) ...........................................................................................................11, 13, 18
§ 1(2)(a) ...............................................................................................11, 13, 18, 26, 27
§ 1(2)(b) .........................................................................................................11, 13, 24
§ 2(1)..............................................................................................................12, 22–23
§ 2(2)...................................................................................................................20, 31

**EXECUTIVE MATERIALS:**

HHS Off. of Inspector General (OIG), *Memorandum Report: Contract Pharmacy Arrangements in the 340B Program*, OEI-05-13-00431 (Feb. 4, 2014).......................9

HRSA, *340B ADR Decision Summaries* (last updated May 15, 2025) .........................20

**OTHER AUTHORITIES:**

Adam Fein, *EXCLUSIVE: For 2023, Five For-Profit Retailers and PBMs Dominate an Evolving 340B Contract Pharmacy Market*, Drug Channels (July 11, 2023) .....................8

Adam Fein, *The 340B Program Reached $66 Billion in 2023—Up 23% vs. 2022: Analyzing the Numbers and HRSA's Curious Actions*, Drug Channels (Oct. 22, 2024)...............9

Letter from Representative Rob Nosse to Oregon House of Representatives (submitted April 14, 2025).......................................................................................................28

Letter from Senator Deb Patterson to the Oregon Senate (submitted May 28, 2025)..................28

Novartis AG, *U.S. Securities & Exchange Commission Form 20-F 2024* (Jan. 31, 2025) ............................................................................................................................20

Milena Sullivan et al., *Contract Pharmacy Trends May Help Inform 340B Reform Debate*, Avalere (June 10, 2024) ............................................................................8

## MOTION

Novartis seeks a preliminary injunction barring enforcement of the recently enacted Oregon House Bill No. 2385 (H.B. 2385). In compliance with LR 7-1, Novartis first contacted counsel for Defendants on July 30, 2025, and the parties have since been negotiating a potential stipulation that may eliminate the need for preliminary relief. Despite these ongoing good-faith efforts, approval for the agreement has not yet been obtained. Given H.B. 2385's fast-approaching effective date, Novartis is filing this motion to ensure that it can be timely heard if necessary.

## INTRODUCTION

As a condition of having their drugs covered by Medicaid and Medicare Part B, manufacturers are required to participate in the federal 340B Drug Pricing Program, which requires them to offer steeply discounted prices—as low as a penny—on certain drug products to a specified list of *non-profit* hospitals and federal grantees called "covered entities." A new Oregon law, H.B. 2385, seeks to upend that federal scheme by requiring manufacturers to provide the federal 340B discount on an unlimited number of transactions involving *for-profit* pharmacies called "contract pharmacies." In doing so, H.B. 2385 dramatically expands the scope of the federal law and increases the burdens imposed on manufacturers who participate in the federal 340B program. H.B. 2385 is preempted by federal law and violates the dormant Commerce Clause.

Federal law creates and governs every detail of the 340B Program. Congress carefully calibrated the conditions of participating in 340B in order to ensure that manufacturers were not disincentivized from participating in the 340B Program—and by extension, Medicaid and Medicare. Congress required manufacturers to give the 340B discount on sales to 15 specified types of covered entities. But Congress considered and rejected a requirement that manufacturers recognize unlimited contract pharmacy arrangements, instead leaving manufacturers discretion to set

their own policies.  For that reason, multiple federal courts have concluded that the federal 340B statute allows drug manufacturers to place reasonable conditions on the use of contract pharmacies, including refusing to deliver 340B-priced drugs to an unlimited number of contract pharmacies. *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 704 (3d Cir. 2023); *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024).

Yet the new Oregon law forbids that which Congress chose to allow under federal law. The state law sweeps contract pharmacy transactions that would otherwise occur outside the 340B Program into the federal program's discount mandate.  Thus, while the law does speak of "delivery," what it requires is delivery of a "340B drug"—which is defined to mean a drug that has received discounted 340B pricing.  In other words, the state law requires 340B pricing on transactions that are not otherwise 340B-eligible under federal law.  In doing so, H.B. 2385 dramatically expands the burden on manufacturers of participating in the federal 340B program.  H.B. 2385 also bars manufacturers from requiring covered entities to provide basic claims data relating to their claimed discounts—even though HRSA and multiple federal courts have confirmed that federal law allows Novartis to do precisely that in order to comply with federal audit and dispute-resolution requirements.

H.B. 2385 interferes with federal law in other ways, too.  The 340B Program is exclusively overseen and enforced by a division of the United States Department of Health and Human Services, which Congress intended would oversee a "unitary administrative and enforcement scheme."  *See Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 113–114, 119–120 (2011). H.B. 2385 creates entirely new non-federal enforcement mechanisms by allowing the Oregon Board of Pharmacy to make its own determinations on issues of federal law and impose draconian new penalties.  Making a state agency a second enforcer of issues governed by federal law

inherently disrupts federal uniformity and subjects manufacturers to duplicative and potentially inconsistent enforcement efforts.

Finally, H.B. 2385 violates the dormant Commerce Clause because it impermissibly regulates wholly out-of-state transactions between manufacturers and wholesalers.  It does so with both discriminatory intent and discriminatory effect, by privileging in-state contract pharmacies' economic interests at the expense of out-of-state manufacturers.  In doing so, the state law violates the "antidiscrimination principle [that] lies at the 'very core' of . . . dormant Commerce Clause jurisprudence."  *National Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023).

Absent immediate judicial intervention enjoining H.B. 2385, Novartis will suffer irreparable harm.  Once the law takes effect on **September 26, 2025**, Novartis will risk violating Oregon law—and incurring serious penalties—merely by maintaining a 340B policy whose elements multiple courts have already found lawful.  If H.B. 2385 is not enjoined, Novartis will suffer an ongoing loss of constitutional rights and unrecoverable financial costs as it scrambles to navigate a continuously shifting regulatory landscape.  In contrast, the public interest will not be harmed by an injunction.  The new state law seeks only to move dollars from drug manufacturers to hospitals and pharmacy chains; it has no impact on patients' ability to access their medicines at a location of their choosing or on the prices they pay at the pharmacy counter.  Novartis therefore requests a preliminary injunction enjoining enforcement of H.B. 2385 pending a decision on the merits.

## STATEMENT OF FACTS

### *The 340B Program*

Congress created the 340B Drug Pricing Program in 1992.  Verified Compl. ¶ 26.  The Program requires pharmaceutical manufacturers that want their drugs to be eligible for federal reimbursement under Medicaid and Medicare Part B to agree to provide deep discounts on those

drugs to specified types of hospitals and clinics. 42 U.S.C. § 256b(a); *see also id.* §§ 1396r-8(a)(1), (a)(5)(A). Qualifying hospitals and clinics are known as "covered entities," defined by statute as specific types of healthcare centers serving poor, uninsured, underinsured, or otherwise vulnerable patient groups. *Id*. § 256b(a)(4). For-profit pharmacies are (unsurprisingly) not among them. Manufacturers need not offer 340B pricing to anyone other than a covered entity, *id.* § 256b(a)(1), and even an otherwise-qualifying provider does not meet the statutory definition of a covered entity if it fails to observe certain compliance requirements, *id.* §§ 256b(a)(4)–(5).

The 340B Program requires a participating pharmaceutical manufacturer to charge a covered entity no more than the 340B ceiling price—a discounted price calculated under a statutory formula that can be as low as a penny—for each unit of a covered outpatient drug. 42 U.S.C. §§ 256b(a)(1), (a)(4), (b)(1). A participating manufacturer "shall . . . offer each covered entity covered outpatient drugs for purchase at or below the applicable ceiling price if such drug is made available to any other purchaser at any price." *Id.* § 256b(a)(1). The statute defines the term "covered entity" narrowly to ensure that the 340B Program's steep discounts benefit only qualified safety-net providers. *See id.* § 256b(a)(4). To count as a "covered entity," a provider must qualify as one of the 15 types specifically enumerated by statute. These include certain entities operating under a federal grant, as well as particular types of hospitals, such as certain children's hospitals and freestanding cancer hospitals. *Id.*

The 340B Program can be enormously lucrative for covered entities. That is because the 340B statute does not require covered entities to pass on 340B savings to patients, and they rarely do so. Verified Compl. ¶ 7. Thus, the 340B Program creates an arbitrage opportunity: Providers can buy drugs low and sell them high by billing patients' insurers and other payors for the full commercial rate (and collecting patients' market-rate co-pays), pocketing the difference. *Id.* This

incentive has driven the program's explosive growth.  Although only about 1,000 covered entities participated in the 340B Program at first, the 340B Program is now the second-largest federal drug-pricing program—surpassing Medicaid and Medicare Part B.  *Id.* ¶¶ 28, 48.

Congress did not intend to pursue its goals at all costs, however.  The 340B statute balances competing goals and contains important limitations to protect against abuse.  First, it prohibits "duplicate discounts"—a manufacturer cannot be required to both pay a Medicaid rebate and provide a 340B discount on the same unit of drug.  42 U.S.C. § 256b(a)(5)(A)(i).  To accomplish this, a covered entity is prohibited from requesting payment under Medicaid for a unit of a covered outpatient drug purchased under the 340B Program.  *Id.*  Second, to prevent "diversion," the statute prohibits a covered entity from reselling or otherwise transferring a 340B drug to "a person who is not a patient of the entity."  *Id.* § 256b(a)(5)(B).  To give these substantive requirements teeth, covered entities must also permit manufacturers to audit records that "directly pertain to the entity's compliance" with these anti-duplication and anti-diversion prohibitions.  *Id.* § 256b(a)(5)(C).

### *Federal Enforcement Mechanisms*

The 340B statute lays out two exclusive enforcement remedies in the event a manufacturer fails to give the discount when due.  First, the federal agencies overseeing implementation of the 340B statute have direct enforcement powers.  42 U.S.C. § 256b(d)(1)(B)(vi).  And second, the statute requires the Secretary of Health and Human Services to promulgate regulations establishing an Administrative Dispute Resolution (ADR) process to resolve specific categories of disputes between covered entities and manufacturers.  *Id.* § 256b(d)(3).  The statute specifically describes the two claim categories that are funneled to administrative dispute resolution: (1) "claims by covered entities that they have been overcharged for drugs purchased under this section," and (2) claims by manufacturers relating to duplicate discounts and drug diversion.  *Id.* § 256b(d)(3)(A).

HRSA, the subagency currently responsible for administering the 340B Program, recently finalized a regulation reflecting the most recent iteration of that ADR pathway.  In that regulation, HRSA took the position that the ADR pathway is available to covered entities wishing to challenge a manufacturer's refusal to provide a 340B discount on a particular sale.  340B Drug Pricing Program; Administrative Dispute Resolution Regulation, 89 Fed. Reg. 28,643, 28,657 (Apr. 19, 2024). Thus, according to HRSA, a covered entity may bring a claim against a manufacturer alleging that it "has been overcharged by a manufacturer for a covered outpatient drug" or that "a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price."  42 C.F.R. § 10.21(a).

### Contract Pharmacy Arrangements

At first, covered entities claimed the 340B discount solely on their own drug purchases. Verified Compl. ¶¶ 35, 37.  The statutory text, after all, contemplates "one-to-one transactions between a covered entity and a drug maker."  *Sanofi*, 58 F.4th at 704.  But some covered entities have no in-house pharmacy, and they argued to HRSA that they could not access 340B discounts unless they could contract with an outside pharmacy.  Verified Compl. ¶ 36.

In 1996, HRSA began allowing covered entities to use *one* outside pharmacy for this purpose, a mechanism "designed to facilitate program participation for those eligible covered entities that do not have access to appropriate 'inhouse' pharmacy services."[1]  This arrangement persisted until 2010, when HRSA "swerved."  *Novartis*, 102 F.4th at 457.  The agency now claims covered entities may use *unlimited* contract pharmacies—regardless of whether they have an in-house

---

[1]  HRSA, Notice Regarding Section 602 of the Veterans Health Care Act of 1992; Contract Pharmacy Services, 61 Fed. Reg. 43,549, 43,555 (Aug. 23, 1996).

pharmacy—fundamentally changing the nature of a contract pharmacy arrangement and of the 340B Program itself.[2]

Under these newer arrangements, covered entities predominantly claim 340B pricing retroactively. Verified Compl. ¶ 38. That is, covered entities hire third-party administrators to cull through pharmacy claims data—after the fact—to identify through an opaque algorithm never disclosed to the manufacturers whether any previous dispenses to individual customers of a contract pharmacy may have involved patients of the covered entity. *Id.* ¶ 39. All of this data-culling and patient-identifying takes place long after the customer has filled her prescription, paid whatever market-rate co-pay her insurance requires, and left the pharmacy. *Id.* ¶ 40. It therefore has no impact on patient access to medicine or the prices they pay at the pharmacy counter. *Id.*

Retroactive pricing models employ several variations. The predominant "replenishment" model works like this: A pharmacy dispenses drugs to its customers in the normal course. After the customer has paid its co-pay and left the pharmacy, a third-party administrator reviews claims data and tries to match a list of pharmacy customers to previous hospital patients. When the administrator finds a match, another drug is ordered at the 340B discounted price to "replenish" the prior unit by delivering the discounted unit to the contract pharmacy. Verified Compl. ¶ 39. That new unit is then dispensed to the next pharmacy customer that walks in the door, regardless of whether that customer is a patient of a covered entity. *Id.*; *see also Novartis*, 102 F.4th at 461–463.

The contract pharmacies and third-party administrators that drive these retroactive pricing models often receive a per-drug fee and are thus motivated to find as many potentially 340B-eligible drugs as possible. *Novartis*, 102 F.4th at 457–458. And each actor gets a slice of the pie:

---

[2] *See* Notice Regarding 340B Drug Pricing Program-Contract Pharmacy Services, 75 Fed. Reg. 10,272, 10,277 (March. 5, 2010).

"The covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate." *Id*. at 457. So there is a significant financial incentive for covered entities, contract pharmacies, and third-party administrators to maximize the sales they claim as 340B transactions. Verified Compl. ¶ 43.

The timing of all this is very important. As noted, units are identified as purportedly 340B-eligible long after the patient has already received the drug and paid whatever price her insurance requires. Verified Compl. ¶ 40. And because there is no requirement that contract pharmacies or covered entities pass on 340B cost savings to the patient who purchased the drug, they hardly ever do—which means that the after-the-fact designation of the drug as 340B eligible has no effect on what the patient pays. *Id.* ¶¶ 29, 56. Patients often have no idea they have even "participated" in the 340B Program. *Id.* ¶ 46.

HRSA's 2010 policy change created an exponential increase in contract pharmacy arrangements—a trend that has coincided with the ubiquity of retroactive pricing models. Verified Compl. ¶¶ 42-43. About 35,000 pharmacy locations now act as 340B contract pharmacies,[3] up from about 1,300 in 2010.[4] That is roughly half of all pharmacy locations in the United States, and it is dominated by five major, for-profit pharmacy chains, which collectively account for 75% of all 340B contract pharmacy relationships.[5] 340B expenditures, too, have swelled alongside contract

---

[3] Milena Sullivan et al., *Contract Pharmacy Trends May Help Inform 340B Reform Debate*, Avalere (June 10, 2024), https://tinyurl.com/3umyyrvc.

[4] Government Accountability Off. (GAO), *Drug Discount Program, Federal Oversight of Compliance at 340B Contract Pharmacies Needs Improvement*, GAO-18-480 at 10 (June 2018) (2018 GAO Report), https://www.gao.gov/assets/gao-18-480.pdf.

[5] Adam Fein, *EXCLUSIVE: For 2023, Five For-Profit Retailers and PBMs Dominate an Evolving 340B Contract Pharmacy Market*, Drug Channels (July 11, 2023), https://tinyurl.com/5n6hfmtd.

pharmacy arrangements over the last ten years.  Discounted 340B purchases hit a record high of $66.3 billion in 2023—a more than 23% year-over-year increase.[6]

This new explosive growth of contract pharmacy arrangements transformed the 340B Program into something Congress never contemplated, greatly exacerbating longstanding program-integrity concerns in the process.[7]  As one Congressional committee put it, 340B "discount errors" have become "likely" and "duplicate discounts" are now "quite common."  House Energy & Com. Comm., *Review of the 340B Drug Pricing Program* 36 (Jan. 10, 2018), https://ti-nyurl.com/58rpjkfv.  And after a detailed investigation into how the 340B Program works on the ground, a Senate committee recently concluded that the covered entities it studied "do not pass 340B discounts directly to their patients," and that in recent years manufacturers "have seen significant increases in 340B sales to contract pharmacies compared to direct sales to hospitals and grantees."  Senate Health, Education, Labor & Pensions Comm., *Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Reform* (Apr. 2025), https://tinyurl.com/bdd24yd4.

***Novartis's Contract Pharmacy Policy and Resulting Litigation***

After watching the 340B program balloon in the years following the 2010 guidance and concerned about the ever-increasing abuse generated by the fast-multiplying contract pharmacy arrangements, Novartis notified HRSA in late 2020 of its plans to update its contract pharmacy policy.  Verified Compl. ¶ 59.  Beginning in November 2020, Novartis explained, it would impose certain limits on the number of contract pharmacy arrangements that it would recognize.  *Id.*  A

---

[6]  Adam Fein, *The 340B Program Reached $66 Billion in 2023—Up 23% vs. 2022: Analyzing the Numbers and HRSA's Curious Actions*, Drug Channels (Oct. 22, 2024), https://ti-nyurl.com/mryxdh34.

[7]  *See, e.g.,* HHS Off. of Inspector General (OIG), *Memorandum Report: Contract Pharmacy Arrangements in the 340B Program,* OEI-05- 13-00431 at 5 (Feb. 4, 2014), https://ti-nyurl.com/2nmdrcey ; 2018 GAO Report, *supra* n.4, at 36.

few months later, HRSA issued a violation letter to Novartis, contending that Novartis's policy violated the statute and demanding immediate compliance with HRSA's view that a manufacturer must deliver 340B drugs to any contract pharmacy, or face an enforcement action. *Id.* ¶ 61.

Upon receiving HRSA's violation letter, Novartis challenged the agency action in the U.S. District Court for the District of Columbia. *See Novartis Pharms. Corp. v. Espinosa*, No. 1:21-CV-1479 (D.D.C filed May 31, 2021). The district court vacated HRSA's violation letter and rejected HRSA's requirement that manufacturers recognize unlimited contract pharmacies. *Novartis Pharms. Corp.*, 2021 WL 5161783 (D.D.C. Nov. 5, 2021). It also held that "[t]he statute's plain language, purpose, and structure do not prohibit drug manufacturers from attaching any conditions to the sales of covered drugs through contract pharmacies," and HRSA's reasoning to the contrary "rest[s] upon an erroneous reading of Section 340B." *Id.* at *9 (emphasis omitted).

On appeal, the D.C. Circuit agreed. First, the D.C. Circuit recognized that contract pharmacy arrangements are not designed to benefit patients. "The covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate. Each of these actors thus has a financial incentive to catalog as many prescriptions as possible as eligible for the discount." *Novartis*, 102 F.4th at 457–458. The D.C. Circuit then noted that under the plain language of the federal 340B statute, manufacturers are not required to recognize an unlimited number of contract pharmacies. *Id.* at 459. To the contrary, the court found that the statute's silence reflected a deliberate choice by Congress to narrow the circumstances triggering the 340B discount. *Id.* at 460. And in reviewing parallel disputes, the Third Circuit reached the same conclusion. *Sanofi*, 58 F.4th at 703–706.

Novartis has since updated its contract pharmacy policy to reflect these legal decisions. Verified Compl. ¶¶ 63, 68. A current version of Novartis's contract pharmacy policy is attached

as Exhibit 1 to Novartis's Verified Complaint. It states that for covered entities lacking an in-house pharmacy, Novartis will recognize a single contract pharmacy, and each such contract pharmacy must provide basic claims data to receive 340B-priced drugs. ECF No. 1-1 at 1. This claims data allows Novartis to gain some much-needed transparency into the transactions for which the 340B discount is claimed in order to avoid violations of the duplicate-discount and diversion requirements of the 340B statute.

***Oregon Enacts Its Own 340B Legislation***

The Oregon Legislature passed H.B. 2385 on June 2. At its core, H.B. 2385 is about drug pricing. The state law forbids manufacturers from "deny[ing], restrict[ing], prohibit[ing], or otherwise interfer[ing] directly or indirectly with the acquisition of a 340B drug, delivery of a 340B drug to or dispensation of a 340B drug by" a contract pharmacy. H.B. 2385 § 1(2)(a).

Although the statute claims to be about "delivery," or "acquisition," the key focus is actually price: What purportedly must be 'delivered' or 'acquired' is not just a drug, but a "340B drug"—which is defined to mean a drug *priced* at or below the federal 340B ceiling price. H.B. 2385 § 1(2)(a); *see also id.* § 1(1)(c). In other words, the work done by the state statute is to mandate 340B discounts in situations where they would not otherwise be mandated under federal law. H.B. 2385 has no effect on an Oregon pharmacy's ability to acquire Novartis's products. Novartis currently delivers the very same drugs to the very same pharmacies at ordinary market prices. Verified Compl. ¶ 74.

H.B. 2385 also purports to make it unlawful for a manufacturer to "directly or indirectly" require covered entities "to submit a claim or utilization review data as a condition" of receiving 340B pricing. H.B. 2385 § 1(2)(b). H.B. 2385 exempts data that is *required* by federal law. *See id.* But this narrow carve-out does not include data that federal law *authorizes*, or even encourages

manufacturers to obtain—including as a predicate to initiating an ADR proceeding or avoiding duplicate discounts.

H.B. 2385 carries its own stiff penalty scheme, on top of the federal penalties that Congress carefully crafted for the 340B Program. "In addition to any other liability or penalty provided by law," it authorizes the State Board of Pharmacy to impose civil fines of **up to $5,000** to be deposited into the State Board of Pharmacy Account. H.B. 2385 §§ 2(1)–(2). These fines add up quickly: The act authorizes the Board of Pharmacy to seek up to $5,000 "*per day*" for "*each violation*." *Id.* § 2(1) (emphasis added).

In short, the penalties for a violation of H.B. 2385 can be dire.

## ARGUMENT

To obtain a preliminary injunction, Novartis must show: (1) that it is "likely to succeed on the merits," (2) that it "is likely to suffer irreparable harm in the absence of preliminary relief," (3) that "the balance of equities" favors an injunction, and (4) "that an injunction is in the public interest." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Likelihood of success on the merits is the most important factor. *See Environmental Prot. Info. Ctr. v. Carlson*, 968 F.3d 985, 989 (9th Cir. 2020). Where a state official is the non-moving party, the third and fourth factors merge into a single consideration of where the public interest lies. *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018).

Novartis readily satisfies these requirements here.

## I.    NOVARTIS IS LIKELY TO PREVAIL ON THE MERITS.

### A.    H.B. 2385 Is Preempted By Federal Law

The Constitution's Supremacy Clause sets forth a "clear rule" that federal law "shall be the supreme law of the land . . . anything in the . . . laws of any State to the contrary notwithstanding."

*Arizona v. United States*, 567 U.S. 387, 399 (2012) (quoting U.S. Const. art. VI, cl. 2). H.B. 2385 is preempted by the federal 340B law under both field- and conflict-preemption principles.

### 1.    Federal Law Occupies the Field H.B. 2385 Seeks to Regulate.

The longest-standing preemption principle is the one Chief Justice Marshall pronounced more than 200 years ago: "[C]ongress should be able to exercise its constitutional powers, at its own discretion, without being subject to the control of state legislation." *McCulloch v. Maryland,* 17 U.S. 316, 330 (1819). State law is field-preempted where (1) Congress's "framework of regulation [is] 'so pervasive' " that Congress has "left no room for the States to supplement it," or (2) there is a "federal interest . . . so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399 (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947)).

H.B. 2385 prohibits drug manufacturers from interfering with delivery of a "340B drug" to—or dispensation of a "340B drug" by—a contract pharmacy. H.B. 2385 § 1(2)(a). The term "340B drug" is defined to mean "a drug that has been subject to an offer of a reduced price" under the federal 340B statute. *Id.* § 1(1)(c). H.B. 2385 also prohibits manufacturers from requiring submission of basic claims data needed to verify a particular unit's eligibility for federal 340B pricing. *Id.* § 1(2)(b). Both of these requirement legislate directly into a federally preempted field.

Field preemption analysis begins with "delineat[ing] the pertinent regulatory field" and "survey[ing] the scope of the federal regulation" within it. *National Fed'n of the Blind v. United Airlines, Inc.*, 813 F.3d 718, 734 (9th Cir. 2016). The "essential" inquiry is "whether the density and detail of federal regulation merits the inference" that state regulation "will necessarily interfere with the federal regulatory scheme." *Id.* at 734–736 (holding state claims preempted where the federal regulation "sp[oke] directly to the concerns raised" and governed "*what* standards apply," as well as "*when* compliance [wa]s required").

That question is easily answered here.  Federal law *created* the 340B Program, so the density of federal regulation is absolute.  The field in question is the scope of manufacturers' obligations to provide 340B discounts.  The federal 340B statute comprehensively proscribes the standards for compliance with the 340B Program, from the "prices manufacturers may charge" for covered outpatient drugs to the circumstances that trigger the discount to the remedies for any violation.  *Astra*, 563 U.S. at 113, 115–116.  In creating a detailed and comprehensive system delineating the circumstances in which manufacturers must give the discount, the enforcement pathways available in the event they do not, and the penalties that apply in the event of a violation, Congress left no room for states to tinker with the contours of 340B.  *Id.*

The "purpose, history, and language" of the federal 340B statute make clear that Congress intended to occupy the field.  *See, e.g.*, *Montalvo v. Spirit Airlines*, 508 F.3d 464, 471 (9th Cir. 2007).  Take the text first.  Congress crafted the statute to put manufacturers on notice of the full set of obligations they would incur by signing a Pharmaceutical Pricing Agreement and participating in the 340B program.  *See* 42 U.S.C. § 256b(a)(1).  Congress also repeatedly committed key questions about the program's scope and enforcement to "the Secretary" of HHS.  *E.g.*, *id.* § 256b(a)(1), (a)(5)(A)(ii), (a)(5)(C), (a)(5)(D), (a)(7)–(9), (d)(1)–(3).  This was not only intentional, but also essential to how Congress intended the 340B Program to work.  As the Supreme Court has explained, vesting HHS with sole oversight authority ensured the agency could "administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis."  *Astra*, 563 U.S. at 120.  Thus, the federal 340B statute provides a "full set of standards" for the program, which is "designed to work as a 'harmonious whole' " along with Medicaid and Medicare.  *Valle Del Sol Inc. v. Whiting*¸ 732 F.3d 1006, 1024–26 (9th Cir. 2013) (quoting *Arizona*, 567 U.S. at 401) (holding that a federal statute that was "part of a larger federal scheme" was "comprehensive

and field preemptive"). If state law were to disrupt the "single, uniform system" that "Congress intended," it would destroy this "delicate balance." *Montalvo*, 508 F.3d at 471.

It makes sense that Congress wanted to ensure that HHS would hold the reins in enforcing 340B. Congress had to carefully calibrate the terms of the bargain to ensure that manufacturers were sufficiently incentivized to participate in the 340B Program—and by extension, Medicare and Medicaid. After all, "[u]nlike ordinary legislation, which 'imposes congressional policy' on regulated parties 'involuntarily,' Spending Clause legislation" like the 340B Program "operates based on consent: 'in return for federal funds, the [recipients] agree to comply with federally imposed conditions.' " *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022) (citations omitted). And manufacturers needed to have clear notice of the scope of their obligations under the 340B Program for them to "knowingly accept" those obligations. *Id.* (citation omitted).

All this explains why the Supreme Court so strongly emphasized that the 340B Program must be administered and enforced solely by or through the federal government. In *Astra*, county-operated 340B facilities sued drug manufacturers alleging overcharges on 340B-eligible drugs. 563 U.S. at 116. The plaintiffs' claims were styled as third-party beneficiary claims for breach of contract. *Id.* The Court rejected the plaintiffs' attempt to manufacture a private right of action to enforce federal 340B requirements because "Congress placed the Secretary (acting through her designate, HRSA) in control of § 340B's drug-price prescriptions." *Id.* at 114. Congress intended the 340B Program to be administered on a "nationwide basis" and thus set up a "unitary adminis-trative and enforcement scheme"—and gave HHS the keys. *Astra*, 563 U.S. at 120 (quotation omitted). It entrusted the federal agency with "authority to oversee compliance" in order to ensure that the 340B Program is administered on a "uniform, nationwide basis." *Id.* at 117, 120. This intent to give a federal agency "full responsibility and authority" over a "unified and exclusive

system of federal regulation" is a hallmark of field preemption. *See, e.g.*, *Montalvo*, 508 F.3d at 471–472 (quoting *City of Burbank v. Lockheed Air Terminal Inc.*, 411 U.S. 624, 639 (1973)).

By any metric, federal regulation of the 340B Program is also pervasive. Congress determined the prices manufacturers may charge covered entities and decided which transactions trigger that discount by delineating the fifteen types of covered entities that are eligible to claim the discount (notably excluding contract pharmacies). *See* 42 U.S.C. §§ 256b(a)(1), (a)(4), (b)(1). Congress then balanced the pricing obligations it imposed on manufacturers with corresponding limitations on covered entities. Covered entities may not exploit the program by diverting 340B-priced drugs to persons who are not "patient[s] of the covered entity." *Id.* § 256b(a)(5)(B). And Congress directed that manufacturers should not have to provide 340B pricing that duplicates discounts it has separately required under the Medicaid Drug Rebate Program, *id.* § 256b(a)(5)(A)(i), or the Inflation Reduction Act of 2022, *id.* § 1320f-2(d)(1).

Because Congress intended to place exclusive authority to implement 340B law in federal hands, the Oregon legislature cannot lawfully tinker with 340B Program requirements. Yet there can be no doubt that H.B. 2385 intrudes on the federal 340B regulatory scheme. H.B. 2385 has no force or meaning outside of the federal 340B Program: It applies only to 340B covered entities and repeatedly cross-references the federal law. If Congress repealed 42 U.S.C. § 256b tomorrow, H.B. 2385 would cease to have any effect. In that sense, it is not an independently operative state law—it is grafted onto a federal program, with the aim of altering the burdens placed on manufacturers who participate in the 340B program. That is unlawful. *See Buckman Co. v. Plaintiffs' Legal Comm.*, 531 U.S. 341, 347 (2001) (procedures under a federal program were "inherently federal in character"—and thus preemptive—when they "originate[d] from, [were] governed by, and terminate[d] according to federal law"). By regulating on top of what the 340B Program

already requires, H.B. 2385 would "detract[ ] from the integrated scheme of regulation created by Congress." *Arizona*, 567 U.S. at 402 (internal citation and quotation omitted).

### 2. H.B. 2385 Is Preempted Under Conflict Preemption Principles.

H.B. 2385 is also preempted under conflict preemption principles. By modifying the 340B Program in several key ways, the state law interferes with the methods by which Congress sought to achieve its objectives. In doing so, H.B. 2385 would impede "the full purposes and objectives of Congress" and "interfere[ ] with the methods by which the federal statute was designed to reach [its] goal[s]." *International Paper Co. v. Ouellette*, 479 U.S. 481, 492, 494 (1987) (quotation omitted). H.B. 2385 conflicts with federal law in three main ways. We take each in turn below.

### a. Expanding the Transactions Triggering 340B Pricing

First, H.B. 2385 interferes with federal law by requiring that manufacturers provide 340B pricing in situations where the federal statute does not. Multiple courts have held that federal law does *not* require manufacturers to offer 340B prices on an unlimited number of contract pharmacy arrangements. *Novartis*, 102 F.4th at 461; *Sanofi*, 58 F.4th at 703; *Novartis*, 2021 WL 5161783, at *7; *AstraZeneca Pharms. LP v. Becerra*, 543 F. Supp. 3d 47, 61 (D. Del. 2021). The D.C. Circuit held that manufacturers must merely make an "offer" to sell their drugs to a covered entity at 340B prices, and noted that Congress's silence on contract pharmacies intentionally "preserves, rather than abrogates, the ability of sellers to impose at least some conditions on contract pharmacies." *Novartis*, 102 F.4th at 460. The Third Circuit agreed, noting that Congress originally proposed legislation that *would* have required recognition of contract pharmacy arrangements, but then dropped that language from the bill. *Sanofi*, 58 F.4th at 705. Federal law thus gives manufacturers some discretion as to when to recognize contract pharmacy arrangements.

H.B. 2385 frustrates the objectives of federal law by abrogating that discretion. The Oregon law forbids manufacturers to "[d]eny, restrict, prohibit, or otherwise interfere" with contract

pharmacies from acquiring a "340B drug"—defined to mean a drug "subject to an offer of a reduced price" under the federal 340B Program. H.B. 2385 §§ 1(1)(c); (1)(2)(a). In other words, the state law mandates that manufacturers give 340B pricing on acquisitions by contract pharmacies. By giving covered entities the unfettered ability to demand 340B pricing on contract pharmacy purchases, H.B. 2385 will improperly swell the 340B Program even further. Verified Compl. ¶ 54. But states may not impose on manufacturers "a duty" that federal law expressly declined to impose. *Geier v. American Honda Motor Co.*, 529 U.S. 861, 881 (2000) (state law mandating a safety feature that Congress had left to the discretion of manufacturers was preempted).

And there can be no doubt that H.B. 2385 mandates 340B discounts on contract pharmacy arrangements. The state law requires manufacturers to allow for delivery and dispensation of "340B drugs" by contract pharmacies. H.B. 2385 § 1(2)(a). The term "340B drug" is defined by state law to mean a drug that is subject to "a reduced price" under federal 340B law. *Id.* § 1(1)(c). And to be clear: There is no such thing as "340B drug"—there are only drugs, some of which are sold at the 340B discount. Manufacturers are already delivering these same drugs to pharmacies all over the state of Oregon at commercial pricing. Put another way, "[p]rice is what distinguishes between an 'ordinary drug' and a 340B Program drug." *Pharmaceutical Rsch. & Mfrs. of Am. v. Morrisey*, 760 F. Supp. 3d 439, 455 (S.D. W. Va. 2024) (addressing a similar West Virginia statute and finding it likely preempted by federal law).

That conclusion is underscored by the replenishment model, which is the dominant methods of offering 340B pricing in Oregon. Verified Compl. ¶ 38. A pharmacy first acquires drugs at commercial prices and stores and dispenses them without regard to 340B status. *Id.* ¶ 39. The pharmacy charges each customer her ordinary co-pay on each prescription fill and does not attempt to ascertain whether the transaction is 340B-eligible. *Id.* Later, the pharmacy or a third-party

administrator retroactively analyzes data generated by those transactions—using an opaque algorithm never disclosed to the manufacturers—to determine whether the sales were ostensibly eligible for 340B pricing. *Id.* After purporting to identify a certain number of such transactions, a demand is made for 340B pricing on "replenishment" units to be delivered to the contract pharmacy. *Id.* The pharmacy places those units back in common inventory, and they are again dispensed to the next customers to arrive at the pharmacy counter with a prescription. *Id.* These machinations are undertaken to effectuate after-the-fact 340B pricing. *Id.* ¶ 76.

The replenishment model treats 340B status like a baton that is passed from unit to unit according to whatever suits a covered entity's needs at a given time. *See* Verified Compl. ¶ 40. Thus, it is not even clear which drug a covered entity would argue is the "340B drug" for purposes of enforcing H.B. 2385—the drug initially dispensed to the purported patient of the covered entity, or the "replenishment" unit purchased at the 340B price and dispensed to the non-patient of the covered entity. All that matters to a covered entity is that it receives access to deeply discounted 340B pricing for as many units as it possibly can.

It is no answer for Oregon to say that H.B. 2385 pursues the same purpose as the federal 340B statute and merely expands its reach. No legislation serves its purpose at all costs, and the scope of the law is Congress's decision to make, not Oregon's. *See Cohen v. Apple Inc.*, 497 F. Supp. 3d 769, 780 (N.D. Cal. 2020) ("Where Congress has determined the appropriate balance [of interests]," additional state regulation may "upset that balance and be displaced by federal law even where the state 'attempts to achieve one of the same goals.' " (quoting *Arizona*, 567 U.S. at 406)), *aff'd*, 46 F.4th 1012 (9th Cir. 2022). In crafting the 340B statute, Congress carefully balanced the costs of compliance to ensure manufacturers were incentivized to participate in the 340B Program. H.B. 2385 seeks to ratchet up those costs, a "conflict in technique" that "interferes with"

Congress's design. *Valle del Sol*, 732 F.3d at 1026 (quoting *Arizona*, 567 U.S. at 406) (alterations

adopted). States do not have free rein to leverage access to Medicare and Medicaid to extract

whatever additional concessions they desire. But that is exactly what H.B. 2385 purports to do.

### b.    Conflicting Enforcement Procedures and Remedies

H.B. 2385 also is preempted because it sets up a shadow enforcement process to compete

with the unified federal enforcement regime Congress authored. *Astra*, 563 U.S. at 119–120. Un-

der federal law, there are only two enforcement pathways: HHS may impose "sanctions in the

form of civil monetary penalties"—but only up to $7,034, and only in the event of knowing and

intentional conduct.[8] Or covered entities may initiate ADR claims for alleged overcharges on

340B-eligible drugs. 42 U.S.C. § 256b(d)(3)(A); 42 C.F.R. § 10.20 *et seq.*[9] When Congress ex-

pressly provides for methods of enforcing a statute, courts presume those methods are exclusive.

*Middlesex Cnty. Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 20 (1981).

H.B. 2385 attempts to wrest control away from HHS and supplement the federal enforce-

ment process with an enforcement scheme all its own. The bill would allow the Oregon Board of

Pharmacy to enforce its modifications of the federal 340B Program and seek civil penalties up to

$5,000 per day "for each violation." *See* H.B. 2385 § 2(2). And in contrast to the federal scienter

standard, state law imposes penalties regardless of whether the violation was knowing and

---

[8]  42 U.S.C. § 256b(d)(1)(B)(vi); 42 C.F.R. § 1003.100 *et seq.*; 340B Drug Pricing Program Ceil-
ing Price and Manufacturer Civil Monetary Penalties Regulation, 82 Fed. Reg. 1,210, 1,210 (Jan.
5, 2017); Annual Civil Monetary Penalties Inflation Adjustment, 89 Fed. Reg. 64,815, 64,819
(Aug. 8, 2024) (adjusting the statutory penalty amount for inflation).

[9]  The availability of this enforcement mechanism is not hypothetical—multiple covered entities
brought ADR proceedings to challenge Novartis's contract pharmacy policies, characterizing
them as a form of overcharge. Novartis AG, *U.S. Securities & Exchange Commission Form 20-
F 2024* F-45 (Jan. 31, 2025), https://tinyurl.com/5n7r3s45. HRSA has now adopted manufactur-
ers' understanding of federal law. HRSA, *340B ADR Decision Summaries* (last updated May 15,
2025), https://tinyurl.com/2b9e24ec.

intentional. That is not permissible. *Nexus Pharms., Inc. v. Central Admixture Pharm. Servs.*, 48 F.4th 1040, 1048 (9th Cir. 2022) (holding that a federal agency's "statutory monopoly on enforcement authority" preempted related state-law claims that "facilitate[d] enforcement beyond what [the federal agency] deemed appropriate"). State enforcement of H.B. 2385 "could spawn a multitude of dispersed and uncoordinated" determinations of a manufacturer's 340B obligations, posing a "substantial" "risk of conflicting adjudications." *See Astra*, 563 U.S. at 120. Complying with the federal 340B statute "in the shadow of" potentially 50 parallel state regimes would also "dramatically increase the burdens facing" manufacturers—"burdens not contemplated by Congress in enacting" the 340B statute. *Buckman*, 531 U.S. at 350.

The state's parallel enforcement authority is especially problematic because the Oregon Board of Pharmacy cannot enforce H.B. 2385 without passing on several thorny federal questions. For example, the board would need to determine that each individual transaction involved a "340B drug," which is defined by cross-reference to discount obligations under the federal 340B statute. That, in turn, requires the state actor to find that the drug is a federally defined "covered outpatient drug," is sold to a federally defined "covered entity," does not violate federal prohibitions on duplication or diversion, and is otherwise eligible for 340B discounted pricing under federal law. *See* 42 U.S.C. §§ 256b(a)(1), (a)(4)–(5). Any one of these issues spawns tricky policy and legal issues under federal law, which must be handled by federal actors.

Parallel federal proceedings also might turn on precisely the same questions. 42 U.S.C. § 256b(d)(2)(B)(v); 42 C.F.R. § 10.21(a)(2). In particular, HRSA has promulgated a rule that opens the ADR process anytime "a manufacturer has limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. § 10.21(a). This is precisely what would be at issue in any effort to apply the new Oregon law. So the Oregon Board

of Pharmacy might determine that a manufacturer was obliged to offer 340B pricing on a particular unit, while HHS concludes that the manufacturer was *not* obliged to offer 340B pricing *on the same unit*.  Under H.B. 2385, a manufacturer could face steep fines in that situation—despite complying with the federal obligation state law supposedly incorporates.  Preemption does not get any plainer.  *See Maine Forest Prods. Council v. Cormier*, 51 F.4th 1, 10 (1st Cir. 2022) ("It is difficult to envision a more perfect collision of purposes" than for states to "forbid" what federal law "authorizes.").

Ultimately, the fact of separate adjudications overseen by different actors is the problem.  Where uniformity is part of Congress's goals, a multiplicity of adjudications itself frustrates federal purposes.  *See, e.g.*, *Cohen.*, 497 F. Supp. 3d at 785–786.  That is especially true here, where HHS would not even be a party to the state enforcement proceedings that implicate federal law.  *See Morrisey*, 760 F. Supp. 3d at 454 (explaining that if a manufacturer were to raise compliance with the federal 340B statute as a defense, there is no apparent federal mechanism for deciding the issue).  State law thus makes it impossible for HHS to remain "in control" of the federal 340B Program's "drug-price prescriptions."  *Astra*, 563 U.S. at 113–114.

The remedies imposed by state law also differ significantly from their federal counterparts.  The Oregon law imposes penalties without regard to whether the manufacturer acted willfully—in stark contrast to federal law.  *Compare* H.B. 2385 § 2(1), *with* 42 U.S.C. § 256b(d)(1)(B)(vi)(III).  And the penalty amount can be much higher than that imposed under federal law, violating Congress's carefully calibrated carrot-and-stick approach.  Federal law limits civil monetary penalties to $7,034, and even then only in the event of a knowing violation.  42 U.S.C. § 256b(d)(1)(B)(vi); 42 C.F.R. § 1003.100 *et seq.*  By contrast, violations of the Oregon law are punishable with fines up to **$5,000 per day for each violation** (without regard to scienter, unlike

federal law). H.B. 2385 § 2(1). As the Supreme Court has recognized, "conflict is imminent whenever two separate remedies are brought to bear on the same activity." *Wisconsin Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 286 (1986) (quotation omitted). In the face of such conflict, the Supremacy Clause dictates that state law must give way.

### c.    Frustration of Claims Data Collection

H.B. 2385 also clashes with federal law by prohibiting federally authorized collection of claims data. Novartis's contract pharmacy policy requires covered entities to provide basic claims data arising from contract pharmacy arrangements in order to remain eligible for 340B pricing. ECF No. 1-1 at 1. This data includes identification of the specific transaction as to which the discount is claimed, the drug at issue, the pharmacy name, the covered entity name, and the pre-scriber name. Novartis uses that data to try to "mitigate instances of duplicative discounts, and otherwise help maintain the integrity and sustainability of [the 340B] program." *Id.*

Federal law readily contemplates manufacturers having access to this claims data. Before a manufacturer may bring an ADR proceeding against a covered entity, it must first complete an audit of that covered entity, 42 U.S.C. § 256b(a)(5)(C); 42 C.F.R. § 10.21(a)(2). And before a manufacturer can initiate an audit, 340B Program guidance requires the manufacturer to amass "sufficient facts and evidence in support" of its concern as to that covered entity. Manufacturer Audit Guidelines and Dispute Resolution Process, 61 Fed. Reg. 65,406, 65,410 (Dec. 12, 1996). Thus, Novartis cannot access any part of Congress's enforcement scheme unless it can collect claims data. Covered entities supply no data about the basis for the requested discount under retroactive pricing models, so manufacturers usually do not receive sufficient data by default to clear that first hurdle. Verified Compl. ¶¶ 115, 116.

For that reason, multiple courts have held that federal law authorizes manufacturers to re-quire basic claims data as a reasonable condition of recognizing contract pharmacy arrangements.

*Novartis*, 102 F.4th at 463; *Sanofi*, 58 F.4th at 701, 706.[10]  Indeed, HRSA recently announced a pilot rebate program pursuant to which manufacturers would be expected to require claims data for certain drugs before providing 340B pricing in the form of a rebate.  HRSA, 340B Program Notice: Application Process for the 340B Rebate Model Pilot Program, 90 Fed. Reg. 36,163 (Aug. 1, 2025).  HRSA has said that it is considering expanding this program in the future.  *Id.* at 36,164.  Federal law, in other words, already addresses this subject directly—and that law is evolving under HRSA's centralized oversight.

H.B. 2385, by contrast, would keep 340B pricing opaque, thereby expanding the universe of sales subject to unlawful duplicate discounting.  Verified Compl. ¶¶ 117, 120.  That is a proto-typical example of state law "stand[ing] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.  *Fidelity Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982) (citation omitted).  If H.B. 2385's anti-transparency mandate takes effect, manufacturers will unknowingly offer unlawfully duplicative discounts that they would not other-wise provide.  If that occurs, "the federal objective of preventing fraud in the 340B Program" will be frustrated.  *Morrisey*, 760 F. Supp. 3d at 453.

## B.    H.B. 2385 Violates the Dormant Commerce Clause.

H.B. 2385 is also unenforceable under the dormant Commerce Clause.  The Commerce Clause grants Congress the power to regulate commerce among the several states.  U.S. Cont. art. I, § 8, cl. 3.  That power carries with it a "negative" or "dormant" restriction:  Even when Congress has not acted, states may not "discriminate against or burden the interstate flow of arti-cles of commerce."  *Oregon Waste Sys., Inc. v. Department of Env't Quality of State of Or.*, 511

---

[10]  It is therefore irrelevant that H.B. 2385 exempts data covered entities *must* provide under fed-eral law.  H.B. 2385 § 1(2)(b).  That provision is little help when federal law *authorizes* data col-lection rather than outright mandating it.

U.S. 93, 98 (1994).  A state statute violates the dormant Commerce Clause when it (1) discrimi-nates against interstate commerce in favor of in-state commerce; (2) regulates extraterritorial trans-actions; or (3) imposes excessive burdens on interstate commerce.  *See National Collegiate Ath-letic Ass'n v. Miller*, 10 F.3d 633, 638 (9th Cir. 1993); *National Pork Producers Council v. Ross*, 598 U.S. 356, 369, 376 n.1, 377–378 (2023).  H.B. 2385 does all three.

### 1.    H.B. 2385 Is Unlawfully Extraterritorial.

The prohibition against extraterritoriality rests on the fundamental idea that States lack "inherent . . . authority" to "directly control[ ] commerce occurring wholly outside" their borders. *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989); *see also Pork Producers*, 598 U.S. at 375, 376 n.1 (reaffirming the "territorial limits of state authority under the Constitution's horizontal separation of powers").  Under this principle, the existence of a local nexus cannot "validate the law if it regulates the out-of-state transactions." *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 580 (1986); *see also Edgar v. MITE Corp.*, 457 U.S. 624, 642–643 (1982) (the Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State"). Yet H.B. 2385 attempts to do just that.  It applies to transactions between out-of-state manufactur-ers and wholesalers that take place entirely outside Oregon's borders.

To see why, consider how pharmaceutical distribution interacts with retroactive pricing models.  Novartis is not located in Oregon.  Verified Compl. ¶ 21.  Distribution of its 340B-eligible drugs to individual pharmacies necessarily takes place through a complex series of interstate trans-actions.  Novartis enters into nationwide contracts to sell its medicines to wholesalers and distrib-utors at commercial prices. *Id.* ¶ 123.  The wholesalers and distributors then sell to national chain pharmacies before the products are ultimately distributed to, and dispensed by, an in-state contract pharmacy out of its common inventory. *Id.*

Under retroactive pricing models, the 340B discount later gets billed back to Novartis through a new transaction chain. For example, once a contract pharmacy's third-party administrator has purported to identify enough 340B-eligible transactions, it may submit a "replenishment" claim to the wholesaler, and the wholesaler would then arrange for the covered entity to be billed for that quantity at the 340B price (whether or not it ships new product to the contract pharmacy). Verified Compl. ¶ 124. The wholesaler then requests a refund from the manufacturer, and the manufacturer fulfills its purported 340B pricing obligation by paying the refund. *Id.*

Despite these distinct, and mostly out-of-state, transactions, H.B. 2385's broad language directly regulates only out-of-state manufacturers. It prohibits manufacturers from "*indirectly*" restricting "*or otherwise interfer[ing]*" with a contract pharmacy's ability to obtain 340B-priced product. H.B. 2385 § 1(2)(a) (emphases added). But manufacturers give the 340B discount to wholesalers, and both of these entities are typically located outside of the state. In this way, H.B. 2385 purports to "control" what Novartis can charge *wholesalers* in transactions "beyond the boundaries of the State." *Healy*, 491 U.S. at 336. H.B. 2385 therefore set the terms of a wholly out-of-state transaction between non-Oregon entities. Courts have not hesitated to invalidate laws containing this precise defect in the drug-pricing area. *E.g.*, *Association for Accessible Meds. v. Ellison*, 140 F.4th 957, 960–961 (8th Cir. 2025) (state law violated dormant Commerce Clause where it restricted prices manufacturer could charge its wholesalers, noting that due to the nature of drug distribution, the state law had an "impermissible extraterritorial effect" and effectively "set policy in other states"); *Association for Accessible Meds. v. Frosh*, 887 F.3d 664, 666 (4th Cir. 2018) (invalidating a Maryland law prohibiting "an unconscionable increase" in prescription drug pricing because it directly regulated the "price the manufacturer or wholesaler charge[d] *in the initial sale of the drug*," rather than the "the price the . . . consumer ultimately pays").

This case is no different. As the Ninth Circuit has recognized, States may not dictate the price of "a transaction that occurs wholly outside the State." *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1324 (9th Cir. 2015) (en banc). But H.B. 2385 forces manufacturers to pay wholesalers' refund requests to effectuate state-mandated 340B discounts. H.B. 2385 § 1(2)(a). The state law therefore impermissibly "insists that out-of-state manufacturers sell their drugs to wholesalers for a certain price." *Association for Accessible Meds.*, 140 F.4th at 961. And the Supreme Court's recent *Pork Producers* decision leaves intact the longstanding rule that "*directly regulat*[ing] out-of-state transactions" in this way violates the dormant Commerce Clause. 598 U.S. at 376 n.1.

For the same reason, H.B. 2385 is fundamentally different from attempts to regulate in-state behavior that create incidental impacts on out-of-state commerce. *See, e.g.*, *Pork Producers*, 598 U.S. at 371 (upholding a state law that "impose[d] substantial new costs on out-of-state pork producers *who wish to sell their products in California*") (emphasis added). H.B. 2385 instead requires manufacturers to go along with a *new* transaction outside of Oregon: payment of a rebate to wholesalers. Verified Compl. ¶ 124. There is no relevant in-state conduct by Novartis to regulate. By definition, Novartis can meet H.B. 2385's demands only by restructuring its out-of-state conduct. *Id.* ¶¶ 123–124, 128–129. But Oregon cannot regulate beyond its borders.

### 2.    H.B. 2385 Discriminates Against Out-of-State Commerce.

H.B. 2385 also engages in "economic protectionism"—the "very core" of a dormant Commerce Clause challenge. *Pork Producers*, 598 U.S. at 357. States may not enact regulations to benefit in-state economic interests at the expense of out-of-state competitors. *See id.* State laws that discriminate against "nonresident economic actors," are invalid unless they are "narrowly tailored to advance a legitimate local purpose." *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*,

588 U.S. 504, 518 (2019) (cleaned up); *Department of Revenue of Ky. v. Davis*, 553 U.S. 328, 338 (2008) (discriminatory laws are "virtually *per se* invalid").

H.B. 2385 exists to benefit in-state hospitals and pharmacies by forcing out-of-state man-ufacturers to give them steep discounts far beyond what federal law requires. This point was made clear by the two lawmakers who sponsored the bill. Both submitted floor letters urging the legis-lature to "hold drug companies accountable" to "Oregonians" and explaining the bill's purpose to "restore[ ] funding" to Oregon "hospitals and health centers . . . at no cost to Oregon's taxpayers." Letter from Senator Deb Patterson to the Oregon Senate (submitted May 28, 2025), https://ti-nyurl.com/529vzm36; Letter from Representative Rob Nosse to Oregon House of Representatives (submitted April 14, 2025), https://tinyurl.com/2ude8xmf. Animus against non-Oregon entities does not get much clearer than that.

That motive is impermissible. The dormant Commerce Clause acts to preserve a compet-itive national market "undisturbed by" such "preferential advantages" to in-state interests. *GMC v. Tracy*, 519 U.S. 278, 299 (1997); *see also Brown-Forman*, 476 U.S. at 580 (explaining that "[e]conomic protectionism is not limited to attempts to convey advantages on local merchants" but also includes attempts "to give local consumers an advantage over consumers in other States"). Out-of-state manufacturers like Novartis operate within the same chain of distribution as in-state contract pharmacies and covered entities, selling the same products to a "single market" of patients and competing vertically for a share of the profit. *GMC*, 519 U.S. at 300. But H.B. 2385 imper-missibly purports to "build up . . . domestic commerce" by privileging in-state interests at Novartis and other drug manufacturers' expense. *Pork Producers*, 598 U.S. at 369 (quoting *Guy v. Balti-more*, 100 U.S. 434, 443 (1880)).

Far from satisfying the "strictest scrutiny," Oregon has no legitimate justification for discriminating against out-of-state manufacturers in this way. *Oregon Waste Sys.*, 511 U.S. at 101. There is no suggestion here that Oregon covered entities or pharmacies are subject to some unique disadvantage—nor can there be, given that the federal 340B Program establishes uniform national requirements for participants, which Novartis unquestionably observes. *Novartis*, 102 F.4th at 463–464; *Sanofi*, 58 F.4th at 703–706.[11]  The benefits from unlimited contract pharmacy arrangements that H.B. 2385 seeks to create do not run to local patients or the public. Verified Compl. ¶ 134. Novartis, through its wholesalers, *already delivers* the very same drug products to the very same pharmacies, which routinely dispense them without regard to whether a patient is 340B-eligible. And revenue generated from the 340B discount increasingly falls into the hands of for-profit middlemen. *Id.*; *see also, e.g.*, *Novartis*, 102 F.4th at 457–458.  Other, more targeted means, such as direct grants to hospitals and pharmacies, would better support these entities without discriminating against interstate commerce.

### 3. H.B. 2385 Excessively Burdens Interstate Commerce.

Finally, even if Oregon's law were not discriminatory, it would still fail under the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970).  H.B. 2385 imposes a substantial burden on interstate commerce that is excessive compared to the purported local benefits. *Id.* at 142; *see also, e.g.*, *Association of Am. Railroads v. Randolph*, No. 2:23-CV-1154, 2024 WL 664359, at *10 (E.D. Cal. Feb. 16, 2024) (finding nondiscriminatory burdens on interstate commerce sufficient to state a dormant Commerce Clause claim after *Pork Producers*).

---

[11]  If anything, Novartis's policy is more generous than what federal law requires because it allows covered entities to dispense their discounted drugs through a contract pharmacy—and exempts federal grantees from contract pharmacy restrictions or data provision requirements entirely. *See* ECF No. 1-1 at 1.

H.B. 2385 forcibly shifts the bargaining power along the distribution chain by requiring out-of-state manufacturers to subsidize in-state industries. To comply with the law, manufacturers face high administrative costs, as they must now make state-specific exceptions to formerly national contract pharmacy policies. Verified Compl. ¶ 136. To make matters worse, state-specific pricing laws collectively impose conflicting requirements on drug manufacturers and their wholesalers and distributors. *See Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 616 (9th Cir. 2018) (invalidating a state law with "the baleful effect of subjecting businesses to conflicting requirements"). The burden from inconsistent regulation of these inherently national activities falls entirely on non-Oregon entities. And the Court must also consider the burden that would arise if "many or every[ ] State adopted similar legislation." *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992) (quoting *Healy*, 491 U.S. at 336). "The effect of such a patch-work regulatory scheme would be immense." *Union Pac. R.R. Co. v. California Pub. Utilities Comm'n*, 346 F.3d 851, 871 (9th Cir. 2003) (invalidating such a scheme under *Pike*).

That burden is no hypothetical concern. Already, Arkansas, Colorado, Kansas, Louisiana, Maine, Maryland, Minnesota, Mississippi, Missouri, Nebraska, New Mexico, North Dakota, Oklahoma, Rhode Island, South Dakota, Tennessee, Utah, Vermont, and West Virginia have enacted similar laws.[12] As Oregon and other states continue to enact conflicting 340B laws, Novartis will be increasingly unable to implement the federal 340B program on a uniform, nationwide basis.

---

[12] Arkansas (Ark. Code § 23-92-601 *et seq.*); Colorado (Colo. R.S. § 6-29-101 *et seq.*); Hawaii (H.B. 712 (2025)); Kansas (Kan. Stat. § 65-483); Louisiana (La. Rev. Stat. § 40:2883); Maine (L.D. 210 (2025)); Maryland (H.B. 1056 (2024)); Minnesota (H.F. 4991 (2024)); Mississippi (Miss. Code § 75-24-5); Missouri (H.B. 728 (2024)); Nebraska (Neb. L.B. 168, § 3(1) (2025)); New Mexico (N.M. H.B. 78 (2025)); North Dakota (N.D. Cent. Code § 43-15.3-08); Oklahoma (H.B. 2048 (2025)); Rhode Island (S.B. 114 (2025)); South Dakota (S.B. 154 (2025)); Tennessee (S.B. 1414 (2025)); Utah (Utah Code § 31A-46-311); Vermont (H. 266 (2025)); and West Virginia (W. Va. Code § 60A-8-6a).

This is exactly the compounding burden on interstate commerce that the dormant Commerce Clause prohibits. *E.g.*, *Frosh*, 887 F.3d at 673 (holding that a drug-pricing statute disproportionately burdened interstate commerce when it had "the potential to subject prescription drug manufacturers to conflicting state requirements").

## II.    NOVARTIS WILL SUFFER IRREPARABLE HARM ABSENT RELIEF.

Novartis will be irreparably harmed unless this Court enjoins Defendants from enforcing H.B. 2385. If Novartis comes into compliance with the law, it will have to devote significant time and resources to satisfy the requirements of an unconstitutional law. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). And being subject to an unconstitutional law is also itself a serious irreparable harm. *American Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009) (holding that being forced to agree to "conditions which are likely unconstitutional because they are preempted" constituted irreparable injury). This is especially true here, where enforcement of H.B. 2385 would undermine Novartis's ability to rely on rights conferred by federal law that protect its conduct. *See Novartis*, 102 F.4th at 463–464; *Sanofi*, 58 F.4th at 703–706.

Compliance with H.B. 2385 will also cost Novartis millions in discounts it is not required to offer under federal law. Ex. 1 (McCrudden Decl.) ¶ 16. Although economic loss alone is sometimes held not to qualify as irreparable injury, the amounts lost due to compliance with Oregon law are unrecoverable, not least because of the State's sovereign immunity. *E.g.*, *Idaho v. Coeur D'Alene Tribe*, 794 F.3d 1039, 1046 (9th Cir. 2015).

On the other hand, if Novartis does not comply with H.B. 2385, it could face costly enforcement actions and severe penalties. Novartis could be subject to fines of up to $5,000 per violation, with each day considered a separate violation. H.B. 2385 § 2(2). Regardless of the

ultimate penalty, any enforcement action will at a minimum require Novartis to expend significant resources defending itself or its employees. Verified Compl. ¶ 145. None of those sanctions or costs could ever be recovered.

Whatever Novartis chooses, it will be forced to divert time and resources away from its core business—researching and developing crucial new drug therapies for patients. Novartis relies on the revenue it generates from the sale of its innovator drug products to recoup the costs from developing them. *See* McCrudden Decl. ¶ 18. Loss of revenue will, in turn, hurt Novartis's ability to invest in new medications and improve existing ones, and there is no way to recover the lost opportunity costs from reducing investment in research and development. *Id.* ¶ 19.

## III.    THE EQUITIES AND THE PUBLIC INTEREST FAVOR AN INJUNCTION.

The balance of equities also tips strongly in Novartis's favor. Injunctive relief will preserve the status quo and cause no harm to Defendants. *See, e.g.*, *April in Paris v. Becerra*, 494 F. Supp. 3d 756, 771 (E.D. Cal. 2020) (finding a preliminary injunction "proper" because it "preserve[d] the *status quo ante*" and caused "no new harms" to the State). Oregon's "interest ends where the preemptive effect of federal law begins." *Id.*; *see also GEO Grp., Inc. v. Inslee*, 720 F. Supp. 3d 1029, 1068 (W.D. Wash. 2024) (finding an injunction in the public interest because the state law likely violated the Supremacy Clause). Preserving the status quo would also prevent Novartis from being harmed by being forced to provide massive discounts not required by federal law. Verified Compl. ¶ 143, 147.

Nor will injunctive relief cause any harm to patients, who do not typically benefit from 340B discounts. Verified Compl. ¶¶ 40, 148. An injunction would not cause patients to lose access to any drugs or to travel farther to receive their medications; the vast majority of patients do not care—or ever even know—that they "participate" in the 340B Program. *See id.* ¶ 40, 46.

And Novartis will continue to participate fully in the federal 340B Program, meeting all requirements that federal law imposes. *See, e.g.*, *Association for Accessible Meds. v. Bonta*, 562 F. Supp. 3d 973, 989 (E.D. Cal. 2021) (finding the State's interest "relatively *de minimis*" when, even with a preliminary injunction in place, the plaintiff would still be subject to federal antitrust law).

Finally, an injunction is in the public interest. It is not "equitable or in the public interest" for a State "to violate the requirements of federal law." *Valle del Sol*, 732 F.3d at 1029. Rather, "the interest of preserving the Supremacy Clause is paramount." *California Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 853 (9th Cir. 2009), *vacated and remanded on other grounds sub nom. Douglas v. Indep. Living Ctr. of S. Cal., Inc.*, 565 U.S. 606 (2012); *see also Small v. Avanti Health Sys., LLC*, 661 F.3d 1180, 1197 (9th Cir. 2011) (recognizing that "the public interest favors applying federal law correctly"). Likewise, an injunction will preserve the operation of the federal 340B Program as Congress—acting on behalf of the public—intended it to function. *See, e.g.*, *American Trucking Ass'ns*, 559 F.3d at 1059–60 (finding "the public interest represented in Congress' decision" and in "the Constitution's declaration that federal law is to be supreme"); *United States v. Alabama*, 691 F.3d 1269, 1301 (11th Cir. 2012) ("Frustration of federal statutes and prerogatives are not in the public interest."). The federal 340B statute "reflect[s] a judgment by Congress" that exclusive federal enforcement by HHS serves "the public interest." *See Azar*, 911 F.3d at 581 (quotation omitted). An injunction would respect that judgment—as the Supremacy Clause requires.

## CONCLUSION

For all those reasons, the Court should preliminarily enjoin Defendants from enforcing H.B. 2385 against Novartis or any of its affiliates, officers, agents, representatives, or contractors pending a merits decision.

Dated: August 18, 2025.                          Respectfully submitted,

                                                 /s/ Paul Conable
                                                 Paul Conable, OSB No. 975368
                                                 Steven D. Olson, OSB No. 003410
                                                 TONKON TORP LLP
                                                 1300 S.W. Fifth Avenue, Suite 2400
                                                 Portland, OR 97201
                                                 Telephone: (503) 802-2188
                                                 paul.conable@tonkon.com

                                                 Susan M. Cook*
                                                 Jessica L. Ellsworth*
                                                 Alexander V. Sverdlov*
                                                 Marlan Golden*
                                                 Jacob T. Young*
                                                 HOGAN LOVELLS US LLP
                                                 555 Thirteenth Street, N.W.
                                                 Washington, D.C. 20004-1109
                                                 Telephone: (202) 637-5600
                                                 Facsimile: (202) 637-5910
                                                 susan.cook@hoganlovells.com

                                                 *Attorneys for Plaintiff Novartis Pharmaceuticals Corporation*

                                                 *Motion for admission pro hac vice forthcoming*