Paul Conable, OSB No. 975368
  Direct:  503.802.2188
  Email:  paul.conable@tonkon.com
Steven D. Olson, OSB No. 003410
  Direct:  503.802.2159
  Email:  steven.olson@tonkon.com
Tonkon Torp LLP
1300 SW Fifth Ave., Suite 2400
Portland, OR 97201
Facsimile:  503.274.8779

*Attorneys for Plaintiff*
*Novartis Pharmaceuticals*
*Corporation*

Susan Cook*
  Email:  susan.cook@hoganlovells.com
Jessica L. Ellsworth*
  Email:  jessica.ellsworth@hoganlovells.com
Alexander V. Sverdlov*
  Email:  aleks.sverdlov@hoganlovells.com
Marlan Golden*
  Email:  marlan.golden@hoganlovells.com
Jacob T. Young*
  Email:  jake.young@hoganlovells.com
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-5600

*Admitted pro hac vice*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(PORTLAND DIVISION)

| | |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>    Plaintiff,<br><br>    v.<br><br>OREGON BOARD OF PHARMACY PRESIDENT RICHARD JOYCE, in his official capacity; OREGON BOARD OF PHARMACY VICE PRESIDENT AMY KIRKBRIDE, in her official capacity; and MEMBERS OF THE OREGON BOARD OF PHARMACY KATHLEEN CHINN, JENNIFER HALL, VICTORIA KROEGER, PRIYAL PATEL, ANA PINEDO, and BRYAN SMITH, in their official capacities,<br><br>    Defendants. | No. 3:25-CV-1330-IM<br><br>**PLAINTIFF NOVARTIS PHARMACEUTICALS CORPORATION'S MOTION FOR SUMMARY JUDGMENT**<br><br>**ORAL ARGUMENT REQUESTED** |

**LOCAL RULE 7-1 CERTIFICATION**

Pursuant to Local Rule 7-1, counsel for Plaintiff Novartis Pharmaceuticals Corporation

("Plaintiff" or "Novartis") certifies that the parties made a good faith effort through telephone

conference and e-mail communication to resolve the disputes which are the subject of this motion, but were unable to do so.

## MOTION

Plaintiff Novartis Pharmaceuticals Corporation moves this Court to enter summary judgment in its favor on Counts I–III of Novartis's Verified Complaint (ECF No. 1). Novartis challenges the constitutionality of H.B. 2385, a new state law that purports to change the scope of the federal 340B Drug Pricing Program within Oregon. Oregon Legis. Info., H.B. 2385 (last visited Nov. 20, 2025), https://tinyurl.com/3fa8d7mh. For the following reasons, as well as those set out in the accompanying brief in support, the Court should declare H.B. 2385 unlawful and permanently enjoin Defendants from enforcing it against Novartis.

The federal 340B statute requires drug manufacturers to provide deeply discounted prices on certain drugs purchased by qualifying "covered entities"—*non-profit* hospitals and clinics meeting statutory criteria. H.B. 2385 expands the scope of this mandate by requiring that manufacturers provide 340B discounts on transactions involving an unlimited number of *for-profit* contract pharmacies. In this way, H.B. 2385 requires Novartis to offer far more 340B discounts than federal law requires it to provide. The state law also forbids manufacturers to require covered entities to submit basic claims data as a condition for receiving 340B pricing—a condition federal law allows manufacturers to impose. Federal law preempts H.B. 2385, under both field- and conflict-preemption principles.

The state law also violates the dormant Commerce Clause. It operates as a price cap on wholly out-of-state sales between manufacturers and wholesalers, an unlawful form of extraterritorial control. The law engages in forbidden economic protectionism by forcing out-of-state drug manufacturers like Novartis to further subsidize in-state hospitals and pharmacies. And it

contributes to a patchwork of conflicting federal and state regulation of the 340B Program, impos-

ing administrative costs that clearly exceed the law's illusory local benefits.

Novartis respectfully requests oral argument on this motion. It estimates that two hours of

argument time will suffice. This motion is supported by Plaintiff's Memorandum in Support of

Motion for Summary Judgment and the Declaration of Shannon McCrudden.

Dated: November 20, 2025                              Respectfully submitted,


                                                     /s/ Steven D. Olson
                                                     Paul Conable, OSB No. 975368
                                                     Steven D. Olson, OSB No. 003410
                                                     TONKON TORP LLP
                                                     1300 S.W. Fifth Avenue, Suite 2400
                                                     Portland, OR 97201
                                                     Telephone: (503) 802-2188
                                                     paul.conable@tonkon.com

                                                     Susan Cook*
                                                     Jessica L. Ellsworth*
                                                     Alexander V. Sverdlov*
                                                     Marlan Golden*
                                                     Jacob T. Young*
                                                     HOGAN LOVELLS US LLP
                                                     555 Thirteenth Street, N.W.
                                                     Washington, D.C. 20004-1109
                                                     Telephone: (202) 637-5600
                                                     susan.cook@hoganlovells.com

                                                     *Attorneys for Plaintiff Novartis
                                                     Pharmaceuticals Corporation*

                                                     *Admitted pro hac vice*

Paul Conable, OSB No. 975368
  Direct: 503.802.2188
  Email: paul.conable@tonkon.com
Steven D. Olson, OSB No. 003410
  Direct: 503.802.2159
  Email: steven.olson@tonkon.com
Tonkon Torp LLP
1300 SW Fifth Ave., Suite 2400
Portland, OR 97201
Facsimile: 503.274.8779

*Attorneys for Plaintiff*
*Novartis Pharmaceuticals*
*Corporation*

Susan Cook*
  Email: susan.cook@hoganlovells.com
Jessica L. Ellsworth*
  Email: jessica.ellsworth@hoganlovells.com
Alexander V. Sverdlov*
  Email: aleks.sverdlov@hoganlovells.com
Marlan Golden*
  Email: marlan.golden@hoganlovells.com
Jacob T. Young*
  Email: jake.young@hoganlovells.com
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-5600

*Admitted pro hac vice*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

(PORTLAND DIVISION)

| | |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>        Plaintiff,<br><br>   v.<br><br>OREGON BOARD OF PHARMACY PRESIDENT RICHARD JOYCE, in his official capacity; OREGON BOARD OF PHARMACY VICE PRESIDENT AMY KIRKBRIDE, in her official capacity; and MEMBERS OF THE OREGON BOARD OF PHARMACY KATHLEEN CHINN, JENNIFER HALL, VICTORIA KROEGER, PRIYAL PATEL, ANA PINEDO, and BRYAN SMITH, in their official capacities,<br><br>        Defendants. | No. 3:25-CV-1330-IM<br><br>**PLAINTIFF NOVARTIS PHARMACEUTICALS CORPORATION'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION .............................................................................................................. 1

STATEMENT OF FACTS ................................................................................................. 4

ARGUMENT ................................................................................................................... 13

I.   H.B. 2385 IS FEDERALLY PREEMPTED ............................................................ 14

   A.   Federal Law Occupies the Field ..................................................................... 14

      1.   Congress Created a Uniform, Nationwide 340B Program .................... 15

      2.   The Federal Field Is the Scope of Manufacturers' 340B Obligations ... 16

      3.   Federal 340B Regulation Is Pervasive .................................................. 18

   B.   H.B. 2385 Conflicts with Federal Law ........................................................... 19

      1.   H.B. 2385 Forbids Conduct Purposely Allowed by Federal Law .......... 20

      2.   H.B. 2385 Upsets Congress's Careful Balancing of Interests ............... 22

      3.   H.B. 2385 Creates Conflicting Enforcement Procedures ..................... 23

      4.   H.B. 2385 Increases Potential 340B Penalties ..................................... 27

II.  H.B. 2385 VIOLATES THE DORMANT COMMERCE CLAUSE ........................... 28

   A.   H.B. 2385 Is Unlawfully Extraterritorial ....................................................... 28

   B.   H.B. 2385 Discriminates Against Out-of-State Commerce ............................ 30

   C.   H.B. 2385 Excessively Burdens Interstate Commerce ................................... 31

CONCLUSION ............................................................................................................... 33

# TABLE OF AUTHORITIES

Page(s)

CASES:

*AbbVie Inc. v. Drummond*, No. CIV-25-726-PRW,
  __ F. Supp. 3d __, 2025 WL 3048929 (W.D. Okla. Oct. 31, 2025) .....................17, 21, 22, 27

*Arizona v. United States*,
  567 U.S. 387 (2012)..............................................................................14, 15, 17, 18, 27

*Association for Accessible Meds. v. Ellison*,
  140 F.4th 957 (8th Cir. 2025) ...............................................................................29

*Association for Accessible Meds. v. Frosh*,
  887 F.3d 664 (4th Cir. 2018) ............................................................................29, 32

*Association of Am. Railroads v. Randolph*,
  No. 2:23-CV-1154, 2024 WL 664359 (E.D. Cal. Feb. 16, 2024) .........................................31

*Astra USA, Inc. v. Santa Clara County*,
  563 U.S. 110 (2011).................................................................1, 3, 6, 7, 15, 16, 24, 26

*Brown-Forman Distillers Corp. v. N.Y. State Liquor Auth.*,
  476 U.S. 573 (1986)..........................................................................................30

*Buckman Co. v. Plaintiff's Legal Comm.*,
  531 U.S. 341 (2001)..........................................................................................16

*Chamber of Com. of the U.S. v. Bonta*,
  62 F.4th 473 (9th Cir. 2023) ............................................................................19, 22

*Chlorine Inst., Inc. v. Cal. Highway Patrol*,
  29 F.3d 495 (9th Cir. 1994) ................................................................................27

*Cohen v. Apple Inc.*,
  46 F.4th 1012 (9th Cir. 2022) ...........................................................................22, 23

*Crosby v. National Foreign Trade Council*,
  530 U.S. 363 (2000)........................................................................................14, 27

*Cummings v. Premier Rehab Keller, P.L.L.C.*,
  596 U.S. 212 (2022).........................................................................................5

*Daniels Sharpsmart, Inc. v. Smith*,
  889 F.3d 608 (9th Cir. 2018) ............................................................................31–32

*Edgar v. MITE Corp.*,
    457 U.S. 624 (1982)..................................................................28

*Forest Park II v. Hadley*,
    336 F.3d 724 (8th Cir. 2003) ....................................................23

*Gade v. National Solid Wastes Mgmt. Ass'n*,
    505 U.S. 88 (1992)...............................................................14, 17

*Geier v. American Honda Motor Co.*,
    529 U.S. 861 (2000)..................................................................22

*Geo Grp., Inc. v. Newsom*,
    50 F.4th 745 (9th Cir. 2022) (en banc) ....................................27

*Guy v. Baltimore*,
    100 U.S. 434 (1880)..................................................................30

*Hawaii Newspaper Agency v. Bronster*,
    103 F.3d 742 (9th Cir. 1996) ....................................................14

*Healy v. Beer Inst.*,
    491 U.S. 324 (1989)..............................................................29, 32

*International Paper Co. v. Ouellette*,
    479 U.S. 481 (1987)..................................................................19

*Kurns v. Railroad Friction Prods. Corp.*,
    565 U.S. 625 (2012)..................................................................16

*McDaniel v. Wells Fargo Invs., LLC*,
    717 F.3d 668 (9th Cir. 2013) ................................................20, 21

*Montalvo v. Spirit Airlines*,
    508 F.3d 464 (9th Cir. 2007) ................................................14–18

*National Collegiate Athletic Ass'n v. Miller*,
    10 F.3d 633 (9th Cir. 1993) ......................................................28

*National Fed'n of the Blind v. United Airlines Inc.*,
    813 F.3d 718 (9th Cir. 2016) ................................................15–19

*National Pork Producers Council v. Ross*,
    598 U.S. 356 (2023)..............................................................28–30

*Nexus Pharms., Inc. v. Central Admixture Pharm. Servs., Inc.*,
    48 F.4th 1040 (9th Cir. 2022) ..................................................26

*Novartis Pharms. Corp. v. Espinosa*,
  No. 21-CV-1479, 2021 WL 5161783 (D.D.C. Nov. 5, 2021) ................................................11

*Novartis Pharms. Corp. v. Johnson*,
  102 F.4th 452 (D.C. Cir. 2024)..................................................2, 8, 9, 11, 20, 21, 31

*Occidental Eng'g Co. v. INS*,
  753 F.2d 766 (9th Cir. 1985) ........................................................................13

*Oregon Nat. Desert Ass'n v. Cain*,
  17 F. Supp. 3d 1037 (D. Or. 2014) ..............................................................14

*Oregon Waste Sys., Inc. v. Dep't of Env't Quality of the State of Or.*,
  511 U.S. 93 (1994).................................................................................28, 30

*Pennhurst State Sch. & Hosp. v. Halderman*,
  451 U.S. 1 (1981).......................................................................................5

*Pharmaceutical Rsch. & Mfrs. of Am. v. Morrisey*,
  760 F. Supp. 3d 439 (S.D. W. Va. 2024) ......................................................26

*Pike v. Bruce Church, Inc.*,
  397 U.S. 137 (1970)..................................................................................31

*Sam Francis Found. v. Christies, Inc.*,
  784 F.3d 1320 (9th Cir. 2015) ....................................................................28

*Sanofi Aventis U.S. LLC v. HHS*,
  58 F.4th 696 (3d Cir. 2023) ......................................2, 9, 11, 20, 21, 31

*Schneidewind v. ANR Pipeline Co.*,
  485 U.S. 293 (1988)..................................................................................19

*Tennessee Wine & Spirits Retailers Ass'n v. Thomas*,
  588 U.S. 504 (2019)..................................................................................30

*Union Pac. R.R. Co. v. Cal. Pub. Utilities Comm'n*,
  346 F.3d 851 (9th Cir. 2003) ......................................................................32

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) ..............................................................17, 27

*Whistler Invs., Inc. v. Depository Tr. & Clearing Corp.*,
  539 F.3d 1159 (9th Cir. 2008) ....................................................................22

*Wisconsin Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*,
  475 U.S. 282 (1986)..................................................................................27

*Wyoming v. Oklahoma,*
    502 U.S. 437 (1992) .............................................................................32

**CONSTITUTIONAL PROVISIONS:**

U.S. Cont. art. I, § 8, cl. 3 ............................................................................28

**RULES:**

Fed. R. Civ. P. 56(a) ....................................................................................13

**STATUTES:**

42 U.S.C. § 1396d(l)(2)(B) ..........................................................................12

42 U.S.C. § 1396r-8(a)(1) ..............................................................................4

42 U.S.C. § 1396r-8(a)(5)(A) .........................................................................4

42 U.S.C. § 256b ..........................................................................................16

42 U.S.C. § 256b(a)(1) .............................................................................4, 18

42 U.S.C. § 256b(a)(2) .............................................................................4, 18

42 U.S.C. § 256b(a)(3) ..................................................................................18

42 U.S.C. § 256b(a)(4) .............................................................................4, 18

42 U.S.C. § 256b(a)(5) ..................................................................................18

42 U.S.C. § 256b(a)(5)(B) .............................................................................25

42 U.S.C. § 256b(a)(5)(C) ...............................................................................7

42 U.S.C. § 256b(a)(8) ..................................................................................18

42 U.S.C. § 256b(d)(1)(B)(vi) ...............................................................6, 23, 27

42 U.S.C. § 256b(d)(1)(B)(vi)(II) ....................................................................6

42 U.S.C. § 256b(d)(1)(B)(vi)(III) ...................................................................6

42 U.S.C. § 256b(d)(2)(B)(iv) .......................................................................18

42 U.S.C. § 256b(d)(2)(B)(v) ........................................................................18

42 U.S.C. § 256b(d)(3) ...................................................................................6

42 U.S.C. § 256b(d)(3)(A) ...................................................................6, 18, 23

42 U.S.C. § 256b(d)(3)(B)(iv) ........................................................................7

H.B. 2385 § 1(1)(a) ...........................................................................12, 16, 24

H.B. 2385 § 1(1)(c) ......................................................................12, 16, 24, 25

H.B. 2385 § 1(2)(a) ..................................................................12, 16, 20, 24

H.B. 2385 § 1(2)(b) ........................................................................20, 24

H.B. 2385 § 2(1) ...........................................................................13, 27

**REGULATIONS:**

42 C.F.R. §§ 10.1–10.25 ...................................................................18

42 C.F.R. § 10.21(a) .......................................................................25

42 C.F.R. § 10.21(a)(1) ..................................................................7, 26

42 C.F.R. § 10.23 ..............................................................................7

42 C.F.R. § 10.24 ..............................................................................7

45 C.F.R. § 102.3 ..............................................................................6

61 Fed. Reg. 55,156 (Oct. 24, 1996)..................................................25

61 Fed. Reg. 65,406 (Dec. 12, 1996)...................................................7

75 Fed. Reg. 10,272 (Mar. 5, 2010).....................................................9

82 Fed. Reg. 1,210 (Jan. 5, 2017).......................................................4

89 Fed. Reg. 28,643 (Apr. 19, 2024) ...............................................7, 21

**LEGISLATIVE MATERIALS:**

Congressional Budget Off., *Growth in the 340B Drug Pricing Program*
 (Sep. 2025)....................................................................................10

H.R. Rep. No. 102-384(II) (1992) .......................................................4

Letter from Representative Rob Nosse to Oregon House of Representatives
 (submitted April 14, 2025)...............................................................30

Letter from Senator Deb Patterson to Oregon Senate (submitted May 28, 2025)........30

Senate Health, Education, Labor & Pensions Comm., *Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program* (Apr. 2025)...................................10, 12

**OTHER AUTHORITIES:**

Department of Health & Human Servs., *Example Pharmaceutical Pricing Agreement (PPA)* ...................................................................................................................5

Editorial, *A Good Idea to Cut Drug Costs*, WALL ST. J. (Sep. 21, 2025).....................................10

Milt Freudenheim, *Big Costs Imposed on Drug Makers*, N.Y. TIMES (Nov. 6, 1990) ....................................................................................................4

HRSA, 340B ADR Decision Summaries (last updated May 15, 2025) ........................................26

Medicaid & CHIP Payment & Access Comm'n (MACPAC), *The 340B Drug Pricing Program & Medicaid Drug Rebate Program: How They Interact* (May 2018)....................................................................................................4

Janet Weiner, *Community Health Centers & Value-Based Payment* (April 2024) ......................12

## INTRODUCTION

This case is about a new Oregon law, H.B. 2385, that purports to vastly—and unconstitutionally—expand the scope of a federal drug-pricing program.  Federal law purposely limits the program's scope, including by allowing manufacturers to impose reasonable conditions on access to discounted drugs.  The new Oregon law prevents manufacturers from imposing the very restrictions that federal law allows.  H.B. 2385 is unconstitutional because it is preempted by federal law under field- and conflict-preemption principles, and because it violates the dormant Commerce Clause.

Under federal law, in exchange for having their drugs reimbursed by Medicaid and Medicare Part B, manufacturers must offer to sell deeply discounted drugs to select providers called "covered entities."  The pricing rules, compliance obligations, and enforcement mechanisms surrounding this statutory requirement are collectively known as the 340B Drug Pricing Program. The 340B Program subsidizes covered entities by allowing them to buy drugs cheaply—as low as a penny per unit—while charging patients the drug's full commercial price.  Because covered entities can pocket the difference, they have unsurprisingly sought to maximize the 340B Program; every additional transaction completed at the 340B price boosts their bottom line.

Congress sought to balance two competing objectives when it created the 340B Program: subsidizing covered entities while not making the subsidy so large that it dissuades manufacturers from participating in Medicaid and Medicare Part B.  To ensure careful calibration of these objectives, Congress gave a single federal agency centralized oversight of both Medicaid and the 340B Program.  *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110, 119–120 (2011).

To supersize the number of 340B discounts they claim, covered entities started contracting with third-party pharmacies located all over the country—often large, for-profit chain pharmacies

like CVS or Walgreens. Covered entities hire data-crunchers called "third-party administrators" to retroactively analyze prescriptions previously filled at contract pharmacies, looking for pharmacy customers that covered entities could argue they treated at some point in the past. For each such connection the third-party administrator purports to find, the covered entity (or one of its for-profit partners) arranges for the pharmacy to acquire a discounted drug—which the pharmacy then sells to the next customer who walks in the door. The covered entity, third-party administrator, and pharmacy all split the resulting profit.

The 340B statute does not mention contract pharmacies. Four years after the 340B statute was enacted, however, the federal agency responsible for the 340B Program started allowing covered entities to use one contract pharmacy—primarily so entities without an in-house pharmacy could participate. The volume of 340B discount claims skyrocketed, ultimately leading some drug manufacturers (including Novartis) to introduce their own limits on the use of contract pharmacies as conditions of offering 340B pricing. Two circuit courts have now confirmed that Congress intentionally preserved manufacturers' discretion to recognize only one contract pharmacy and to require claims data as a condition of seeking a discount—the same conditions Novartis now requires in its contract pharmacy policy. *Novartis Pharms. Corp. v. Johnson*, 102 F.4th 452, 460 (D.C. Cir. 2024); *Sanofi Aventis U.S. LLC v. HHS*, 58 F.4th 696, 704–706 (3d Cir. 2023).

H.B. 2385 eliminates the discretion Congress preserved for manufacturers to impose reasonable commercial limits on covered entities' purchases. In fact, H.B. 2385 prohibits the very same manufacturer limits endorsed by *Novartis* and *Sanofi*: (1) restricting the number of contract pharmacy arrangements manufacturers recognize; and (2) requiring claims data about the specific units for which 340B discounts are sought. It also authorizes state enforcement of supposed 340B

requirements, destroying the federal government's ability to administer the program "on a uniform, nationwide basis." *Astra*, 563 U.S. at 120.

Federal law preempts H.B. 2385. The federal government has overriding interests in regulating the circumstances that trigger 340B discounts and in preserving the uniformity of 340B enforcement. The 340B statute's pervasive regulation of the program leaves no room for state supplementation. H.B. 2385 also frustrates Congress's goals in four ways: outlawing conduct Congress chose to allow as part of its balancing of objectives, tinkering with Congress's delicate balance of interests in the 340B Program, inviting inconsistent adjudications regarding manufacturers' 340B obligations, and backing up these modifications of the federal program with draconian new sanctions.

H.B. 2385 also violates the dormant Commerce Clause. The statute caps the price manufacturers may charge for drugs that end up at contract pharmacies in Oregon. But manufacturers sell their drugs to wholesalers outside of Oregon, and those wholesalers then resell those drugs to pharmacies. When covered entities located in Oregon demand 340B pricing for contract-pharmacy sales, the wholesaler provides the discount and then asks the manufacturer for reimbursement in a distinct transaction that takes place wholly outside the state. Such extraterritorial regulation is impermissible. And the law separately discriminates against interstate commerce and imposes burdens that clearly exceed its (illusory) local benefits, meaning it violates the dormant Commerce Clause in every way possible.

Novartis is therefore entitled to summary judgment on all three counts alleged in its Verified Complaint (ECF No. 1).

## STATEMENT OF FACTS

*The 340B Program and Medicaid*

Congress created the Medicaid Drug Rebate Program (MDRP) in 1990 as a bargain between drug manufacturers, states, and the federal government.[1]  In exchange for near-universal Medicaid coverage of their products, manufacturers in the MDRP agree to offer state Medicaid plans the "best price" given to any other purchaser.  H.R. Rep. No. 102-384(II), *9–10 (1992).  This design inadvertently discouraged drug manufacturers from continuing their longstanding practice of offering steep discounts to charitable hospitals.  *Id.*; *see also* Milt Freudenheim, *Big Costs Imposed on Drug Makers*, N.Y. TIMES (Nov. 6, 1990) at D2, https://tinyurl.com/368umt5y.

Congress created the 340B Program in 1992 to address that disincentive.  H.R. Rep. No. 102-384(II), *12 (1992).  Under the 340B Program, as a condition of having their drugs covered by Medicaid and Medicare Part B, manufacturers must offer to sell their products to certain healthcare providers at rock-bottom prices.  *See* 42 U.S.C. §§ 256b(a)(1), (a)(4), 1396r-8(a)(1), (a)(5)(A).  The select non-profit providers entitled to these discounts—called "covered entities"—are carefully delineated in the 340B statute.  *Id.* § 256b(a)(4).  340B prices, too, are set by a federal statutory formula that references MDRP pricing.  *Id.* §§ 256b(a)(1)–(2).  340B prices can drop as low as a penny.  82 Fed. Reg. 1,210, 1,215 (Jan. 5, 2017).  But covered entities need not pass on these discounts to their patients, and they mostly do not.  Verified Compl. ¶¶ 29, 40.

Limiting the circumstances in which covered entities can claim 340B discounts also guards against the runaway incentives the program otherwise creates.  Because covered entities need not give their patients 340B discounts, they can charge insurers and other payors the non-discounted

---

[1]  Medicaid & CHIP Payment & Access Comm'n (MACPAC), *The 340B Drug Pricing Program & Medicaid Drug Rebate Program: How They Interact* 1–2 (May 2018), https://tinyurl.com/43uum74c.

price of the drug.  Verified Compl. ¶ 40.  Suppose, for example, that an insurer has agreed to reimburse a hospital $50 for a unit of a particular drug.  If the hospital purchases that drug through the 340B Program, it may pay as little as a penny for it.  The insurer would nevertheless pay the full $50 (often unaware that the hospital has claimed the 340B discount), leaving the covered entity with $49.99 to spend however it chooses.  Covered entities are therefore motivated to maximize their number of 340B transactions, and guardrails on their ability to do so ensure the 340B Program does not become larger than Congress intended.

Congress also had a legal reason to cabin the 340B Program's size:  The program is an exercise of Congress's spending power, so manufacturers may choose whether to participate.  Such legislation "is much in the nature of a contract." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981).  Congress must spell out the conditions of participation unambiguously to give potential participants advance notice of what they are agreeing to do. *Cummings v. Premier Rehab Keller, P.L.L.C.*, 596 U.S. 212, 219 (2022).  If Congress made 340B burdens too heavy, manufacturers might abstain—which would hurt Medicaid and Medicare Part B, too.

Manufacturers therefore memorialize their 340B participation in a Pharmaceutical Pricing Agreement (PPA) with the federal government.  A PPA lists seven discrete "responsibilities" that a manufacturer accepts when it agrees to join the program.[2]  Only a drug manufacturer and the Secretary of Health and Human Services (HHS) are parties to a PPA, and the agreements are "construed in accordance with Federal common law." *Example PPA*, *supra* n.2, § VII(g).  By signing a PPA, a manufacturer indicates that it "voluntarily and knowingly accepts the terms" reflected in the 340B statute. *Cummings*, 596 U.S. at 219 (quotation omitted).

---

[2]  Department of Health & Human Servs., *Example Pharmaceutical Pricing Agreement (PPA)* § II, https://tinyurl.com/4nshe96y.

*340B's Nationwide Enforcement Mechanisms*

Congress vested HHS with exclusive authority to oversee the 340B Program. This centralization is critical to both the 340B Program and the MDRP. "The interdependent nature of the two programs' requirements means," as HHS has explained, that governance of "one program must proceed with an eye towards any implications for the other."[3] For this reason, Congress directed HHS to "administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis." *Astra*, 563 U.S. at 120. HHS currently administers 340B through its subagency the Health Resources and Services Administration (HRSA).

There are two enforcement methods spelled out in the 340B statute. The first is HHS's direct enforcement power. If a manufacturer fails to provide 340B pricing, HHS may impose "civil monetary penalties." 42 U.S.C. § 256b(d)(1)(B)(vi). But these penalties are carefully circumscribed: They apply only to "knowing[ ] and intentional[ ]" violations, *id.* § 256b(d)(1)(B) (vi)(III), and "shall not exceed $5,000" per violation, *id.* § 256b(d)(1)(B)(vi)(II).[4]

The second enforcement method is the Administrative Dispute Resolution (ADR) process. Congress instructed HHS to create an ADR system to resolve specific categories of 340B disputes between covered entities and manufacturers. *See* 42 U.S.C. § 256b(d)(3). Manufacturers may bring ADR claims alleging that a covered entity has diverted 340B-priced drugs to non-patients or claimed discounts that duplicate MDRP rebates. *Id.* § 256b(d)(3)(A). And according to a recently finalized HRSA regulation, covered entities may bring claims alleging that a manufacturer has

---

[3] Brief for the U.S. as Amicus Curiae Supporting Pet'rs at 34, *Astra USA, Inc. v. Santa Clara County*, 563 U.S. 110 (2011) (No. 09-1273), 2010 WL 4717264 (Nov. 19, 2010) (HHS Amicus Brief), https://tinyurl.com/bdeah9c4.

[4] HHS adjusts this amount annually for inflation. 45 C.F.R. § 102.3.

overcharged the entity or unduly "limited the covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price." 42 C.F.R. § 10.21(a)(1).

Manufacturers, however, must complete the statutory audit process before bringing an ADR claim. 42 U.S.C. § 256b(d)(3)(B)(iv). The 340B statute gives manufacturers the right to audit a covered entity's "records . . . that directly pertain to the entity's compliance." *Id.* § 256b(a)(5)(C). But HRSA guidance requires manufacturers to demonstrate "reasonable cause" to believe a covered entity has violated the statute before receiving permission to audit. 61 Fed. Reg. 65,406, 65,410 (Dec. 12, 1996).

A manufacturer's pathway to seeking redress against a covered entity thus involves multiple steps: First, gather enough data to show "reasonable cause" and convince HRSA to authorize an audit. Then, complete the audit. Finally, submit an ADR claim against the covered entity and litigate that claim through HRSA's panel decision and reconsideration process, as well as potential judicial review of the final agency decision. *See generally* 42 C.F.R. §§ 10.23–10.24.

That system is difficult for manufacturers to navigate without claims data from covered entities. According to HRSA's Director of the Office of Pharmacy Affairs, the agency approved just 37 audit plans in *over a decade*—and only 18 of those audits were successfully completed.[5] HRSA's final ADR rule thus noted the "infrequency of finalized manufacturer audit reports," identifying only *two* between November 2022 and April 2024. 89 Fed. Reg. 28,643, 28,644 (Apr. 19, 2024). Yet the Supreme Court has made clear that ADR proceedings are the sole method of adjudicating covered entities' and manufacturers' 340B obligations. *Astra*, 563 U.S. at 121–122.

---

[5] Declaration of Chantelle Britton, *University of Wash. Med. Ctr. v. Kennedy*, No. 24-CV-2998 (D.D.C. Dec. 20, 2024), ECF No. 22-1 ¶ 15.

**Contract Pharmacies**

Covered entities' profits from the 340B Program are driven by the number of units for which they claim the discount. *Supra* pp.4–5. This dynamic has "left the section 340B program vulnerable to abuse—at great cost to the manufacturers." *Novartis*, 102 F.4th at 455. Covered entities have devised creative ways to associate themselves with more and more transactions, facilitating claims that the manufacturer was required to sell a particular unit at the 340B price.

That's where "contract pharmacies" come in. A contract pharmacy is a for-profit, third-party pharmacy that dispenses drugs to any customer with a prescription. Verified Compl. ¶¶ 36–40. Some of these pharmacy customers will inevitably have visited one or more covered entities at one time or another. A contract pharmacy helps a covered entity supercharge its 340B profits by purporting to match pharmacy customers to people who have visited the covered entity—even if the visit was for an unrelated condition, or was many years ago, or both—allowing the covered entity to claim the pharmacy customer is also its "patient." *Id.* ¶ 39–42. To do that, the parties often employ a for-profit third-party administrator, whose job is to sift oceans of data, looking for these purported matches. *Id.* ¶ 39.

When it finds a supposed match, the covered entity claims 340B pricing for the unit previously bought by the pharmacy and dispensed to its customer. "The covered entity, the pharmacy, and the third-party administrator often divvy up the spread between the discounted price and the higher insurance reimbursement rate." *Novartis*, 102 F.4th at 457. The covered entity and its for-profit partners thus have "a financial incentive to catalog as many prescriptions as possible as eligible for the discount." *Id.* at 457–458. And these self-interested parties almost never reveal to manufacturers why they have claimed 340B pricing, or even identify the specific drug sales or patients that prompted the claim. Verified Compl. ¶ 45.

The timing of all this is key. By the time anyone claims 340B eligibility for a drug dispensed at a contract pharmacy, the customer has long since received the drug, paid full price, and returned home. Verified Compl. ¶¶ 39–40. Contract pharmacies are thus based on various retroactive accounting fictions to effectuate 340B pricing after the fact. The predominant method of doing so is called the "replenishment model." *Id.* ¶ 39 (explaining the mechanics). Because of these backward-looking pricing methods—and the fact that covered entities keep 340B discounts for themselves—contract pharmacies do not affect drug delivery or the prices people pay. *Id.* ¶¶ 40, 97. The same drugs are delivered to the same pharmacies and sold to their customers at the same prices, whether or not a covered entity later shoehorns itself into the transaction. *Id.* ¶ 12. These "patients" often have no idea they were ever part of the 340B Program. *Id.* ¶ 46.

The 340B Program has not always worked this way. In fact, the 340B statute says nothing about contract pharmacies; its text suggests Congress "had in mind one-to-one transactions between a covered entity and a drug maker." *Sanofi*, 58 F.4th at 704. But some covered entities lack an in-house pharmacy, and in 1996 HRSA recognized the use of *one* contract pharmacy as a way of permitting these covered entities to benefit from 340B pricing. 61 Fed. Reg. 43,549, 43,555 (Aug. 23, 1996). That guidance persisted until 2010, when "HRSA swerved" by opining that covered entities "may contract with an unlimited number of outside pharmacies . . . regardless of whether the entities have in-house pharmacies." *Novartis*, 102 F.4th at 457 (citing 75 Fed. Reg. 10,272, 10,272–73 (Mar. 5, 2010)).

HRSA's 2010 contract pharmacy guidance had dramatic consequences. Since 2010, the volume of 340B-priced sales has rocketed to over *ten times* its former size—going from about $6.6 billion to $66.3 billion. Verified Compl. ¶ 48. In just the last five years of available data, the 340B Program has grown by over 129 percent. *Id.* It is now the second-largest federal drug-pricing

program (behind only Medicare Part D), surpassing both Medicaid and Medicare Part B. *Id.* At the same time, the number of contract pharmacy arrangements exploded from about 1,300 in 2010 to about 35,000 today. *Id.* ¶ 49. The increase in the number of contract pharmacy arrangements has driven the growth in 340B discounts. A Senate committee recently examined the data and found "significant increases in 340B sales to contract pharmacies compared to direct sales to [covered entities]."[6] The Congressional Budget Office has found the same connection. Verified Compl. ¶ 54; *see also* Congressional Budget Off., *Growth in the 340B Drug Pricing Program* 19 (Sep. 2025) ("The expanded use of contract pharmacies increased the proportion of prescriptions for which 340B facilities received a 340B discount."), https://tinyurl.com/4j45ybvn.

Patients have felt little (if any) benefit from this growth. Covered entities have used 340B revenue for "deals with minor-league and college sports teams for naming rights," to launch "a film company," and to fuel industry consolidation that "has increased prices and insurance premiums."[7] Middlemen take their cut, too—about 16 percent of all 340B revenue now goes to for-profit contract pharmacies and third-party administrators. Verified Compl. ¶ 44.

### *Novartis's Contract Pharmacy Policy*

Concerned about this seemingly endless expansion, Novartis notified HRSA in 2020 that it would begin limiting the contract pharmacy arrangements it would recognize. Verified Compl. ¶ 59. HRSA issued a violation letter, claiming the 340B statute required Novartis to provide discounted pricing on transactions at unlimited contract pharmacies. *Id.* ¶ 61. Novartis challenged

---

[6] Senate Health, Education, Labor & Pensions Comm., *Congress Must Act to Bring Needed Reforms to the 340B Drug Pricing Program* 32–33 (Apr. 2025) (HELP Committee Report), https://tinyurl.com/bdd24yd4.

[7] *E.g.*, Editorial, *A Good Idea to Cut Drug Costs*, WALL ST. J. (Sep. 21, 2025), https://tinyurl.com/y3k63v3z.

that position in federal court as unlawful under the Administrative Procedure Act.  *Id.* ¶ 62.  The court vacated HRSA's violation letter, concluding the agency's argument "rest[ed] upon an erroneous reading of Section 340B."  *Novartis Pharms. Corp. v. Espinosa*, No. 21-CV-1479, 2021 WL 5161783, at *9 (D.D.C. Nov. 5, 2021).  "The statute's plain language, purpose, and structure do not prohibit drug manufacturers from attaching any conditions to the sales of covered drugs through contract pharmacies."  *Id.*

The D.C. Circuit agreed.  It pointed out that the federal statute says nothing about contract pharmacies, concluding that this "silence preserves—rather than abrogates—the ability of sellers to impose at least some delivery conditions."  *Novartis*, 102 F.4th at 460.  Manufacturers need only make a "bona fide offer" to sell covered entities 340B-priced drugs, which may include reasonable limits on the circumstances in which they will do so.  *Id.* at 462–463.  The court held that limiting covered entities to one contract pharmacy and requiring that pharmacy to share data explaining the basis for claiming 340B pricing was reasonable, lawful, and "consistent with historic practices under the section 340B program."  *Id.* at 463-464.

In 2023, the Third Circuit reached a similar conclusion regarding other manufacturers' policies.  Surveying the text, context, and history of the 340B statute, it concluded that federal law does not "require[e] delivery of discounted drugs to an unlimited number of contract pharmacies."  *Sanofi*, 58 F.4th at 704–706.  The court pointed out, for example, that Congress had rejected a bill that would have required manufacturers to provide discounts at contract pharmacies, and that "Section 340B's statutory neighbor" contains a similar requirement, showing that Congress purposely rejected the requirement HRSA advocated.  *Id.* at 704–705.

Novartis has since updated its contract pharmacy policy to reflect these decisions.  Verified Compl. ¶¶ 68–71.  Three aspects of that policy are most relevant here:  *First*, covered entities

without an in-house pharmacy may designate one contract pharmacy, but Novartis will otherwise provide 340B pricing only on purchases made directly by covered entities. *Id.* ¶¶ 63, 70–71. *Second*, to receive 340B pricing at a designated contract pharmacy, a covered entity must provide basic claims data to show eligibility for the discount on the requested purchases. *Id.* ¶ 69. *Third*, these conditions do not apply to federal grantees, who may continue to designate contract pharmacies without restriction. *Id.* ¶¶ 59, 133.[8]

### Oregon's Attempt to Modify the 340B Program

Against that backdrop, Oregon enacted H.B. 2385. The new state law purports to directly regulate the federal 340B Program by imposing new conditions of participation in 340B. The state law defines its key terms by incorporating federal law: A "covered entity," for example, has "the same meaning" provided by "42 U.S.C. 256b(a)(4)." H.B. 2385 § 1(1)(a). And the goal of H.B. 2385 is to attempt to outlaw contract pharmacy policies like Novartis's, effectively overturning the *Novartis* and *Sanofi* decisions.

H.B. 2385 is essentially a mandate to provide 340B pricing on more transactions. The law forbids manufacturers to "[d]eny, restrict, prohibit, or otherwise interfere . . . with the acquisition of a *340B drug*, delivery of a *340B drug* to or dispensation of a *340B drug* by" a contract pharmacy. H.B. 2385 § 1(2)(a) (emphases added). The substance of this provision comes from the statutory definition of a "340B drug": It means "a drug that has been subject to an *offer of a reduced price by a manufacturer pursuant to 42 U.S.C. 256b.*" H.B. 2385 § 1(1)(c) (emphasis added). That is, manufacturers must provide a *discounted* unit of a drug to contract pharmacies on demand. Put

---

[8] Federal grantees comprise federally qualified health centers (FQHCs) and FQHC lookalikes. *See* 42 U.S.C. § 1396d(*l*)(2)(B); Janet Weiner, *Community Health Centers & Value-Based Payment* 2 (April 2024), https://tinyurl.com/bdd5zb78. Novartis exempts grantees in part because—unlike other covered entities—they often *do* pass on 340B discounts to their patients. HELP Committee Report, *supra* n.6, at 2.

differently, this state law is a *pricing* regulation—a restriction on what Novartis may charge for its products.

H.B. 2385 also impedes manufacturers' efforts to make the 340B Program more transparent. The law forbids manufacturers from "directly or indirectly" requiring covered entities "to submit a claim or utilization review data as a condition" of receiving 340B pricing. H.B. 2385 § 1(2)(b). This provision targets Novartis's policy "requir[ing] that all non-grantee covered entities upload their claims data" to an electronic platform. ECF No. 1-1 at 1.

Finally, H.B. 2385 ratchets up the potential penalties facing manufacturers for refusing to provide the 340B discount on any given transaction. "In addition to any other liability or penalty provided by law," it authorizes the State Board of Pharmacy to impose civil fines of up to "$5,000 *per day* . . . for *each violation*"—far exceeding anything federal law contemplates. H.B. 2385 §§ 2(1) (emphases added).

## ARGUMENT

This case presents purely legal questions regarding the constitutionality of H.B. 2385. Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, summary judgment is the "appropriate mechanism for deciding the legal question[s]" underlying Novartis's claims: whether federal law preempts H.B. 2385 and whether it violates the dormant Commerce Clause. *See Occidental Eng'g Co. v. INS*, 753 F.2d 766, 770 (9th Cir. 1985). The Court need not "separately analyze" Novartis's motion and the State's forthcoming cross motion, but instead "address [the] questions of law equally applicable to both motions." *See Oregon Nat. Desert Ass'n v. Cain*, 17 F. Supp. 3d 1037, 1047 (D. Or. 2014). The Court should therefore enter summary judgment for Novartis because H.B. 2385 is unconstitutional.

## I.    H.B. 2385 IS FEDERALLY PREEMPTED.

Congress's "power to preempt state law" is a "fundamental principle of the Constitution." *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 372 (2000). As relevant here, Congress may implicitly preempt state law by "so thoroughly occup[ying] a legislative field as to make reasonable the inference that Congress left no room for the States to supplement it." *Montalvo v. Spirit Airlines*, 508 F.3d 464, 470 (9th Cir. 2007) (quotation omitted). State laws are also "preempted when they conflict with federal law," including by posing "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (quotation omitted).

Field and conflict preemption raise related analytic questions that may overlap; they are not mutually exclusive categories. *Gade v. National Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 104 n.2 (1992). Either way, the fundamental question is about "congressional intent" to oust state law. *Hawaii Newspaper Agency v. Bronster*, 103 F.3d 742, 748 (9th Cir. 1996). Here, both approaches show that H.B. 2385 disrupts Congress's nationally uniform design for the 340B Program.

### A.    Federal Law Occupies the Field.

State law is field-preempted where a "federal interest [is] so dominant that the federal system will be assumed to preclude enforcement of state laws on the same subject." *Arizona*, 567 U.S. at 399 (quotation omitted). The field here is the scope of manufacturers' 340B obligations, which implicates two such interests: *First*, the federal government has an interest in maintaining the nationwide uniformity of the 340B Program. *Second*, the federal government has an interest in calibrating the incentives of participating in 340B to avoid discouraging participation in Medicaid and Medicare Part B. Both interests dominate the field, leaving no room for state regulation. Finally, field preemption applies because Congress crafted "a framework of regulation

so pervasive . . . that Congress left no room for the States to supplement it." *Arizona*, 567 U.S. at 399 (quotation omitted).

### 1.    Congress Created a Uniform, Nationwide 340B Program.

When Congress intends federal law to operate the same way nationwide, state law must yield.  In *Montalvo*, for instance, the Ninth Circuit examined the "purpose, history, and language" of a federal statutory scheme, inferring field preemption from Congress's intent "to have a single, uniform system."  508 F.3d at 471.  Likewise, the Supreme Court in *Arizona* pointed to the "comprehensive and unified" nature of federal alien-registration requirements in finding the field "occupied by federal law."  567 U.S. at 401–402.  And in *National Federation of the Blind v. United Airlines Inc.*, the Ninth Circuit not only pointed to Congress's desire for nationwide consistency, but also explained why that desire matters for field preemption:  A statute cannot "determine entirely the rights and obligations of affected parties" if a competing system might impose yet "another set of comprehensive regulations covering the same area."  813 F.3d 718, 732–733 (9th Cir. 2016).

There can be no doubt that Congress intended the 340B Program to operate uniformly nationwide; that is exactly what the Supreme Court held in *Astra*.  There, a county had sued drug manufacturers claiming its covered entities had not received required 340B pricing.  563 U.S. at 116.  The Court rejected those claims, holding that Congress intended "centralized enforcement in the government."  *Id.* at 119 (quoting HHS Amicus Brief, *supra* n.3, at 32).  Given 340B's connections to Medicaid, "an adjudication of rights under one program must proceed with an eye towards any implications for the other."  *Id.* at 120 (quotation omitted).  HHS must therefore "administer both Medicaid and § 340B harmoniously and on a uniform, nationwide basis."  *Id.*

*Astra* was not a preemption case; the county claimed to be enforcing manufacturers' federal PPAs rather than a state law. *See* 563 U.S. at 117. But *Astra*'s analysis cuts to the heart of the preemption inquiry here, because the Supreme Court held that Congress intended a unified nationwide enforcement regime, shunning outside influence over the 340B Program that would leave "HHS unable to hold the control rein." *Id.* at 120. That conclusion is confirmed by the federal government's brief in *Astra*, which relied on a key preemption case to demonstrate that its enforcement power is exclusive. HHS Amicus Brief, *supra* n.3, at 34–35 (citing *Buckman Co. v. Plaintiff's Legal Comm.*, 531 U.S. 341 (2001)). Put another way, *Astra* answers the critical legal question that determines whether field preemption applies: Congress created a "unitary administrative and enforcement scheme," in which HHS must implement the 340B Program "on a uniform, nationwide basis." 563 U.S. at 120; *see also National Fed'n of the Blind*, 813 F.3d at 732 (Congress created a "uniform and exclusive system of federal regulation" (quoting *Montalvo*, 508 F.3d at 471)). That should end the matter.

## 2. The Federal Field Is the Scope of Manufacturers' 340B Obligations.

Federal law also has an interest in overseeing the scope of manufacturers' 340B obligations. The federal 340B statute created a new drug-pricing program from whole cloth, rather than regulating some preexisting activity that was historically governed by states. 42 U.S.C. § 256b. H.B. 2385 regulates the degree of manufacturers' obligations under this intrinsically federal program. Its requirements apply solely to drugs subject to "a reduced price" under the 340B Program and that are dispensed by a pharmacy claiming to operate on behalf of a 340B "covered entity." H.B. 2385 §§ 1(1)(a), (c), (2)(a). The fact that the federal and state law both regulate the same entities on the same subject is the most important determinant of the field. *See Kurns v. Railroad Friction Prods. Corp.*, 565 U.S. 625, 632, 636 (2012) (defining the field "on the

basis of the physical elements regulated"); *Gade*, 505 U.S. at 105 (looking "to the effects of the law"). In *Arizona*, for example, the Supreme Court defined the field as "alien registration" because that is what both federal law and the relevant provision of state law regulated. 567 U.S. at 400.

The interdependent nature of federal drug-pricing programs confirms that the field includes everything that determines manufacturers' 340B obligations. The extent of manufacturers' 340B burdens functions as "the price of admission" to Medicaid and Medicare Part B. *AbbVie Inc. v. Drummond*, __ F. Supp. 3d __, 2025 WL 3048929, at *6 (W.D. Okla. Oct. 31, 2025) (finding a similar state law preempted). Thus, the power to expand manufacturers' 340B obligations is the power to disincentivize participation in Medicaid and Medicare Part B. *Id.* That is why "the Federal Government has reserved for itself" the ability to set manufacturers' 340B obligations— they affect uniquely federal interests. *See Arizona*, 567 U.S. at 402.

In this way, the requirements imposed on manufacturers wishing to participate in the 340B Program operate with other federal drug-pricing mechanisms as part of a "harmonious whole." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1025 (9th Cir. 2013) (quoting *Arizona*, 567 U.S. at 401). H.B. 2385 seeks to disrupt that harmony in order to increase the 340B Program's subsidy beyond the amount Congress selected. That effort is field-preempted because it cannot be reconciled with "the legislative goal of establishing a single, uniform system" to determine the scope of the 340B Program. *Montalvo*, 508 F.3d at 473. States cannot replace federal uniformity with a "chaotic" patchwork of regulations designed to tinker with Congress's policy choices. *National Fed'n of the Blind*, 813 F.3d at 732–733.

### 3. Federal 340B Regulation Is Pervasive.

There is also a further basis for field preemption here, even setting aside *Astra* and the overriding federal interests at issue. Courts infer field preemption from "a framework of regulation

so pervasive . . . that Congress left no room for the States to supplement it." *Arizona*, 567 U.S. at 399 (quotation omitted). Federal 340B law amply qualifies under this standard.

Federal law governs the 340B Program from soup to nuts. The statute starts by defining the prices of drugs purchased under the program, 42 U.S.C. §§ 256b(a)(1)–(2), the drugs eligible for that pricing, *id.* § 256b(a)(3), the entities entitled to receive that pricing, *id.* § 256b(a)(4), and the compliance obligations those entities accept, *id.* § 256b(a)(5). From there, the statute directs HHS to create a program to effectuate "distribution" of 340B-priced drugs, *id.* § 256b(a)(8), and a "single, universal, and standardized" system for "facilitating the ordering, purchasing, and delivery" of 340B-priced drugs, *id.* § 256b(d)(2)(B)(iv). HHS has done so via the Prime Vendor Program, intended to be a "central source overseeing distribution" under HRSA's ultimate oversight.[9] On the back end, federal law creates a comprehensive enforcement system, including direct enforcement by HHS, 42 U.S.C. § 256b(d)(2)(B)(v), and adjudications of both "claims by covered entities" and "claims by manufacturers" in the ADR process, *id.* § 256b(d)(3)(A). HHS has expanded on these statutory requirements by regulation. 42 C.F.R. §§ 10.1–10.25.

That regulatory suite includes all the hallmarks of field preemption. It contains "great detail," *National Fed'n of the Blind*, 813 F.3d at 735, and comprehensively covers the subjects relevant to creating and operating a federal drug-pricing program, *see, e.g.*, *Montalvo*, 508 F.3d at 472–473. The statute is so comprehensive, in fact, that it has governed the 340B Program without assistance from Oregon for over three decades. After all, federal law already "provide[s] a full set of standards . . . , including the punishment for noncompliance." *Arizona*, 567 U.S. at 401. Congress has thereby "equipped [HHS] adequately to address the precise concerns

---

[9] Apexus, *About Apexus* (last visited Nov. 20, 2025), https://tinyurl.com/yck4v9aj.

[H.B. 2385] purports to manage." *Schneidewind v. ANR Pipeline Co.*, 485 U.S. 293, 309 (1988). Field preemption follows directly from that conclusion. *Id.*

The federal statute's comprehensiveness is not undercut by the fact that H.B. 2385 purports to create novel 340B obligations not found in federal law. As the Ninth Circuit has explained, "comprehensive regulatory schemes often represent considered decisions to *refrain* from mandating certain actions or protections." *National Fed'n of the Blind*, 813 F.3d at 733 (emphasis added). That is especially true of the 340B Program because of its Spending Clause nature. Given the need to offer regulated parties clear, advance notice of what they were agreeing to do by joining the program, that which the 340B statute does *not* require is just as important as that which it *does* require. Both equally determine the sum total of Congress's conditions for accessing Medicaid and Medicare Part B. Any requirement not imposed by federal law reflects Congress's judgment that such "regulation simply should not be employed." *Schneidewind*, 485 U.S. at 306.

## B.    H.B. 2385 Conflicts with Federal Law.

H.B. 2385 also is conflict preempted under obstacle-preemption principles. Oregon law impedes "the full purposes and objectives of Congress" and "interferes with the methods by which the federal statute was designed to reach [its] goal[s]." *International Paper Co. v. Ouellette*, 479 U.S. 481, 492, 494 (1987) (quotation omitted). To trigger obstacle preemption, state law need not create requirements that are irreconcilable with requirements imposed by federal law. A state statute that disrupts "the purpose and intended effects of [a] federal statute" is obstacle-preempted. *Chamber of Com. of the U.S. v. Bonta*, 62 F.4th 473, 482 (9th Cir. 2023).

H.B. 2385 obstructs federal policy in four main ways: (1) forbidding what federal law allows; (2) altering Congress's balance of benefits and burdens among 340B, Medicaid, and

Medicare Part B; (3) inviting inconsistent adjudications regarding 340B obligations; and (4) heightening the penalties associated with 340B compliance.

### 1.    H.B. 2385 Forbids Conduct Purposely Allowed by Federal Law.

Where "federal law grants an actor a choice, and state law would restrict that choice, state law is preempted if preserving that choice was a significant federal regulatory objective." *McDaniel v. Wells Fargo Invs., LLC*, 717 F.3d 668, 675 (9th Cir. 2013) (quotation omitted and alterations adopted). That principle resolves this case. Federal law purposely gives manufacturers discretion to set reasonable limits on the use of contract pharmacies to claim 340B pricing, and Novartis has done just that. ECF No. 1-1. H.B. 2385 attempts to restrict that discretion in two ways: prohibiting manufacturers from limiting the number of contract pharmacies that they will recognize, H.B. 2385 § 1(2)(a), and forbidding manufacturers to condition access to 340B pricing on submission of claims or utilization data, *id.* § 1(2)(b).

There can be no dispute that federal law, which established the 340B Program, permits Novartis's contract pharmacy policy. Two circuit courts have already held as much. In *Novartis*, the D.C. Circuit explained that manufacturers may restrict 340B pricing to drugs dispensed at "a covered entity's in-house pharmacy or [at] a single contract pharmacy designated by the covered entity." 102 F.4th at 463–464. And it confirmed that manufacturers may condition 340B pricing at contract pharmacies on the receipt of claims data, consistent with longstanding record-retention policies governing the 340B Program. *Id.* at 463. The Third Circuit approved the same requirements. *See Sanofi*, 58 F.4th at 701 (summarizing the contested policies). Novartis's policy has also been accepted by HRSA, the agency responsible for nationwide enforcement of the program. Ex. 2 (HRSA order dismissing ADR claim challenging Novartis's policy).

Congress intentionally gave manufacturers discretion in these areas.  After observing that federal law does not require delivery of 340B-priced drugs to unlimited contract pharmacies, the D.C. Circuit concluded "that this silence preserves—rather than abrogates—the ability of sellers to impose at least some delivery conditions." *Novartis*, 102 F.4th at 460.  The Third Circuit likewise held that federal law "leav[es] drug makers discretion on delivery" of 340B-priced drugs. *Sanofi*, 58 F.4th at 705.  The court reached that conclusion after noting that Congress *has* required the sale of "discounted drugs through contract pharmacies" in a related context, and expressly rejected a bill that would have adopted that requirement for the 340B Program. *Id.* at 704–706.

Permitting manufacturers to require basic claims data about the unit of drug on which the discount is claimed also serves vital federal objectives.  These data facilitate access to the federal statute's audit and ADR processes, which has historically been problematic for manufacturers. *Supra* p.7.  HRSA, for example, has noted "the infrequency of finalized manufacturer audit reports," which it correctly predicted would lead to few "manufacturer ADR claims."  89 Fed. Reg. at 28,644–45.  That is despite widespread compliance failures in the 340B Program, repeatedly documented by the federal government and private analysts alike.  Verified Compl. ¶¶ 50–53. Novartis has therefore begun requiring covered entities to submit basic claims data demonstrating that transactions at contract pharmacies are eligible for 340B pricing, in an effort to restore program integrity and access to the enforcement mechanisms created by Congress.  Ex. 1 (McCrudden Decl.) ¶¶ 11–12, 15, 20.  As another district court recently recognized in finding a similar state law preempted, Novartis's policy is "*the* way to detect possible [compliance violations]." *Drummond*, 2025 WL 3048929, at *7.  For that reason, federal law allows manufacturers to require claims data from covered entities. *See Novartis*, 102 F.4th at 463–464.

H.B. 2385 forbids the very same claims-data requirements that federal law allows.  This case thus fits squarely in the line of authority invalidating state efforts to abridge implicit rights created when federal law intentionally authorizes conduct.  *See, e.g.*, *McDaniel*, 737 F.3d at 676 (state law preempted where it banned "firms from exercising a federally blessed option" (quotation omitted)); *Geier v. American Honda Motor Co.*, 529 U.S. 861, 881 (2000) (state could not mandate airbags where federal law permitted a "variety and mix of [passive-restraint] devices"); *Chamber of Com.*, 62 F.4th at 486 (state could not "disfavor[ ] the formation of [arbitration] agreements" allowed by federal law); *Whistler Invs., Inc. v. Depository Tr. & Clearing Corp.*, 539 F.3d 1159, 1167 (9th Cir. 2008) (state law cannot undermine a program's "federally-approved operation").

### 2.    H.B. 2385 Upsets Congress's Careful Balancing of Interests.

The new Oregon law also reconfigures Congress's "balance among overlapping and potentially conflicting policies."  *Cohen v. Apple Inc.*, 46 F.4th 1012, 1029 (9th Cir. 2022).  Its primary purpose and effect is to expand the universe of transactions for which manufacturers must provide 340B discounts.  Verified Compl. ¶¶ 48–49, 54, 96–98.  In other words, it requires manufacturers to subsidize covered entities to a greater extent than federal law does.

Congress "struck a delicate balance with the federal 340B Program."  *Drummond*, 2025 WL 3048929, at *6.  The extent to which federal law requires manufacturers to offer 340B discounts is part of that balance.  "The Program is a bargain between drug manufacturers and the federal government whereby" manufacturers agree to this subsidy "in exchange for access to the lucrative Medicaid and Medicare Part B markets."  *Id.*  Thus, Congress "limited the scope of the 340B Program to ensure that the price of admission wasn't too high."  *Id.*  By ratcheting up that price, H.B. 2385 risks "the deleterious effect of causing drug manufacturers to opt out of Medicaid

and Medicare Part B." *Id.*; *see also id.* at *6 n.65 ("[O]ne manufacturer has done just that, due to the rising costs of the 340B Program.").

The Eighth Circuit's decision in a similar Spending Clause case is instructive. In *Forest Park II v. Hadley*, Congress had incentivized private developers to provide low-income housing by subsidizing the loans used to finance construction. 336 F.3d 724, 728 (8th Cir. 2003). Once the developers repaid those loans, they were no longer subject to the program's requirements, so Congress specified the conditions under which a participating developer could prepay its loan and exit the program. *Id.* at 728–730. Wishing to further subsidize low-income housing in the state, Minnesota added further conditions restricting prepayment. *Id.* at 730. But that law was preempted, the court explained, because it "would directly interfere with Congress's original intent of offering prepayment as an incentive." *Id.* at 733.

The same principle is enough to decide this case. Where Congress has calculated the incentive needed to attract participation in a voluntary federal program, the level of that incentive is not up for debate. Thus, states cannot "place additional requirements on federal program participants [or] restrict the exercise of the participants' federally granted . . . rights." *Forest Park II*, 336 F.3d at 734. H.B. 2385 operates on the opposite principle—it wrongly assumes the volume of required 340B discounts was randomly or uncarefully chosen by Congress, rendering the federal statute's balancing "essentially meaningless." *Cohen*, 46 F.4th at 1031.

### 3.    H.B. 2385 Creates Conflicting Enforcement Procedures.

H.B. 2385's parallel enforcement scheme independently conflicts with federal law. When a manufacturer's 340B compliance is questioned, federal law channels the claim down one of two paths:  HHS may assess the appropriateness of sanctions, or a covered entity may bring an ADR claim. 42 U.S.C. §§ 256b(d)(1)(B)(vi), (d)(3)(A). Those two paths are exclusive. *Astra*, 563 U.S.

at 121–122.  Yet Oregon law now purports to create a third:  The State Board of Pharmacy can surmise that a manufacturer should have provided 340B pricing on a particular drug and seek to enforce that view with a civil penalty.  H.B. 2385 § 2(1).  Those proceedings are precisely the kind of "dispersed and uncoordinated lawsuits" *Astra* rejected for fear of producing "conflicting adjudications."  563 U.S. at 120.

The state law grafts parasitically onto federal law, so it is impossible for the state law to be enforced without also applying federal requirements.  The state law defines "340B drug" to mean "a drug that has been subject to an offer of a reduced price by a manufacturer pursuant to 42 U.S.C. 256b."  H.B. 2385 § 1(1)(c).  It also says a "covered entity" "has the same meaning given that term" in the federal 340B statute.  *Id.* § 1(1)(a).  Both state-law terms, then, import federal standards to decide when manufacturers must provide 340B pricing.  And these terms shape all of H.B. 2385's mandates to manufacturers.  *Id.* § 1(2)(a)–(b) (repeatedly using the terms "340B drug" and "covered entity").  For *every* alleged violation of H.B. 2385, the State must prove that *every* federal 340B condition was satisfied, plus the additional conditions of state law.

This is a question of price.  Before H.B. 2385 existed, the same drugs were already being delivered to the same pharmacies at commercial prices.  Verified Compl. ¶¶ 40, 74, 97, 134.  That is why Oregon regulators cannot simply ask whether a given pharmacy has physically received a product.  They must ask whether the pharmacy paid the commercial price for a particular unit that would have been fully eligible for 340B pricing under federal standards—but for the manufacturer's contract pharmacy policy.

This question is far from straightforward.  Federal law is riddled with nuanced eligibility issues implicating HRSA's unique expertise.  For just one example, consider the patient definition.  Recall that a covered entity may not divert 340B-priced drugs to anyone "who is not [its] patient."

42 U.S.C. § 256b(a)(5)(B).  The federal statute, however, does not define a "patient."  HRSA

deems a person an entity's patient if

> [1] the covered entity has established a relationship with the individual, such that
> the covered entity maintains records of the individual's health care; and [2] the
> individual receives health care services from a health care professional who is either
> employed by the covered entity or provides health care under contractual or other
> arrangements . . . such that responsibility for the care provided remains with the
> covered entity; and [3] [for federal grantees,] the individual receives a health care
> service or range of services from the covered entity which is consistent with the . . .
> range of services for which . . . funding . . . has been provided to the entity.

61 Fed. Reg. 55,156, 55,157–58 (Oct. 24, 1996).

Needless to say, two decisionmakers could apply that standard differently to the same facts.

Yet to enforce H.B. 2385, the State must prove—transaction by transaction—that a commercially

priced drug was dispensed by a contract pharmacy to a person meeting that standard vis-à-vis the

covered entity that claimed 340B pricing.  If the standard is not met, the drug is not a "340B drug"

because it cannot be "subject to an offer of a reduced price" under the 340B Program.  H.B. 2385

§ 1(1)(c).  How will Oregon handle a pharmacy customer who had an appendectomy at a covered

entity hospital two years ago, and who is now filling an antibiotic prescription for a sinus infection?

What if that customer also gave birth at a different covered entity hospital five years ago?  And if

both covered entities claim the discount on that sale?  There is no telling what position the Board

of Pharmacy will take on questions like these—but take a position it must.

HRSA, meanwhile, is already answering such questions.  Both covered entities and

manufacturers may file ADR claims asserting that 340B pricing was or was not required to be

offered on a given unit.  42 C.F.R. § 10.21(a).  And these ADR claims may involve exactly the

same units at issue in H.B. 2385's enforcement proceedings.  Where that is so, will the State await

the outcome of the federal process before imposing sanctions?  And what will Oregon do if it

punishes a violation, but HRSA later finds the manufacturer was *not* required to offer 340B pricing

on the same unit?  The state law's text offers no hint about how to handle these practical problems.

But one thing is certain:  Contrary to Congress's design, HRSA will no longer "hold the control

rein."  *Astra*, 563 U.S. at 120; *see also Pharmaceutical Rsch. & Mfrs. of Am. v. Morrisey*, 760 F.

Supp. 3d 439, 458 (S.D. W. Va. 2024) (finding a similar state law preempted for this reason).

      Federal law mandates that these same disputes be resolved exclusively by HRSA.  The

disputes committed to HRSA's sole authority include "claims that a manufacturer has *limited* the

covered entity's ability to purchase covered outpatient drugs at or below the 340B ceiling price."

42 C.F.R. § 10.21(a)(1) (emphasis added).  Under that provision, HRSA has heard—and

rejected—ADR claims challenging the same limitations on contract pharmacy usage targeted by

H.B. 2385.  Verified Compl. ¶ 102 & n.24.  And to be clear, HRSA rejects such claims *on the*

*merits* because contract pharmacy policies like Novartis's are allowed by federal law.  Ex. 2 at 2

(finding "no overcharge violation . . . consistent with the [judicial] rulings with respect to

Novartis's policy").[10]  By outlawing these same policies, H.B. 2385 is engineered to produce state-

level decisions directly contrary to HRSA's federal decisions.  It is difficult to imagine a more

tangible example of a conflict between two enforcement schemes.

      In the face of this clash, it is the state-level scheme that must give way.  Congress intended

to leave HRSA—not any state—"in control of § 340B's drug-price prescriptions."  *Astra*, 563 U.S.

at 114.  H.B. 2385 therefore "runs counter to *Astra*'s holding."  *Morrisey*, 760 F. Supp. 3d at 458.

The Ninth Circuit, too, has repeatedly found state law conflict-preempted where it derogates

federal agencies' exclusive enforcement authority.  *E.g.*, *Nexus Pharms., Inc. v. Central Admixture*

*Pharm. Servs., Inc.*, 48 F.4th 1040, 1048 (9th Cir. 2022) (state law preempted where it "facilitate[d]

---

[10]  *See also* HRSA, 340B ADR Decision Summaries (last updated May 15, 2025),
https://tinyurl.com/2b9e24ec.

enforcement beyond what the FDA has deemed appropriate"); *Geo Grp., Inc. v. Newsom*, 50 F.4th 745, 762 (9th Cir. 2022) (en banc) ("Such interference with the discretion that federal law delegates to federal officials goes to the heart of obstacle preemption."); *Valle del Sol*, 732 F.3d at 1027 (state law "conflicts with the federal scheme by divesting federal authorities of the exclusive power to prosecute"); *Chlorine Inst., Inc. v. California Highway Patrol*, 29 F.3d 495, 497–498 (9th Cir. 1994) (finding that state regulation contrary to "DOT's extensive regulation" of the same subjects would "foster[ ] confusion and frustrat[e] Congress' goal of developing a uniform, national scheme of regulation" (quotation omitted)).  The same result should obtain here.

### 4.    H.B. 2385 Increases Potential 340B Penalties.

H.B. 2385's harsh penalties exacerbate its overlapping-enforcement problem.  Congress carefully calibrated the consequences of 340B noncompliance: penalties that "shall not exceed $5,000"—and only for a manufacturer that "knowingly and intentionally" overcharges a covered entity.  42 U.S.C. § 256b(d)(1)(B)(vi).  Oregon law now dramatically raises the stakes:  penalties up to "$5,000 *per day* . . . for *each* violation"—and with no indication of any scienter requirement. H.B. 2385 § 2(1) (emphases added).

The Supreme Court has repeatedly warned that "conflict is imminent whenever two separate remedies are brought to bear on the same activity."  *Wisconsin Dep't of Indus., Lab. & Hum. Rels. v. Gould Inc.*, 475 U.S. 282, 286 (1986) (quotation omitted); *see also Crosby*, 530 U.S. at 380.  When Congress selects a penalty, it has necessarily determined that a higher penalty "would be inappropriate."  *Arizona*, 567 U.S. at 406.  Yet again, H.B. 2385 second-guesses Congress's judgment.  The severity of the state law creates another conflict-preemption problem: It adds disincentives to 340B participation, putting Medicaid and Medicare Part B at further risk. *Supra* p.5; *see also Drummond*, 2025 WL 3048929, at *6.

## II.    HB. 2385 VIOLATES THE DORMANT COMMERCE CLAUSE.

H.B. 2385 is also unenforceable under the dormant Commerce Clause.  The Constitution grants Congress the power to regulate commerce among the several states.  U.S. Cont. art. I, § 8, cl. 3.  That power carries with it a "negative" or "dormant" restriction:  Even when Congress has not acted, states may not "discriminate against or burden the interstate flow of articles of commerce."  *Oregon Waste Sys., Inc. v. Department of Env't Quality of the State of Or.*, 511 U.S. 93, 98 (1994).  State law violates the dormant Commerce Clause if it (1) directly regulates extraterritorial conduct; (2) discriminates against interstate commerce; or (3) imposes excessive burdens on interstate commerce.  *See National Collegiate Athletic Ass'n v. Miller*, 10 F.3d 633, 638 (9th Cir. 1993).  H.B. 2385 does all three.

### A.    H.B. 2385 Is Unlawfully Extraterritorial.

The Commerce Clause "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders, whether or not the commerce has effects within the State."  *Edgar v. MITE Corp.*, 457 U.S. 624, 642–643 (1982).  This rule reflects "the territorial limits of state authority under the Constitution's horizontal separation of powers."  *National Pork Producers Council v. Ross*, 598 U.S. 356, 369, 376 n.1 (2023).  Courts therefore distinguish between impermissible "regulation of wholly out-of-state conduct" and permissible regulation of "*in-state conduct* with allegedly significant out-of-state practical effects."  *Sam Francis Found. v. Christies, Inc.*, 784 F.3d 1320, 1324 (9th Cir. 2015).

H.B. 2385 is the former kind of law.  To see why, consider the basics of drug distribution:  Rather than attempt to deal directly with many thousands of pharmacies, manufacturers sell drugs to a handful of wholesale distributors.  Verified Compl. ¶ 123.  Wholesalers resell those drugs to pharmacies at commercial prices, where they are dispensed to customers.  *Id.*  When a covered

entity later claims a customer as its supposed patient, the entity (or one of its for-profit partners) tells the wholesaler, and the wholesaler provides the discount upfront using one of various retroactive pricing methods. *Id.* ¶ 124. Finally, the wholesaler seeks a refund from the manufacturer to make it whole on the back end, using "a new transaction chain." *Id.*; *see also* McCrudden Decl. ¶¶ 13–14.

H.B. 2385 thus orders manufacturers to give wholesalers those refunds on demand. Yet these regulated transactions between manufacturers and wholesalers occur wholly outside Oregon, because none of those entities is located inside the state. Verified Compl. ¶ 123; McCrudden Decl. ¶ 18. By purporting to set the terms of transactions between those parties, H.B. 2385 impermissibly tries to control prices charged "beyond the boundaries of the State." *Healy v. Beer Inst.*, 491 U.S. 324, 336 (1989).

Two circuit courts have invalided state laws structured the same way. Most recently, in *Association for Accessible Medicines v. Ellison*, the Eighth Circuit confronted a state law prohibiting manufacturers from setting certain prices on drugs provided to in-state consumers. 140 F.4th 957, 959–960 (8th Cir. 2025). Because of the unique nature of drug distribution, this law effectively "insist[ed] that out-of-state manufacturers sell their drugs to wholesalers for a certain price." *Id.* at 961. But that is "the specific extraterritorial effect of controlling the price of wholly out-of-state transactions" forbidden by the dormant Commerce Clause. *Id.* The Fourth Circuit decided a case on similar grounds seven years ago. *Association for Accessible Meds. v. Frosh*, 887 F.3d 664 (4th Cir. 2018). This case is no different.

**B.    H.B. 2385 Discriminates Against Out-of-State Commerce.**

H.B. 2385 also engages in "economic protectionism"—the "very core" of a dormant Commerce Clause challenge. *Pork Producers*, 598 U.S. at 357. States may not enact regulations

to benefit in-state economic interests at the expense of out-of-state competitors.  *See id.*  State laws that discriminate against "nonresident economic actors," are invalid unless they are "narrowly tailored to advance a legitimate local purpose."  *Tennessee Wine & Spirits Retailers Ass'n v. Thomas*, 588 U.S. 504, 518 (2019) (quotation omitted and alterations adopted).

H.B. 2385 exists to benefit in-state hospitals and pharmacies by forcing out-of-state manufacturers to give them steep discounts far beyond what federal law requires.  Verified Compl. ¶ 131.  In fact, the bill's two sponsors both submitted floor letters urging the legislature to "hold drug companies accountable" to "Oregonians" and explained that the bill's purpose was to "restore[ ] funding" to Oregon "hospitals and health centers . . . *at no cost to Oregon's taxpayers*."[11]  That is an explicit endorsement of "[e]conomic protectionism"—the use of state legislative power to "give local consumers an advantage over consumers in other States."  *Brown-Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 580 (1986).  In the same way, H.B. 2385 impermissibly purports to "build up . . . domestic commerce" by privileging in-state hospitals and pharmacies at Novartis's and other drug manufacturers' expense.  *Pork Producers*, 598 U.S. at 369 (quoting *Guy v. Baltimore*, 100 U.S. 434, 443 (1880)).

Far from satisfying the "strictest scrutiny," the State has no legitimate justification for discriminating against out-of-state manufacturers in this way.  *Oregon Waste Sys.*, 511 U.S. at 101.  Neither Oregon covered entities nor pharmacies are subject to some unique disadvantage—the federal 340B Program establishes uniform national requirements for all participants, which

---

[11]  Letter from Senator Deb Patterson to Oregon Senate (submitted May 28, 2025) (emphasis added), https://tinyurl.com/529vzm36; Letter from Representative Rob Nosse to Oregon House of Representatives (submitted April 14, 2025) (emphasis added), https://tinyurl.com/2ude8xmf.

Novartis unquestionably observes. *Novartis*, 102 F.4th at 463–464; *Sanofi*, 58 F.4th at 703–706.[12] And the supposed benefits H.B. 2385 seeks to create do not run to Oregon patients or the public. Verified Compl. ¶ 134. Novartis, through its wholesalers, already delivers the *same* drug products to the *same* pharmacies, which routinely dispense them no matter whether a patient is 340B-eligible. And revenue generated from 340B discounts increasingly fills the coffers of for-profit middlemen. *Id.*; *see also, e.g.*, *Novartis*, 102 F.4th at 457–458. More targeted means of supporting Oregon covered entities, such as direct grants to hospitals, would better serve H.B. 2385's objectives without discriminating against interstate commerce.

### C.    H.B. 2385 Excessively Burdens Interstate Commerce.

Finally, even if this state law were not discriminatory, it would still fail under the balancing test set forth in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). H.B. 2385 imposes a substantial burden on interstate commerce that is clearly excessive compared to the purported local benefits. *Id.*; *see also, e.g.*, *Association of Am. Railroads v. Randolph*, No. 2:23-CV-1154, 2024 WL 664359, at *10 (E.D. Cal. Feb. 16, 2024) (finding nondiscriminatory burdens on interstate commerce sufficient to state a dormant Commerce Clause claim after *Pork Producers*).

To comply with H.B. 2385 and other laws like it, manufacturers must incur burdensome administrative costs. They must create and administer state-specific exceptions to their formerly national contract pharmacy policies. Verified Compl. ¶ 136. Even worse, these various state laws often impose contradictory requirements on manufacturers—not to mention their differences from federal law. *Id.* ¶¶ 137–139; McCrudden Decl. ¶¶ 22–23; *Daniels Sharpsmart, Inc. v. Smith*, 889 F.3d 608, 616 (9th Cir. 2018) (invalidating state law with "the baleful effect of subjecting

---

[12] If anything, Novartis's policy is more generous than what federal law requires because it allows covered entities to dispense their discounted drugs through a contract pharmacy—and exempts federal grantees from its requirements entirely. ECF No. 1-1 at 1.

businesses to conflicting requirements"). The burden from inconsistent regulation of these inherently national activities falls entirely on non-Oregon entities. And the Court must also consider the burden that would arise if "many or every[ ] State adopted similar legislation." *Wyoming v. Oklahoma*, 502 U.S. 437, 454 (1992) (quoting *Healy*, 491 U.S. at 336). "The effect of such a patchwork regulatory scheme [is] immense." *Union Pac. R.R. Co. v. California Pub. Utilities Comm'n*, 346 F.3d 851, 871 (9th Cir. 2003) (invalidating such a scheme under *Pike*).

This crushing patchwork of regulation has already become reality. So far, Arkansas, Colorado, Hawaii, Kansas, Louisiana, Maine, Maryland, Minnesota, Mississippi, Missouri, Nebraska, New Mexico, North Dakota, Oklahoma, Rhode Island, South Dakota, Tennessee, Utah, Vermont, and West Virginia have enacted similar laws.[13] As Oregon and other states continue to enact conflicting 340B contract-pharmacy laws, Novartis will increasingly be unable to implement the federal 340B program on a uniform, nationwide basis. This is exactly the sort of compounding burden on interstate commerce the Commerce Clause prohibits. *E.g.*, *Frosh*, 887 F.3d at 673 (state drug-pricing statute disproportionately burdened interstate commerce because it had "the potential to subject prescription drug manufacturers to conflicting state requirements").

---

[13] Arkansas (Ark. Code § 23-92-601 *et seq.*); Colorado (Colo. Rev. Stat. § 6-29-101 *et seq.*); Hawaii (Act 143 (2025)); Kansas (S.B. 28 §§ 32–33 (2024)); Louisiana (La. Rev. Stat. § 40:2883); Maine (24-A Me. Rev. Stat. § 7751–57); Maryland (Md. Health Occ. Code § 12-6C-09.1); Minnesota (Minn. Stat. § 62J.96); Mississippi (Miss. Code §§ 41-14-1 *et seq.*); Missouri (Mo. Rev. Stat. § 376.414); Nebraska (Neb. L.B. 168, § 3(1) (2025)); New Mexico (N.M. 2025 Pub. L. ch. 91); North Dakota (N.D. Cent. Code § 43-15.3-08); Oklahoma (Okla. Stat. tit. 36, §§ 5401-03); Rhode Island (R.I. Gen. Laws §§ 5-19.3-1 *et seq.*); South Dakota (S.D. Codified Laws § 58-29G); Tennessee (Tenn. Code Ann. § 47-18-136); Utah (Utah Code § 31A-46-311); Vermont (Vt. Stat. Ann. tit. 18, §§ 4681-85); and West Virginia (W. Va. Code § 60A-8-6a).

## CONCLUSION

For all those reasons, the Court should grant summary judgment for Novartis on the three counts of Novartis's Verified Complaint, declare H.B. 2385 unconstitutional, and permanently enjoin Defendants from enforcing H.B. 2385 against Novartis.

Dated: November 20, 2025                    Respectfully submitted,


                                            /s/ Steven D. Olson
                                            Paul Conable, OSB No. 975368
                                            Steven D. Olson, OSB No. 003410
                                            TONKON TORP LLP
                                            1300 S.W. Fifth Avenue, Suite 2400
                                            Portland, OR 97201
                                            Telephone: (503) 802-2188
                                            paul.conable@tonkon.com

                                            Susan Cook*
                                            Jessica L. Ellsworth*
                                            Alexander V. Sverdlov*
                                            Marlan Golden*
                                            Jacob T. Young*
                                            HOGAN LOVELLS US LLP
                                            555 Thirteenth Street, N.W.
                                            Washington, D.C. 20004-1109
                                            Telephone: (202) 637-5600
                                            susan.cook@hoganlovells.com

                                            *Attorneys for Plaintiff Novartis
                                            Pharmaceuticals Corporation*

                                            *Admitted pro hac vice*