# EXHIBIT 1

Paul Conable, OSB No. 975368
  Direct:  503.802.2188
  Email:  paul.conable@tonkon.com
Steven D. Olson, OSB No. 003410
  Direct:  503.802.2159
  Email:  steven.olson@tonkon.com
Tonkon Torp LLP
1300 SW Fifth Ave., Suite 2400
Portland, OR 97201
Facsimile:  503.274.8779

      *Admitted pro hac vice

      Attorneys for Plaintiff

Susan Cook*
  Email:  susan.cook@hoganlovells.com
Jessica L. Ellsworth*
  Email:  jessica.ellsworth@hoganlovells.com
Alexander V. Sverdlov*
  Email:  aleks.sverdlov@hoganlovells.com
Marlan Golden*
  Email:  marlan.golden@hoganlovells.com
Jacob T. Young*
  Email: jake.young@hoganlovells.com
Hogan Lovells US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109
Telephone: (202) 637-5600

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## (PORTLAND DIVISION)

| | |
|---|---|
| NOVARTIS PHARMACEUTICALS CORPORATION,<br><br>           Plaintiff,<br><br>    v.<br><br>OREGON BOARD OF PHARMACY PRESIDENT RICHARD JOYCE, in his official capacity; OREGON BOARD OF PHARMACY VICE PRESIDENT AMY KIRKBRIDE, in her official capacity; and MEMBERS OF THE OREGON BOARD OF PHARMACY KATHLEEN CHINN, JENNIFER HALL, VICTORIA KROEGER, PRIYAL PATEL, ANA PINEDO, and BRYAN SMITH, in their official capacities.<br><br>           Defendants. | Civil No. 3:25-cv-1330-IM<br><br>**DECLARATION OF SHANNON MCCRUDDEN IN SUPPORT OF PLAINTIFF NOVARTIS PHARMACEUTICAL CORPORATION'S MOTION FOR SUMMARY JUDGMENT** |

I, Shannon McCrudden, declare under penalty of perjury as follows:

1.    I am over the age of 18.  Except as expressly indicated, the facts stated herein are based upon my personal knowledge, including my experience in the pharmaceutical industry, my work at Novartis Pharmaceuticals Corporation (Novartis), and my review of the business records of the company.  If called to testify, I could truthfully and competently testify to those facts.

2.    Novartis is a pharmaceutical company devoted to improving and extending people's lives through medicine.  Novartis manufactures a portfolio of pharmaceutical products focused on improving cardiovascular health, treating patients with immunological or neurological conditions, and helping to heal those battling cancer.  Novartis is also researching and developing new products that, once they come to market, will offer life-changing treatments for patients.  These products include treatments in Novartis's core therapeutic focus areas: Cardiovascular, Renal and Metabolic, Immunology, Neuroscience, and Oncology.

3.    I am the Vice President of Managed Markets Finance at Novartis, where I have been employed since July 27, 2015.  I have over 10 years of experience in the pharmaceutical industry.  During that time, I have had various responsibilities for Commercial Contracting, Contract Operations, and Pricing.

4.    In my current position, I lead Novartis' Managed Markets Finance function, and I am responsible for Contract Operations, Government Reporting, Federal & State Programs, Medicaid, Fair Market Value, and Governance.

5.    I previously submitted a declaration in this matter on August 18, 2025 (ECF No. 6).  The testimony below is substantially similar to my previous testimony.

PAGE 1 – MCCRUDDEN DECLARATION

6.    Novartis is committed to ensuring that its life-altering products and treatments are available to as many patients as possible.  To that end, Novartis is a participant in Medicaid and Medicare Part B—and by extension, the 340B Drug Pricing Program (340B Program).

7.    In November 2020, Novartis implemented a contract-pharmacy policy, pursuant to which Novartis voluntarily recognized all contract pharmacies within 40 miles of a covered entity—an area of more than 5,000 square miles—and allowed covered entities to seek exemptions based on individual circumstances.  This 40-mile limitation did not apply to federal grantee covered entities.

8.    In April 2023, Novartis announced an update to its contract-pharmacy policy, effective May 2023.  That policy provided that units purchased by a covered entity at the 340B discounted price will be delivered only to the covered entity's in-house pharmacy or, if the covered entity lacks an in-house pharmacy, to one designated contract-pharmacy location.  Federal grantee covered entities remained exempt.

9.    In January 2025, Novartis implemented an updated contract-pharmacy policy to more closely adhere to the 340B Program's intended focus.  Verified Compl. Ex. 1 (2025 Policy). Novartis's current policy allows covered entities to designate one contract-pharmacy location to receive 340B drugs on behalf of the covered entity.  The designated contract pharmacy must be a dispensing pharmacy that is not a central fill location.  To increase transparency, mitigate against unlawful duplicative discounts, and maintain program integrity, Novartis's policy also requires covered entities to submit basic claims data on 340B utilization at the designated contract pharmacy.  The policy continues to exempt federal grantee covered entities from requirements under the contract-pharmacy policy.

10.    Novartis's contract-pharmacy policy does not change the number of pharmacies that have access to Novartis's drugs.  Nor does Novartis's policy alter where or how patients can access their medicines—or what price patients or their insurances pay upon dispense.  Novartis's contract-pharmacy policy merely limits the number of transactions for which covered entities can retroactively claim 340B discounts.  The policy does so in order to better match the contours of federal law, as espoused by the D.C. Circuit, the Third Circuit, and several federal district courts— as well as HRSA itself.

11.    Novartis's claims-data requirement was designed to serve a few basic purposes. The 340B statute gives manufacturers like Novartis the right to audit a covered entity's records pertaining to compliance with the anti-duplication and anti-diversion prohibitions.  However, to initiate an audit, the Health Resources and Services Administration (HRSA) requires manufacturers to first establish reasonable cause by showing evidence that a covered entity has misused the 340B Program.  To that end, Novartis places a high priority on obtaining data reasonably necessary to process claims for discounts and implement Novartis's 340B obligations.

12.    In addition, the claims-data requirement is necessary for Novartis to better implement the statutory prohibition on duplicate discounts.  Covered entities and their contract pharmacies mostly use opaque, retroactive methods to claim 340B pricing, including the "replenishment model."  These practices impede identification and elimination of unlawful duplication of discounts.

13.    The replenishment model works like this:

a.    The pharmacy purchases, at commercial prices, a pre-set amount of a drug. The pharmacy places the drug in common inventory—that is, the pharmacy

maintains no distinction between "340B" drugs and other drugs on the pharmacy shelf.

b.      Over time, the pharmacy dispenses drugs from common inventory whenever a patient arrives at the pharmacy counter with a prescription. The pharmacy does so without regard to whether the person is a patient of the covered entity or whether the prescription is 340B-eligible.

c.      A third-party administrator gathers claims data from both covered entities and contract pharmacies to analyze prior dispenses to assess which of them it thinks *could* have been 340B-eligible. That call is made through an opaque algorithm that drug manufacturers never see. And the third-party administrator is incentivized to "find" 340B eligibility as often as possible because it (like contract pharmacies) gets paid based on the number of "matches" it reports.

d.      When the third-party administrator purports to identify enough 340B-eligible transactions, the covered entity orders "replenishment" units of the drug at the 340B price.

e.      The pharmacy places the replenishment drug purchased at the 340B price in its common inventory, to be dispensed to the next patient who walks in the door (whether a patient of the covered entity or not, and whether eligible to receive a 340B drug or not). And the cycle begins all over again.

14.      In short, this "replenishment" model—like all retroactive pricing models—is based on an accounting trick. The upshot is that 340B drugs are dispensed without regard to 340B eligibility. A unit may receive 340B pricing based on the identification of a previously dispensed

PAGE 4 – MCCRUDDEN DECLARATION

drug—often one dispensed long ago—as ostensibly 340B-eligible. But a pharmacy that receives 340B-priced drugs does not treat that inventory as belonging to the 340B Program, and it routinely acquires the same drugs at commercial prices irrespective of the 340B Program. As a logical outgrowth of retroactive pricing models, drugs purchased at 340B prices are not necessarily dispensed to patients of covered entities, nor does a covered entity necessarily maintain title to them.[1] Patients, for their part, almost always pay whatever price their insurance ordinarily requires, without regard to whether their prescription was the trigger for 340B eligibility. Retroactive pricing models treat 340B status like a virtual baton that is passed from unit to unit, depending on whatever narrative suits covered entities' needs at a given moment. In this world, there is no such thing as a singular "340B drug" for all purposes.

15.    The prevailing use of retroactive pricing models prevents manufacturers from receiving timely—if any—information about covered entities' claims to 340B eligibility on particular units of drugs. Covered entities may take weeks or months to claim a retroactive entitlement to 340B discounts—and even then, they typically do not share with manufacturers *which* transactions they have identified as 340B-eligible or *why* the covered entity believes the transaction was 340B-eligible before (or after) demanding 340B pricing.

16.    I understand that Oregon has enacted legislation purporting to impose state-law obligations on manufacturers that have placed certain limitations on the recognition of contract-pharmacy arrangements. I further understand that Oregon's law requires Novartis to recognize an

---

[1] *E.g.*, 340B Contract Pharmacy Services Agreement – ReCept Pharmacy at 5, § 3.2 (Dallas Cnty. Comm'rs Ct.) ("County shall purchase 340B Drugs through a written contract with the Supplier and shall hold title to such drugs from the time the Supplier fills the order from ReCept [(the contract pharmacy)] made on behalf of the County until the time that ReCept takes delivery of the drugs."), https://bit.ly/4gDGvbq; *see also* Pharmacy Services Agreement Between the County of Monterey and CVS Pharmacy, Inc. at 9, https://bit.ly/3Dhg9xo.

unlimited number of contract-pharmacy arrangements with respect to covered entities in the state, and it prohibits Novartis from requiring covered entities to submit basic claims data on 340B utilization at their contract pharmacies.

17.     Because Oregon's law requires Novartis to provide its drugs at steeply discounted 340B prices on transactions that do not fall within the requirements of the federal statute, Novartis will face the threat of millions of dollars lost annually in forced unnecessary discounts as a result of Oregon's law.  Novartis is already beginning to feel financial, operational, and compliance burdens created by Oregon's statute and its potential sweeping application.

18.     Oregon's law also directly regulates wholly out-of-state transactions.  Novartis is not located in Oregon.  Distribution of 340B-eligible drugs from Novartis to individual pharmacies in Oregon necessarily takes place through a complex series of interstate transactions.  Novartis typically enters into nationwide contracts to sell its medicines to wholesalers and distributors at commercial prices.  The wholesalers and distributors then sell to national chain pharmacies before the products are ultimately distributed to and dispensed by an in-state contract pharmacy out of its common inventory.  Upon information and belief, none of Novartis's wholesalers or distributors is located in Oregon.

19.     Under retroactive pricing models, the 340B discount later gets billed back to Novartis through a new transaction chain.  For example, once a contract pharmacy's third-party administrator has purported to identify a certain number of 340B-eligible transactions, it may submit a "replenishment" claim to the wholesaler, and the wholesaler would then arrange for the covered entity to be billed at the 340B price for the relevant number of units (whether or not it ships new product to the contract pharmacy).  The wholesaler requests a refund from the manufacturer, and the manufacturer fulfills its purported 340B pricing obligation by paying the

refund. If Novartis refused to pay such refunds, its wholesalers would be unable to effectuate 340B pricing without losing money on 340B transactions.

20.  The Oregon law also threatens Novartis with significant harm in connection with its prohibition on claims-data requirements. Because the law prohibits Novartis from requiring covered entities to submit basic claims data on 340B transactions, it allows covered entities and contract pharmacies to claim the 340B discount on sales without providing basic detail regarding the unit[s] covered or why they are purportedly eligible for the 340B discount. The prohibition also prevents Novartis from meaningfully guarding against the 340B statute's mandates on duplicate discounts and diversion. And finally, without basic claims data, Novartis cannot enforce 340B compliance against covered entities through the Administrative Dispute Resolution process specifically created by federal law to protect manufacturers' rights under the 340B program. All of this works to irreparably harm Novartis, which will be left with no ability to protect its rights and ensure compliance with the 340B statute.

21.  Oregon's law exposes Novartis to costly enforcement proceedings and severe penalties for noncompliance. Oregon authorizes the state Board of Pharmacy to impose civil fines of up to $5,000 per day for each violation under the act. H.B. 2385 § 2(1). I understand the Oregon law to authorize separate fines for each instance a manufacturer does not honor a request for 340B pricing on drugs dispensed by a contract pharmacy. Such per-sale fines would amount to a staggering loss, and none of these fines appear to be readily recoverable should the Oregon law later be found invalid.

22.  These state punishments, above and beyond those permitted by federal law, make participation in the 340B Program dramatically more onerous for Novartis and other manufacturers. Manufacturers have historically been able to rely on the federal government's

oversight of 340B for uniformity and continuity. Oregon's statute directly threatens that reliance and the balance struck by Congress by imposing greater potential punishment on manufacturers.

23.    Novartis's harm is amplified considering the number of other states that have recently adopted comparable, but differing, statutes. Novartis must contend with a patchwork of inconsistent regimes, all tied to federal 340B participation. The administrative burden is only increasing as Novartis works to distribute pharmaceutical drugs on a nationwide basis while complying with a rapidly growing number of state-specific restrictions.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct.

Shannon McCrudden

Executed on November 20, 2025.

PAGE 8 – MCCRUDDEN DECLARATION